L W/298

#47610

ORIGINAL



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

MAR  8 2011

CLERK, U.S. DISTRICT COURT
By _____
                Deputy

| | | |
|---|---|---|
| EDUCATION LOGISTICS, INC., a Montana corporation, and LOGISTICS MANAGEMENT, INC., a Washington corporation, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| LAIDLAW TRANSIT, INC., a Delaware corporation | § § § | |
| Defendant, | § § | |
| v. | § § | |
| TYLER TECHNOLOGIES, INC., | § § | |
| Respondent. | § | |

3 - 11MC - 0.36 - L

MISC. ACTION NO. _____
(Civil Action No. 07-06-M-DWM
Action pending in: District of Montana,
Missoula Division)

---

**Plaintiffs' Emergency Motion to Compel Document Production with Brief in Support**

---

<u>TABLE OF CONTENTS</u>

**Page**

I.      SUMMARY ...................................................................................................... 1

II.     STATEMENT OF FACTS ................................................................................. 1

    A.  This Motion To Compel Is A Peripheral Proceeding To A Lawsuit Pending In The U.S. District Court For The District Of Montana Captioned *Education Logistics, Inc., et al. v. Laidlaw Transit, Inc.,* Cause No. CV02-183 ................................. 1

    B.  Brief Background Of School Bus Routing Software And The Parties To The Present Dispute .......................................................................................................... 2

        1.  Historically, school bus routes were created by a Bus Route Manager without the aid of optimization tools. ............................................................... 2

        2.  In the late 1970s, Edulog developed school bus routing optimization software that helped school districts reduce their fleet sizes and save money. ...................... 3

        3.  Laidlaw/First Student is the largest school bussing contractor in the United States. ........................................................................................................ 4

        4.  Tyler is a publicly-traded software company that sells Versatrans school bus routing software. ....................................................................................... 5

    C.  In 1992, Edulog And Laidlaw Entered Into A Licensing Agreement That Required Laidlaw To Use Its "Best Efforts" To Promote The Edulog Software ........................ 6

    D.  Edulog's Subpoena To Tyler Seeks Documents Relevant To Liability And Damages Stemming From Laidlaw's Failure To Promote The Edulog Software ...................... 8

        1.  Documents relating to Tyler's relationship with Laidlaw are relevant to Edulog's claim that Laidlaw has failed to promote the Edulog Software. ............... 8

        2.  Edulog's expert needs financial and market data from Tyler to prepare his report. ........................................................................................................ 9

    E.  Tyler Refuses To Comply With Edulog's Validly-Issued Subpoena ......................... 10

    F.  Versatrans Has Previously Disclosed Information Similar To That Being Requested Here ............................................................................................................. 11

    G.  Following Remand From The 9th Circuit Court Of Appeals, The Parties Have Received Only A Narrow Time Window In Which To Complete Their Failure-To-Promote Discovery And Produce Their Expert Reports .............................................. 11

**III.    ARGUMENT AND ANALYSIS** .......................................................................... 12

    **A.  Tyler Asserted Boilerplate Objections That Should Be Overruled In Their Entirety** ........................................................................................................ 13

    **B.  Documents Relating To Tyler's Relationship With Laidlaw Are Relevant To Edulog's Claims That Laidlaw Failed To Use Its Best Efforts To Promote The Edulog Software** ...................................................................................... 14

    **C.  Documents Relating To Tyler's Marketing And Sales Of Bus Routing Software Are Necessary For Edulog's Damage Model** ........................................... 14

    **D.  Tyler Impermissibly Attempts To Tie Its Compliance With The Subpoena To Laidlaw's Discovery Obligations** .................................................................... 16

    **E.  Tyler Fails To Demonstrate That The Requested Documents Are Privileged** ........... 17

    **F.  Edulog Properly Served The Subpoena In Austin And Properly Designated Dallas As The Location Of Production** ..................................................................... 17

**IV.    CONCLUSION** ............................................................................................ 18

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Bridgelux, Inc. v. Cree, Inc.*,
   No. M8-85, 2008 WL 151344 (S.D. N.Y. Jan. 15, 2008)......................................................16

*Centeno Supermarkets v. H.E. Butt Grocery Co.*,
   No. SA-83-CA-72, 1987 WL 42402 (W.D. Tex. Sept. 2, 1987)............................................15

*Dongguk Univ. v. Yale Univ.*,
   270 F.R.D. 70 (D. Conn. 2010)...........................................................................................13

*Education Logistics, Inc. v. Laidlaw Transit, Inc.*,
   309 F.App. 742 (9th Cir. 2010)............................................................................................7

*Enron Corp. Sav. Plan v. Hewitt Assoc., LLC*,
   258 F.R.D. 149 (S.D. Tex. 2009).................................................................................. 13-15

*Ferko v. Nat. Ass'n for Stock Car Auto Racing, Inc.*,
   218 F.R.D. 125 (E.D. Tex. 2003).................................................................................. 14-15

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89 (1981).............................................................................................................13

*Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*,
   No. 09-60351, 2010 WL 3419420 (S.D. Fla. Aug. 27, 2010) .................................................16

*McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*,
   894 F.2d 1482 (5th Cir. 1990)..............................................................................................13

*SEC v. Brady*,
   238 F.R.D. 429 (N.D. Tex. 2006)..................................................................................13, 17

*U.S. v. El Paso Co.*,
   682 F.2d 530 (5th Cir. 1982)...............................................................................................17

### FEDERAL RULES

Fed. R. Civ. P. 26(b)(1)...................................................................................................12-13

Fed. R. Civ. P. 26(c) ...........................................................................................................15

Fed. R. Civ. P. 45...........................................................................................................12, 18

Fed. R. Civ. P. 45(b)(2)(C)......................................................................................................18

# TEXAS RULES

Tex. R. Civ. P. 176.5.........................................................................................................18

Plaintiffs Education Logistics, Inc. and Logistics Management, Inc. (collectively, "Edulog") file this Emergency Motion to Compel Document Production with Brief in Support, and respectfully show the Court as follows:

## I.    SUMMARY

Third-Party Tyler Technologies, Inc. ("Tyler") responded to Edulog's validly-issued subpoena with nonspecific, boilerplate objections that fail to meet the requirements of the Federal Rules of Civil Procedure and refused to produce a single document. The documents sought by Edulog materially relate to its claims in a lawsuit pending in the District of Montana and will be relied upon by its expert, whose report is due April 15, 2011. Edulog respectfully requests that the Court order Tyler to immediately comply with Edulog's subpoena. Based on the urgency with which it needs the requested documents, Edulog requests that the Court shorten the briefing schedule and respectfully requests expedited consideration.

## II.    STATEMENT OF FACTS

**A.    This Motion To Compel Is A Peripheral Proceeding To A Lawsuit Pending In The U.S. District Court For The District Of Montana Captioned *Education Logistics, Inc., et al. v. Laidlaw Transit, Inc.*, Cause No. CV02-183.**

This motion to compel is a peripheral proceeding to a lawsuit pending in the U.S. District Court for the District of Montana captioned *Education Logistics, Inc. v. Laidlaw Transit, Inc.*, Cause No. CV02-183 (the "Montana Action").[1] In the Montana Action, Edulog is suing Laidlaw for breach of contract. One of Edulog's principal claims against Laidlaw is that it failed to use its "best efforts to promote" the Edulog Software as required by a 1992 Agreement between

---

[1]    Declaration of Samuel T. Bull ("Bull Decl.") ¶ 2. [Pl. App. 1].

Edulog and Laidlaw ("failure to promote claim").[2]  The documents sought in Edulog's subpoena

to Tyler relate to this claim.

**B.      Brief Background Of School Bus Routing Software And The Parties To The Present
         Dispute.**

        **1.      Historically, school bus routes were created by a Bus Route Manager without
         the aid of optimization tools.**

Prior to the advent of school bus routing software, school districts relied on school bus

routing managers to create school bus routes to transport students to school.[3]  Typically, this was

done by overlaying a school district map on a cork board and using push pins to identify student

addresses.[4]  Routing managers would then manually create string routes, assigning students to

specific buses.[5]

The task of creating bus routes can be quite complex, because in addition to a thorough

knowledge of the map and travel patterns in the district, the router must satisfy various school

district policy constraints affecting bus routes.[6]  For example, most school districts require that

the to- and from-school travel times for each pupil not exceed a certain amount of time.[7]  In this

vein, a hypothetical Happy Valley School District might decide that the travel time for each of its

pupils must be less than sixty minutes from the moment the pupil is picked up by a school bus to

the moment that pupil arrives at school.[8]  The school bus routing manager must create routes to

insure that each child in the school district arrives at school within the prescribed time.[9]

---

[2]    Bull Decl. Ex. 1, Complaint ¶¶ 17, 22, 24-30;  1992 Agreement § 2.3.3 (Ex. A to the Complaint.).  [Pl. App. 9,
    11-12, 20-21].

[3]    Nguyen Decl. ¶ 3.  [Pl. App. 193].

[4]    *Id.*  [Pl. App. 193-194].

[5]    *Id.*  [Pl. App. 194].

[6]    *Id.* ¶ 4.  [Pl. App. 194].

[7]    *Id.*  [Pl. App. 194].

[8]    *Id.*  [Pl. App. 194].

[9]    *Id.*  [Pl. App. 194].

Generally, the cost of bussing students to school is directly related to the number of school buses that a school district uses to transport its students.[10] The more buses a school district uses to transport its students, the more the school district will pay in transportation costs. For example, a private bus contractor often bases its contracts with school districts on a per-bus fee.[11] The fee is typically around $40,000 per bus and it may vary according to the unique attributes and needs of each school district.[12] Because of this, school districts have an incentive to create efficient routes to minimize the number of school buses they rely upon to transport their students to school.[13]

### 2. In the late 1970s, Edulog developed school bus routing optimization software that helped school districts reduce their fleet sizes and save money.

In the 1970s, working out of his basement, Hien Nguyen, the founder and Chief Executive Officer of Edulog, developed a mathematical algorithm and accompanying software that optimized transportation routing efficiency.[14] Over the ensuing decades, this algorithm has been used by school districts, and a slight variation of it by police departments, and fire departments to optimize fleet sizes, travel routes, and response times.[15]

The Edulog Software is geared to school districts and is tailored to allow school districts to reduce the costs of bussing by reducing the number of buses required to transport students to school.[16] Or put another way, the Edulog Software optimizes a school district's bus routes to enable school districts to use fewer buses to transport the students to school while satisfying all

---

[10]  Swendsen Decl. ¶ 9. [Pl. App. 200].

[11]  *Id.* [Pl. App. 200].

[12]  *Id.* [Pl. App. 200].

[13]  *Id.* [Pl. App. 200].

[14]  Nguyen Decl. ¶ 5. [Pl. App. 194].

[15]  *Id.* The public safety software that is used by police departments and fire departments is owned by a separate company that is not a party to this lawsuit. [Pl. App. 194].

[16]  Nguyen Decl. ¶ 6. [Pl. App. 194].

routing constraints that may be required by the district.[17]  In the case of hypothetical Happy Valley School District, by using the Edulog Software to create more efficient school bus routes, the school district might reduce the number of buses needed to transport its students from 50 to 35 and still get the students to school in the same amount of time.[18]  This reduction generates tremendous cost savings to the school district (15 X $40,000 = $600,000), even when taking into account the cost of the software license.[19]  Although license fees vary, the cost of an Edulog Software license to a 50-school bus school district is approximately $25,000.[20]

Because it significantly reduced the bussing costs of school districts, Edulog was very successful at selling licenses directly to school districts from the time of its founding in the late 1970s through the early 1990s.[21]

### 3.   Laidlaw/First Student is the largest school bussing contractor in the United States.

At the time the Montana Action was commenced, Laidlaw was the largest private bus contractor in the United States.[22]  It had contracts with more than 1,000 school boards and districts in North America, and operated a fleet of approximately 41,000 buses.[23]  During the pendency of this suit, Laidlaw was acquired by FirstGroup plc, the largest bus and rail transport operator in the United Kingdom for approximately $3.6 billion.[24]  FirstGroup plc is currently the largest transport operator in the United Kingdom and North America with revenue of over $9.7

---

[17]  *Id.* [Pl. App. 194].
[18]  *Id.* [Pl. App. 194-195].
[19]  *Id.* [Pl. App. 195].
[20]  *Id.* [Pl. App. 195].
[21]  Nguyen Decl. ¶ 7.  [Pl. App. 195].
[22]  Bull Decl., Ex. 2, p. 5.  [Pl. App. 112].
[23]  *Id.*, p. 6.  [Pl. App. 113].
[24]  *Id.*, p. 5.  [Pl. App. 112].

billion per year.[25]   The company operates approximately 62,000 school buses and employs more than 130,000 staff on two continents to transport some 2.5 billion passengers per year.[26]

Private bus contractors like Laidlaw contract with school districts to provide various bussing services.[27]   In many cases, Laidlaw will contract with a school district to provide the full scope of the school district's bussing needs, providing school buses, bus drivers, and coordinating the transportation of all of a school district's students to and from school.[28]   In other cases, Laidlaw will sign a more limited management contract in which it helps manage a school district's fleet.[29]

While Laidlaw's contracts with school districts vary, in many instances, the amount that Laidlaw receives under a contract is directly related to the number of school buses that a school district operates.[30]   In these circumstances, the more school buses that a school district uses, the more money Laidlaw is paid.[31]

### 4.   Tyler is a publicly-traded software company that sells Versatrans school bus routing software.

Tyler is a publicly-traded company that manufactures public sector software and is headquartered in Dallas.[32]   It has approximately 2,000 employees and annual revenue of nearly $300 million.[33]   In 2008 it acquired Versatrans Solutions Inc., one of Edulog's main competitors

---

[25]   Bull Decl., Ex. 3, p. 4.  [Pl. App. 125].
[26]   *Id.*  [Pl. App. 125].
[27]   Swendsen Decl. ¶ 8.  [Pl. App. 200].
[28]   *Id.*  [Pl. App. 200].
[29]   *Id.*  [Pl. App. 200].
[30]   Swendsen Decl. ¶ 10.  [Pl. App. 200].
[31]   *Id.*  [Pl. App. 200].
[32]   Bull Decl. ¶ 6, Ex. 5.  [Pl. App. 2, 135].
[33]   *Id.*  [Pl. App. 136].

in the school bus routing software market.[34]   While Versatrans was previously an independent

company, it is now operated as a division of Tyler.  Tyler's registered agent is in Austin.

**C.    In 1992, Edulog And Laidlaw Entered Into A Licensing Agreement That Required Laidlaw To Use Its "Best Efforts" To Promote The Edulog Software.**

Following Edulog's success through the 1980s and into the early 1990s, Laidlaw

approached Edulog and inquired about the possibility of purchasing Edulog.[35]   While Edulog

declined Laidlaw's overtures, the parties ultimately negotiated a license agreement that allowed

Laidlaw to use the Edulog Software subject to certain conditions.[36]   One of these conditions,

contained in Section 2.3.3 of the 1992 Agreement, was the agreement that Laidlaw would "use

its best efforts to promote the use of the Software and related services" provided by Edulog to its

school district customers and to prospective clients.[37]

Edulog believed that the 1992 Agreement would enable Edulog and Laidlaw to leverage

their strong market positions to expand their client bases.[38]   For Edulog, the 1992 Agreement

promised to provide it with exposure to Laidlaw's existing and prospective customers with the

anticipated promotion by Laidlaw of its software.[39]   Laidlaw, on the other hand, would receive

the benefit of having a license with the industry-best optimization software that it could use to

attract new customers.[40]

From 1992 to 1997, Edulog and Laidlaw had an "exclusive" license agreement.  During

the period of the exclusive license, Laidlaw was barred from entering into licensing agreements

---

[34]   *Id.* ¶ 7, Ex. 6.  [Pl. App. 3, 138].
[35]   Nguyen Decl. ¶ 8.  [Pl. App. 195].
[36]   *Id.*  [Pl. App. 195].
[37]   Bull Decl. Ex. A to Ex. 1, § 2.3.3.  [Pl. App. 20-21].
[38]   Nguyen Decl. ¶ 9.  [Pl. App. 195].
[39]   *Id.*  [Pl. App. 195].
[40]   *Id.*  [Pl. App. 195-196].

with other bus routing software developers (§ 16.1) and Edulog was not allowed to license the Edulog Software to any other school bus contractors (§ 2.2).[41]

Shortly after signing the 1992 Agreement, it became clear that Laidlaw salespeople and junior management were not thrilled with the fees that the 1992 Agreement required Laidlaw to pay when a school district purchased the Edulog Software.[42] For example, pursuant to Sections 4.2 and 4.4 of the 1992 Agreement, Laidlaw has to pay a per-bus royalty to Edulog under certain circumstances.[43] Because of this, while Laidlaw, as a whole, might have incentives to pitch the Edulog Software to increase the overall number of school districts with which it contracts, Laidlaw sales personnel frequently had a counter-incentive to avoid use of the Edulog Software, lest the royalty fees and other fees that might be due under the 1992 Agreement cut into their own bottom lines.[44]

In 1997, Laidlaw declined to renew the exclusive license and the license converted to a non-exclusive license, paving the way for Laidlaw to enter into licensing agreements with other software providers.[45] Since 1997, Laidlaw has entered into licensing agreements with several other school bus routing software developers, including Versatrans, GeoSpatial Technologies, and others.[46]

Despite the end of exclusivity, Section 2.3.3's "best efforts" provision requiring Laidlaw to promote the Edulog Software remains in effect.[47] Edulog believes that Laidlaw has been systematically breaching this obligation by, among other things, actively promoting Edulog's

---

[41] Bull Decl., Ex. A to Ex. 1, § 2.2. [Pl. App. 19].
[42] Nguyen Decl. ¶ 11. [Pl. App. 196].
[43] Bull Decl., Ex. A to Ex. 1. [Pl. App. 24-25].
[44] Swendsen Decl. ¶ 11. [Pl. App. 200].
[45] Bull Decl., Ex. A to Ex. 1, § 2.1 and 2.2. [Pl. App. 19].
[46] Swendsen Decl. ¶ 12. [Pl. App. 201].
[47] *See Education Logistics, Inc. v. Laidlaw Transit, Inc.*, 309 F.App. 742, 742 (9th Cir. 2010) ("Interpreting the agreement as a matter of law, we conclude the promotion duty survives the exclusive license period."). Bull Decl., Ex. 7. [Pl. App. 139-141].

competitors including Tyler/VersaTrans, at Edulog's expense for purposes of avoiding payment of royalty and other fees to Edulog.

**D.    Edulog's Subpoena To Tyler Seeks Documents Relevant To Liability And Damages Stemming From Laidlaw's Failure To Promote The Edulog Software.**

In its subpoena to Tyler, Edulog seeks the production of two principal categories of documents: (1) documents related to Tyler's relationship with Laidlaw/First Student (request nos. 1-7); and (2) documents relating to Tyler's sales and market position (request nos. 5-13).[48]

**1.    Documents relating to Tyler's relationship with Laidlaw are relevant to Edulog's claim that Laidlaw has failed to promote the Edulog Software.**

Laidlaw's relationship with Tyler and its promotion of Tyler's Versatrans software is central to Edulog's failure to promote claim in the Montana Action.  Versatrans is Edulog's most significant competitor among Laidlaw school district customers.[49]

Laidlaw acknowledges that school districts frequently rely on Laidlaw to recommend specific routing software, such as Versatrans:

Q.    And just so I'm making sure I understand.  Does the Laidlaw branch usually suggest to the school district we think you should use, for example, Versatrans on this project.

A.    Yes.

Q.    <u>Do you know if school districts usually take the advice of the Laidlaw branch with respect to what software to use?</u>

A.    <u>Generally, yes.</u>  And also sometimes the school district gives their preference and the contract manager or the local management will abide by their request.[50]

Edulog expects that the communications and contracts exchanged between Laidlaw and Versatrans are directly relevant to whether Laidlaw has been promoting Versatrans at the

---

[48]    Some of the requests related to both categories.  Bull Decl., Ex. 8.  [Pl. App. 148-150].

[49]    Bull Decl., Ex. 10.  (O'Halloran Dep. 91:22-24, "Q.  After Edulog, what is the second most-used software?  A. Versatrans.")  [Pl. App. 175].

[50]    Bull Decl., Ex. 10.  (O'Halloran Dep. 93:1-12.)  (Emphasis added.)  [Pl. App. 176].

expense of Edulog.[51]   Edulog expects these documents to show that Laidlaw was working hand-in-hand with Versatrans to pitch Versatrans at the expense of Edulog, that Laidlaw was otherwise actively promoting Versatrans software, and that Laidlaw was denigrating the Edulog Software.[52]   In this vein, Edulog already has information that immediately after the end of the 1992 Agreement's exclusive period, Laidlaw purchased a substantial number of Versatrans licenses and has encouraged several school districts to purchase Versatrans instead of Edulog Software.[53]

> **2.     Edulog's expert needs financial and market data from Tyler to prepare his report.**

Edulog's damages expert, Alan C. Hess, intends to prepare a market analysis of the school bus routing software market to show what damages, if any, Laidlaw's failure to promote the Edulog Software has had on Edulog Software sales and market share.[54]

In order to construct this market analysis, Dr. Hess needs financial and sales data from the top routing software developers in the market, as well as any other routing software providers that Laidlaw actively promoted at the expense of Edulog.[55]   To this end, Edulog has subpoenaed documents from Tyler (Versatrans), Transfinder, and Trapeze, the most significant bus routing software developers.[56]   Edulog has also subpoenaed documents from GeoSpatial Technologies, a software developer with whom Laidlaw briefly entered into an exclusive agreement in the mid-2000s.[57]

---

[51]   Nguyen Decl. ¶. 13.  [Pl. App. 196].
[52]   *Id.*  [Pl. App. 196].
[53]   Swendsen Decl. ¶ 13.  [Pl. App. 201].
[54]   Declaration of Alan C. Hess ¶ 3.  [Pl. App. 203].
[55]   Hess Decl. ¶¶ 4-5.  [Pl. App. 203-204].
[56]   Bull Decl. ¶ 14.  [Pl. App. 4].
[57]   *Id.*  [Pl. App. 4].

Dr. Hess is seeking data from three major time periods: (a) prior to the 1992 Agreement; (b) the period during which the exclusive license was in place (1992-1997); and (c) after the exclusive license period.  He needs data from these distinct time periods to determine what impact, if any, the 1992 Agreement had on Edulog Software sales.[58]

The financial and sales records requested are intended to facilitate Dr. Hess's attempt to perform his market analysis.[59]

### E.      Tyler Refuses To Comply With Edulog's Validly-Issued Subpoena.

By letter dated February 14, 2011, Edulog's attorney notified Tyler that it would be serving a subpoena duces tecum.[60]  The letter included a copy of the subpoena, as well as a copy of the protective order previously entered in the Montana Action.[61]   Because Tyler had previously expressed concerns as to the confidentiality of the documents being sought, Edulog's attorney enclosed a copy of the protective order in the Montana Action and offered to stipulate to similar protections for Tyler.[62]

Edulog formally served Tyler Technologies with the subpoena duces tecum on February 18, 2011.[63]   Tyler responded to the subpoena with a February 28, 2011, letter asserting boilerplate objections and refusing to produce a single document.[64]  Edulog's attorney discussed Tyler's response with its attorney, who refused to withdraw Tyler's objections and maintained that Tyler would not be producing a single document. [65]

---

[58]   Hess Decl. ¶ 4.  [Pl. App. 203].
[59]   Hess Decl. ¶¶ 4-5.  [Pl. App. 203-204].
[60]   Bull Decl. ¶ 9, Ex. 8.  [Pl. App. 3, 51-52].
[61]   *Id.* [Pl. App. 151-162].
[62]   *Id.* Ex. 8.  [Pl. App. 151-162].
[63]   Bull Decl. ¶ 10.  [Pl. App. 3].
[64]   *Id.*, Ex. 9.  [Pl. App. 163-171].
[65]   *Id.* ¶ 10.  [Pl. App. 3].

**F.     Versatrans Has Previously Disclosed Information Similar To That Being Requested Here.**

While Tyler has generally asserted that its financial information is confidential and trade secret protected, it has disclosed similar information in the past to news sources.  For example in a February 5, 2007 article in The Business Review, Versatrans disclosed that:

> VersaTrans ended 2006 with sales of $7.1 million and added 131 new clients for a total of 1,260 school districts.  In 2005, it reported $5.6 million in sales, up from $5 million the previous year.  The company now has had six consecutive record-breaking quarters.[66]

**G.     Following Remand From The 9th Circuit Court Of Appeals, The Parties Have Received Only A Narrow Time Window In Which To Complete Their Failure-To-Promote Discovery And Produce Their Expert Reports.**

Edulog requests an expedited ruling on its motion in light of the extremely limited time period in which it has to conduct discovery and complete its expert report in the Montana Action.  Discovery was re-opened on Edulog's failure-to-promote claim on January 14, 2011.[67]  The deadline for Edulog to file failure-to-promote related expert reports is April 15, 2011.[68]  Prior to that time, Edulog will need to collect the necessary market data and liability data sought in its subpoenas to Tyler and other routing software providers, after which its expert will need to process the various data received and draft his expert report.  Because of this limited time window, it is important that the parties resolve the current impasse over Edulog's subpoena to Versatrans as expeditiously as possible.

To date, Edulog has been diligent in seeking discovery relating to its failure to promote claim.  In the Montana Action, prior to the 9th Circuit's ruling that Laidlaw's duty to promote

---

[66]   Notably, the import of the article in which Versatrans disclosed sales figures was that Versatrans and another routing software developer, Transfinder, had "helped topple Education Logistics Inc. ... from its No. 1 spot." *Id.* Bull Decl., Ex. 12. [Pl. App. 4].

[67]   Discovery was re-opened following the 9th Circuit's reversal of the trial court's dismissal of Edulog's failure-to-promote claim.  Prior to the 9th Circuit's reversal, Laidlaw has refused to respond to discovery relating to Edulog's failure-to-promote claim and the trial court had entered a protective order precluding Edulog from propounding failure-to-promote claim discovery.  Because of the 9th Circuit's reversal, discovery was re-opened for this claim, and a new expert disclosure deadline was set. Bull Decl., Ex. 13.

[68]   *Id.* [Pl. App. 181-183].

continued under the 1992 Agreement, the Montana trial court had entered a protective order precluding Edulog from seeking failure-to-promote claim discovery. In fact, any time that Laidlaw's counsel believed that discovery might somehow relate to the failure to promote claim, they were quick to object.[69]

After the case was remanded, Edulog moved to re-open discovery. The Court granted this motion on January 14, 2011. Edulog served discovery on Laidlaw on January 18, 2011 and immediately started to prepare subpoenas to be issued to other software vendors, such as Tyler. Since January 14, the Montana Action has been very busy as both parties have been exchanging discovery (though Laidlaw still refuses to produce substantive responses to specific failure-to-promote claim discovery) and Laidlaw has re-filed summary judgment motions. While, by agreement of the parties, Laidlaw's substantive answers are due on March 8, 2011, a review of its objections to Edulog's failure-to-promote discovery makes it clear that Edulog will also likely need to request assistance from the Montana trial court to compel Laidlaw to meet its discovery obligations.[70]

## III.    ARGUMENT AND ANALYSIS

Federal Rule of Civil Procedure 26(b)(1) allows parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."[71] Rule 45 provides the procedure for obtaining such discovery from nonparties.[72] "Relevancy is broadly construed, and a request for discovery should be considered relevant if there is *any possibility* that the

---

[69] *See* Exhibit 10, O'Halloran Dep. 93:13-14, "Sam, you are not trying to go into the best efforts issue, are you?" Bull Decl. ¶ 16. [Pl. App. 5, 176].

[70] *See, e.g.*, Laidlaw's responses to Interrogatory Nos. 5, 6, and 7, and RFP Nos. 2, 3, 4, 5, and 8. Bull Decl. ¶ 17, Ex. 14. [Pl. App. 5-6, 166-167].

[71] FED. R. CIV. P. 26(b)(1).

[72] FED. R. CIV. P. 45.

information sought may be relevant to the claim or defense of any party."[73]   As the party opposing discovery, Tyler bears the burden of proving that good cause exists to deny the discovery sought, which it must do with a "particular and specific demonstration of fact."[74] Tyler must show specifically how each document request is overly broad, burdensome, or oppressive.[75]

## A.   Tyler Asserted Boilerplate Objections That Should Be Overruled In Their Entirety.

Tyler's response to Edulog's subpoena amounts to no more than a word processing copy job reciting stock objections with no effort to explain their supposed application.  But "broad-based, non-specific objections are almost impossible to assess on their merits, and fall woefully short of the burden that must be borne by a party making an objection."[76]  For example, Tyler asserted that every single request was unduly burdensome.  These objections fail because Tyler has not proven, by affidavit or other evidentiary proof, that the time and expense required to produce responsive documents outweigh the benefits to Edulog in obtaining relevant discovery.[77] Because Tyler falls short of its burden to show specifically how each of its objections apply, its objections should be overruled in their entirety.

---

[73]  *Enron Corp. Sav. Plan v. Hewitt Assoc., LLC*, 258 F.R.D. 149, 159 (S.D. Tex. 2009) (emphasis added); *see also* FED. R. CIV. P. 26(b)(1)("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."); *Ferko v. Nat. Ass'n for Stock Car Auto Racing, Inc.*, 218 F.R.D. 125, 132 (E.D. Tex. 2003) ("Courts construe discovery rules liberally to serve the purposes of discovery:  providing parties with information essential to the proper litigation of all relevant facts, eliminating surprise, and promoting settlement.").

[74]  *Dongguk Univ. v. Yale Univ.*, 270 F.R.D. 70, 74 (D. Conn. 2010) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 (1981)); *Enron Corp. Sav. Plan*, 258 F.R.D. at 159 ("The party resisting discovery bears the burden to clarify and explain its objections and to *provide* support for those objections.").  Tyler cannot satisfy its burden of resisting discovery through conclusory statements.  *See Dongguk Univ., id.*

[75]  *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990).

[76]  *SEC v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006).

[77]  *See Enron Corp. Sav. Plan*, 258 F.R.D. at 159.

**B.    Documents Relating To Tyler's Relationship With Laidlaw Are Relevant To Edulog's Claims That Laidlaw Failed To Use Its Best Efforts To Promote The Edulog Software.**

Document request numbers one through seven in Exhibit A to Edulog's subpoena to Tyler relate to its relationship with Laidlaw and the impact of that relationship on proposals made by Versatrans to school districts. As noted above, Laidlaw has significant influence over its school district customers' choice of school bus routing software. As also noted above, Laidlaw owed Edulog a duty to promote its software to its school district customers. Edulog expects that documents responsive to request numbers one through seven will show that Laidlaw and Tyler worked together to promote Versatrans at the expense of Edulog and that Versatrans was extremely successful in reaching licensing agreements with those school districts to which Laidlaw promoted Versatrans. In other words, Edulog anticipates that the requested documents will show that Laidlaw breached its duty to promote Edulog's software.

**C.    Documents Relating To Tyler's Marketing And Sales Of Bus Routing Software Are Necessary For Edulog's Damage Model.**

As discussed above, Edulog seeks Tyler's marketing and sales data to allow its expert to create a damage model.[78]  Tyler resists producing such information on the basis that it is a competitor of Edulog. But that does not bar Edulog's discovery. If that were the case, discovery would be unduly limited in a vast array of cases. In *Ferko v. National Association for Stock Car Auto Racing, Inc.*, the United States District Court for the Eastern District of Texas compelled a racetrack to provide information on its revenues and profits from stock car races to its competitor.[79]  The plaintiff sought such information to prove how much it would have made on hosting an additional stock car race but for NASCAR awarding the race to the competitor.[80]  The

---

[78]    See Request Nos. 5-13.  [Pl. App. 166-170].
[79]    *Ferko*, 218 F.R.D. at 137.
[80]    *Id.*

court explained that "where, as here, the damages alleged are lost profits from a NASCAR race that never occurred, profits and revenues at other NASCAR races that did occur is pertinent information."[81]

In this case, like in *Ferko*, Edulog seeks marketing and sales information of a competitor to prove how much it would have made had Laidlaw not breached its duty to Edulog by promoting Edulog's competitor. The requested documents reach back to 1987 in some cases to allow Dr. Hess to demonstrate what the market looked like before, during and after the 1992 Agreement's exclusive period. By comparing the relative performance of Edulog and its competitors over these periods, it is anticipated that Dr. Hess will be able to quantify the effect of Laidlaw's failure to promote.

Among Tyler's list of objections is the complaint that documents related to its business are its "trade secret information or other confidential research, development, or commercial information."[82] But, as discussed above, Tyler has previously disclosed information related to its profits and revenues. Further, Rule 26(c) allows the Court to enter an order requiring that confidential information be revealed only in a specified way. The Protective Order proposed by Edulog's attorneys, which applies to confidential documents produced by Edulog and Laidlaw, permits the designation of documents as "Confidential" or "Attorneys' Eyes Only Information."[83] As Edulog's counsel informed Tyler's counsel, Edulog is willing to agree that the protections of the Protective Order apply equally to Tyler. To that end, Tyler is free to

---

[81]   *Id. See also Centeno Supermarkets v. H.E. Butt Grocery Co.*, No. SA-83-CA-72, 1987 WL 42402 (W.D. Tex. Sept. 2, 1987) (compelling disclosure of competitor pricing information that pre-dated alleged anticompetitive conduct to show changes in producing party's pricing strategy).

[82]   Tyler asserted this version of its confidentiality objection to Request Nos. 5-13. It used another variation in response to Request Nos. 1-4, which pertain to documents and communications with Laidlaw. Tyler fails to explain how documents exchanged with Laidlaw might be confidential.

[83]   Protective Order, at ¶2, 5. [Pl. App. 153-162].

designate documents as "Attorneys' Eyes Only Information," thereby limiting their disclosure to Edulog's counsel and experts.

**D.    Tyler Impermissibly Attempts To Tie Its Compliance With The Subpoena To Laidlaw's Discovery Obligations.**

Edulog requested certain contracts, communications and related documents pertaining to Tyler's relationship with Laidlaw.[84]    During a telephone conference with Edulog's counsel, Tyler's counsel explained that because Edulog had tendered similar requests to Laidlaw, Tyler should not have to go through the process of responding to the subpoena.    But the fact that similar requests have been made to Laidlaw does not excuse Tyler's duty in responding to a federal subpoena.

Federal district courts have rejected the notion that a request for documents to a party excuses another party or third party from responding to a similar request.    In *Bridgelux, Inc. v. Cree, Inc.*, the United States District Court for the Southern District of New York ordered a third-party investor to produce documents concerning the defendant's business relationship with its manufacturer and certain design documents.[85]    The court reasoned that the third party's documents may not be identical to the defendant's, that individual employees of the third party "may have made notes upon such documents or comments on them in internal memoranda," and that the third party may have retained relevant documents that the defendant no longer possesses or has not produced.[86]    Similarly, in *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, the United States District Court for the Southern District of Florida stated that "the fact that the defendant in the case has already produced voluminous documents to the plaintiff. . . would not

---

[84]    See Request Nos. 1-4.  [Pl. App. 148-149].

[85]    No. M8-85, 2008 WL 151344 (S.D. N.Y. Jan. 15, 2008).

[86]    *Id.*

relieve [the third party] from its obligation to respond to a properly issued subpoena duces tecum."[87]

In any event, Laidlaw has not produced documents that Edulog now seeks from Tyler.

**E.  Tyler Fails To Demonstrate That The Requested Documents Are Privileged.**

The Fifth Circuit has "made clear that the attorney-client privilege may not be tossed as a blanket over an undifferentiated group of documents. . .[but] must be specifically asserted with respect to similar documents."[88]  Rather, Tyler

> must show that all of the following conditions have been met: (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of a bar of a court, or his subordinate and (b) in connection with this communication was acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of serving primarily either (i) an opinion on law or (ii) legal service or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been claimed and not waived by the client.[89]

Tyler summarily objects that all but three requests seek privileged documents.  On their face, many of the requests seek documents that were exchanged with third parties, suggesting that no privilege existed or that it has been waived through disclosure.

**F.  Edulog Properly Served The Subpoena In Austin And Properly Designated Dallas As The Location Of Production.**

Tyler's response to Edulog's subpoena also takes issue with the location of service and the location of production.  Tyler complains that the subpoena was impermissibly served in Austin, which is more than 100 miles from the place of production in Dallas (Tyler's headquarters).  Tyler's complaint is unfounded.  Rule 45(b)(2)(C) allows a subpoena to be served at any place "within the state of the issuing court if a state statute or court rule allows service at that place of a subpoena issued by a state court of general jurisdiction sitting in the place

---

[87]  2010 WL 3419420 No. 09-60351 (S.D. Fla. Aug. 27, 2010).

[88]  *U.S. v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982).

[89]  *Brady*, 238 F.R.D. at 438.

Respectfully submitted,

Stephen C. Schoettmer
State Bar No. 16551420

Kim McCrea
State Bar No. 24041434

THOMPSON & KNIGHT L.L.P.
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Phone: (214) 969-1700
Fax:    (214) 969-1751

**ATTORNEYS FOR PLAINTIFF**
**EDUCATION LOGISTICS, INC.**

### CERTIFICATE OF CONFERENCE

Counsel for movant and counsel for respondent have personally conducted a conference at which there was a substantive discussion of every item presented to the Court in this motion and despite best efforts the counsel have not been able to revolve those matters presented.

Certified on the 8TH day of March, 2011 by

Kim McCrea

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel by hand delivery on March 8, 2011.

Kim McCrea