7) removal of North American board costs and central overheads.

These savings will enable FirstGroup to drive margin improvements in both Laidlaw and FirstGroup's existing US businesses. FirstGroup should also be able to benefit from significant tax losses and other tax attributes within Laidlaw to reduce the amount of cash tax payable by the combined business.

The potential savings described above are expected to make the Acquisition earnings enhancing in the first full financial year of ownership.

The integration of Laidlaw into FirstGroup's existing business will be overseen by Dean Finch, Group Finance Director. David Leeder, Director of International Development and Marketing, will assume responsibility for Greyhound.

The cash consideration for the Acquisition, including the refinancing of Laidlaw's existing debt, is approximately $3.6 billion (£1.9 billion). This will be financed through new committed bank debt facilities of $3.75 billion (£2.0 billion) and equity issues of approximately £375 million, including the £200 million placing announced separately today. More details of the financing structure are given in paragraph 6 below.

The combined FirstGroup and Laidlaw will have strong cashflows and FirstGroup has designed the financing structure to enhance shareholder value through an efficient use of its balance sheet to minimise the amount of equity to be issued to finance the Acquisition, whilst maintaining a prudent overall capital structure consistent with investment grade status. The strong cashflows from the combined business should enable FirstGroup to rapidly reduce debt levels over the next few years.

4.     Details of the Acquisition

Under the terms of the Acquisition Agreement, FirstGroup has agreed to acquire Laidlaw by way of a merger of Fern Acquisition Vehicle Corporation (a newly incorporated Delaware Corporation and a wholly-owned subsidiary of FirstGroup) with and into Laidlaw (as a result of which each issued and outstanding share of common stock of Laidlaw will be converted into a right to receive $35.25 in cash). Pursuant to such merger, on completion of the Acquisition, Laidlaw will become one of the Company's wholly-owned subsidiaries.

Based on the total issued and outstanding share capital of Laidlaw at the date of this announcement of 81.7 million ordinary shares, including the cashing out of Laidlaw option holders, the total consideration payable by FirstGroup to Laidlaw shareholders will be approximately $2.9 billion.

The Acquisition Agreement contains various representations and warranties customary for a US acquisition of the size and nature of the Acquisition. The representations and warranties from Laidlaw to FirstGroup cover, amongst other things, the organisation and capital of Laidlaw and its subsidiaries, the due and valid execution of the Acquisition Agreement and the absence of certain events and liabilities which could be expected to have a material adverse effect on Laidlaw's financial condition or business or on Laidlaw's ability to consummate the transaction. The

9

representations and warranties from FirstGroup to Laidlaw cover, amongst other things, the due and valid execution of the Acquisition Agreement.

The Acquisition Agreement is conditional upon, amongst other things: (i) the waiting period applicable to the consummation of the Acquisition under the Hart-Scott-Rodino ('HSR') Act having expired, been terminated or been waived and approval having been obtained under the Competition Act (Canada), (ii) the approval of the Acquisition Agreement and the transactions contemplated thereby by Laidlaw shareholders at a special shareholder meeting of Laidlaw; and (iii) the approval of the Acquisition Agreement and the transactions contemplated thereby by FirstGroup shareholders at a general meeting of FirstGroup (the "EGM"). Although the Board is confident that the regulatory conditions referred to above will be satisfied, there can be no assurance as to the timing or outcome of the HSR or other necessary clearance processes or that such clearances will not be subject to conditions, including the giving of certain undertakings (for example, as to divestments) by FirstGroup.

Either FirstGroup or Laidlaw may terminate the Acquisition Agreement if, amongst other things, the merger has not been consummated on or before 8 August 2007; provided that either FirstGroup or Laidlaw may unilaterally extend such date for up to three months if completion of the Acquisition is prevented only by the requirement to obtain the necessary competition clearances.

The Board currently expects that completion of the Acquisition will take place later this year.

Further details of the principal terms and conditions of the Acquisition Agreement will be set out in a circular to be sent to FirstGroup shareholders seeking approval of the Acquisition and giving notice of the EGM (the "Circular").

5.   **Break fees**

The Acquisition Agreement provides for the payment of certain fees and expenses by FirstGroup and Laidlaw to each other in certain circumstances in the event that the Acquisition should not be completed.

Laidlaw has agreed to pay to FirstGroup a break fee of up to $78 million in certain circumstances. FirstGroup has agreed to pay Laidlaw a break fee of up to $43.35 million in certain circumstances.

Further details of these arrangements will be set out in the Circular.

6.   **Financing of the Transaction**

The cash consideration for the Acquisition, including the refinancing of Laidlaw's existing debt, is expected to be approximately $3.6 billion (£1.9 billion). This will be financed through new committed bank facilities of $3.75 billion (£2.0 billion) and equity issues of approximately £375 million, including the £200 million placing announced separately today. In addition FirstGroup expects to replace certain letters of credit and other facilities of Laidlaw.

10

The equity financing of approximately £375 million is expected to comprise the placing announced separately today of approximately £200 million and a further equity issue of approximately £175 million shortly after completion of the Acquisition. The full amount of the equity required has been underwritten pursuant to a standby equity underwriting agreement and to the extent that any such equity has not been issued prior to completion, the funds to complete the Acquisition will be available through a subordinated equity bridge facility of $750 million.

### a) Committed Debt Facilities and Standby Underwriting

The committed bank debt facilities comprise the following facilities entered into today by FirstGroup:

- a senior loan facility (the "Senior Facility") comprising two tranches (a term facility and a revolving credit facility) in an aggregate amount of $3.75 billion entered into with HSBC Bank plc, J.P. Morgan Chase Bank, N.A. and The Royal Bank of Scotland plc; and

- a subordinated equity bridge facility (the "Equity Bridge Facility") in an amount of $750 million entered into with J.P. Morgan Chase Bank, N.A..

The Equity Bridge Facility will be reduced by the amount of any equity issue effected by FirstGroup, including the placing. To the extent that any part of the Equity Bridge Facility is drawn down at completion of the Acquisition, FirstGroup intends to refinance it through an equity issue shortly after completion. FirstGroup has entered into a standby equity underwriting agreement (the "Standby Equity Underwriting Agreement") with JPMorgan Cazenove and J.P. Morgan Securities Limited ("JPMSL") (JPMorgan Cazenove together with JPMSL, the "Underwriters"). The Standby Equity Underwriting Agreement includes an undertaking from FirstGroup to refinance the Equity Bridge Facility by means of an equity offering as soon as reasonably practicable following the consummation of the Acquisition. Although the price at which any new ordinary shares of FirstGroup are to be issued will be determined by FirstGroup and the Underwriters at the time of issue, the Standby Equity Underwriting Agreement nevertheless includes a commitment from the Underwriters to underwrite any such issue at a price not to be less than the nominal value of each new ordinary share. The parties further undertake to cooperate in the negotiation of the underwriting arrangements relating to any specific offering.

Further details of the Senior Facility, the Equity Bridge Facility and the Standby Underwriting Agreement will be set out in the Circular.

### b) Placing of new Ordinary Shares

FirstGroup has today also announced a bookbuilt, non pre-emptive placing (the "Placing") of up to 39,527,477 new ordinary shares (the "Placing Shares") to raise approximately £200 million. The Placing is not conditional on the completion of the Acquisition. The Placing Shares are being placed, subject to the terms and conditions of a placing agreement entered into today between FirstGroup, JPMorgan Cazenove, JPMSL and UBS, at a price (the "Placing Price") to be agreed by JPMorgan Cazenove, JPMSL and FirstGroup at the close of the bookbuilding process. The Placing

11

Shares will represent a maximum of approximately 9.99 per cent. of FirstGroup's current issued share capital.

If the Acquisition does not complete, FirstGroup will use the monies raised in the Placing for potential investment opportunities in Continental Europe, or general corporate purposes in the UK and US.

7.    **Current trading and prospects**

*a) FirstGroup*

Commenting on the interim results announced on the 8 November 2006, FirstGroup's Chief Executive, Moir Lockhead said:

"I believe the Group is well placed for continued growth during the second half of the year. The Group's clear strategy is to increase shareholder value by profitably growing our core businesses and developing opportunities in new markets. The Board remains confident of the Group's future prospects and ability to generate strong cash flows and is committed to dividend growth of 10 per cent. per annum, for the foreseeable future at least until 2008, and where appropriate share repurchases while maintaining a strong balance sheet. Trading in the second half of the year has started well and is in line with our expectations."

*b) The Enlarged Group*

The Board believes that, following completion of the Acquisition, the enlarged group will be well placed to continue to develop its leading position in the large, fragmented North American transport market. The Board has confidence in the financial and trading prospects of the enlarged group for the current and next financial years, much of which will be spent in integrating and assimilating Laidlaw and FirstGroup's North American operations and on the delivery of synergies, to realise the cost savings and operational benefits outlined above.

8.    **Shareholder circular and outline timetable**

FirstGroup intends to despatch the Circular to FirstGroup shareholders giving full details of the Acquisition, and including notice of the EGM, in March. The Board expects separate meetings of FirstGroup shareholders and Laidlaw shareholders to take place during April with completion of the Acquisition, subject to satisfaction of the conditions outlined above, expected later this year.

This announcement assumes throughout an $:£ exchange rate of 1.90.

**ENQUIRIES:**

| FirstGroup | | |
|---|---|---|
| Moir Lockhead, Chief Executive | Tel: | +44 (0) 207 291 0505 |
| Dean Finch, Finance Director | Tel: | +44 (0) 207 291 0512 |
| Rachael Borthwick, Corporate Communications Director | Tel: | +44 (0) 207 291 0508 |

12

119

| | | |
|---|---|---|
| **JPMorgan Cazenove** | Tel: | +44 (0) 207 588 2828 |
| *(Financial advisers & broker to FirstGroup)* | | |
| Ian Hannam | | |
| Malcolm Moir | | |
| Edward Banks | | |
| | | |
| **Tricorn Partners** | Tel: | +44 (0) 207 823 0888 |
| *(Financial advisers to FirstGroup)* | | |
| Justin Dowley | | |
| | | |
| **UBS** | | |
| *(Broker to FirstGroup)* | | |
| Robert Jennings | Tel: | +44 (0) 20 7568 2809 |
| Christopher Smith | Tel: | +44 (0) 20 7568 4389 |
| | | |
| **Brunswick** | Tel: | +44 (0) 207 404 5959 |
| *(PR for FirstGroup)* | | |
| Giles Croot | | |
| Craig Breheny | | |
| | | |
| **Laidlaw** | Tel: | +1 630 848 3120 |
| Kevin Benson, Chief Executive Officer | | |
| Sarah Lewensohn, Director, Investor Relations | | |
| | | |
| **Morgan Stanley** | | |
| *(Financial advisers to Laidlaw)* | | |
| William Strong | Tel: | +1 312 706 4400 |
| Frank Oelerich | Tel: | +1 312 706 4444 |

JPMorgan Cazenove Limited ("JPMorgan Cazenove"), which is authorised and regulated in the United Kingdom by the Financial Services Authority, is acting exclusively as financial adviser and corporate broker for FirstGroup and no one else in connection with the Acquisition and will not be responsible to anyone other than FirstGroup for providing the protections afforded to its clients or for providing advice in relation to the Acquisition or in relation to the contents of this announcement, or for any other transaction, arrangement or matters referred to in this announcement.

Tricorn Partners ("Tricorn"), which is authorised and regulated in the United Kingdom by the Financial Services Authority, is acting exclusively as financial adviser for FirstGroup and no one else in connection with the Acquisition and will not be responsible to anyone other than FirstGroup for providing the protections afforded to its clients or for providing advice in relation to the Acquisition or in relation to the contents of this announcement, or for any other transaction, arrangement or matters referred to in this announcement.

13.

UBS Limited ("UBS") is acting exclusively as corporate broker for FirstGroup and no one else in connection with the Acquisition and will not be responsible to anyone other than FirstGroup for providing the protections afforded to its clients or for providing advice in relation to the Acquisition or in relation to the contents of this announcement, or for any other transaction, arrangement or matters referred to in this announcement.

Morgan Stanley & Co. Inc. ("Morgan Stanley") is acting exclusively as financial adviser to Laidlaw and no one else in connection with the Acquisition and will not be responsible to anyone other than Laidlaw for providing the protections afforded to its clients or for providing advice in relation to the Acquisition or in relation to the contents of this announcement, or for any other transaction, arrangement or matters referred to in this announcement.

Certain statements in this announcement are forward-looking statements. Such statements speak only as at the date of this announcement, are based on current expectations and beliefs and, by their nature, are subject to a number of known and unknown risks and uncertainties that could cause actual results and performance to differ materially from any expected future results or performance expressed or implied by the forward-looking statement. The information contained in this announcement is subject to change without notice and neither FirstGroup, JPMorgan Cazenove, Tricorn, UBS nor Morgan Stanley assumes any responsibility or obligation to update publicly or review any of the forward-looking statements contained herein.

No statement in this announcement is intended to be a profit forecast or to imply that the earnings of FirstGroup for the current year or future years will necessarily match or exceed the historical or published earnings of FirstGroup or Laidlaw.

14

121





**First**
transforming travel

ANNUAL REPORT AND ACCOUNTS 2010

# The leading transport operator in the UK and North America

   

EXHIBIT

**3**

FirstGroup plc is the leading transport operator in the UK and North America with annualised revenues of over £6 billion a year. We employ more than 130,000 staff throughout the UK and North America and transport some 2.5 billion passengers a year.

Our core values of safety and customer service are at the heart of our business and underpin everything we do. There is no higher priority than the safety and security of our passengers and our staff.

**OPERATING AND FINANCIAL REVIEW**

1 Financial highlights
2 Our Group
4 Our markets
8 Delivering our key priorities
10 Chairman's statement
12 Chief Executive's operating review
23 Finance Director's review

**REPORT OF THE DIRECTORS**

28 Board of Directors
30 Corporate governance
38 Directors' remuneration report
44 Directors' report
47 Directors' responsibilities statement

**FINANCIAL STATEMENTS**

48 Consolidated income statement
49 Consolidated statement of comprehensive income
50 Consolidated balance sheet
51 Consolidated statement of changes in equity
52 Consolidated cash flow statement
53 Notes to the consolidated financial statements
97 Independent auditors' report
98 Group financial summary
99 Company balance sheet
100 Notes to the Company financial statements
106 Independent auditors' report
107 Glossary
108 Shareholder information
109 Financial calendar



OPERATING AND FINANCIAL REVIEW

# Financial highlights

| | 2010 | 2009 |
|---|---|---|
| Revenue (£m) | **6,319.3** | 6,187.3 |
| Adjusted EBITDA (£m) | **769.6** | 772.2 |
| Adjusted operating profit[2] (£m) | **453.9** | 497.5 |
| Operating profit (£m) | **368.5** | 371.1 |
| Adjusted profit before tax[2] (£m) | **264.0** | 326.4 |
| Profit before tax (£m) | **179.6** | 200.0 |
| Adjusted basic EPS[2] (pence) | **39.5** | 48.6 |
| Basic EPS (pence) | **27.5** | 30.2 |
| Proposed final dividend per share (pence) | **14.0** | 12.7 |
| Net debt[3] (£m) | **2,281.5** | 2,503.5 |

1 Adjusted operating profit plus depreciation
2 Before amortisation charges, hedge ineffectiveness on financial derivatives, non-recurring bid costs, other non-recurring items and loss/profit on disposal of properties
3 Net debt is stated excluding accrued interest



FirstGroup  Annual Report and Accounts 2010      1

124

# Our Group

FirstGroup plc is the leading transport operator in the UK and North America with revenues of over £6 billion a year. We employ more than 130,000 staff throughout the UK and North America and transport some 2.5 billion passengers a year.



## NORTH AMERICA CONTRACT BUSINESS

We are the leading provider of transportation services in North America. First Student is the largest provider of student transport with a fleet of approximately 60,000 yellow school buses operating every day across the US and Canada.

First Transit is one of the largest private sector providers of transit management and contracting, managing public transport systems on behalf of Transit Authorities. We are one of the largest providers of airport shuttle bus services in the US and also manage call centres, paratransit operations and other light transit activities.

First Services is the largest private sector provider of vehicle maintenance and ancillary support services in the US.



## GREYHOUND

Greyhound is the only national provider of scheduled intercity coach transportation services in the US and Canada. Greyhound provides scheduled passenger services to 3,800 destinations throughout North America carrying some 20 million passengers annually.

We also operate BoltBus, a network of low cost, high quality intercity coach services linking city-pairs within the North East corridor of the US.

We have three operating subsidiaries in the US: Valley Transit Company (Texas-Mexico border), Crucero USA (southern California and Arizona into Mexico) and Americanos USA (Mexico from Texas and New Mexico). Greyhound PackageXpress provides package delivery services to thousands of destinations in North America.



## UK BUS

We are the largest bus operator in the UK with a fleet of 8,500 buses and a market share of approximately 23%. We carry approximately 3 million passengers every day.

The majority of our operations are in urban areas where the bus is the most effective means of tackling traffic congestion. We are working with local authorities and other stakeholders to provide punctual and reliable services for our customers and we continue to develop and promote effective partnerships.

We also operate Greyhound UK providing regular intercity coach services on three routes between London and Bournemouth, Portsmouth and Southampton.



## UK RAIL

Our UK Rail division operates passenger and freight services in the UK. We have a strong balanced portfolio of intercity, regional and commuter franchises. Passenger rail franchises consist of First Capital Connect, First Great Western, First ScotRail and First TransPennine Express and one open access operator First Hull Trains.

We also operate rail freight services through First GBRf and operate the London Tramlink network on behalf of Transport for London carrying 28 million passengers annually.

We are the UK's largest rail operator carrying over 280 million passengers a year.



**Revenue** £2,333.7m   **Operating profit** £233.9m   **Employees** 87,000

**Where we operate**
- First Student
- First Transit
- First Services
- First Canada

Find out more on page 13
▸ www.firstgroup.com/north_america

**Revenue** £603.3m   **Operating profit** £23.9m   **Employees** 8,000

**Where we operate**
- Greyhound network in the US
- Greyhound network in Canada
- Affiliated carriers in Mexico

Find out more on page 15
▸ www.greyhound.com or www.greyhound.ca

**Revenue** £1,170.6m   **Operating profit** £124.6m   **Employees** 25,000

**Where we operate**
- UK Bus operations

Find out more on page 16
▸ www.firstgroup.com/ukbus

**Revenue** £2,188.4m   **Operating profit** £92.6m   **Employees** 13,000

**Where we operate**
- First Capital Connect
- First Great Western
- First Hull Trains
- First ScotRail
- First TransPennine Express
- First GBRf operates rail freight services throughout the UK

Find out more on page 18
▸ www.firstgroup.com/uktrain

FirstGroup Annual Report and Accounts 2010    3

# Our markets

Our businesses in the UK and North America operate in local markets with different commercial and regulatory features. This overview illustrates the markets in which we operate, their scale and characteristics together with our position in each one.

Our position in the local bus and rail markets in the UK and in the student transportation, transit, vehicle services and intercity coach markets in the US and Canada provides us with unrivalled knowledge and experience of the many different commercial and regulatory frameworks in place and also puts us at the forefront in developing new and future opportunities.

Our portfolio of businesses is diversified by geography and customer base and structured in to four main operating divisions: UK Bus, UK Rail, North America contract businesses (Student transportation, Transit and Services) and Greyhound. We also have small bus operations in Germany and Ireland and are joint venture partners in rail operations in Denmark and Sweden.

Our strength lies in our diversity. The Group has a balanced portfolio of operations providing a mix of contract-backed and passenger revenues. During these challenging economic times this mix of operations has provided strength and resilience against a fast changing trading backdrop.

## UK BUS

Local bus services in the UK operate on two very different models. Outside London the market is deregulated and within London the market is regulated and competitively tendered.

**The market**
**Outside London**
Local bus services in the UK, outside London, were deregulated in the mid-1980s. The market is highly competitive between commercial bus operators – large and small – and between the bus and the private car. Revenue principally comes directly from fare paying passengers and indirectly from reimbursement by local authorities for concessionary passengers. Bus operators take revenue risk and cost risk.

Bus markets are local and are affected by local issues from demographics to politics to topography. Local bus services operate on a flexible model with bus operators setting fares, frequencies and routes on a commercial basis to meet customer demand and also running "socially necessary" local bus services under contract to local authorities.

**London**
Bus services in London are operated on behalf of Transport for London (TfL). Contracts are gross cost and typically five years in length. TfL specifies fares, routes, timetables and vehicles, takes the revenue risk and pays operators for running services with a bonus and penalty regime linked to service quality.

**Our market share**
‣ We are the UK's largest bus operator
‣ We operate one in five of all local bus services
‣ Our operations are diversified by geography – 40 major towns and cities – and by customer and journey purpose
‣ We operate a modern fleet at half life
‣ We also operate Greyhound intercity coach services in the UK

Approximate market share

 **23%**

Approximate passengers we carry per day

 **3 million**

**Market features**
‣ High customer satisfaction
‣ Investment in new vehicles
‣ Innovation in ticketing, marketing and information

**Changes in market during 2009/10**
‣ Lower passenger revenue growth as a result of economic weakness and higher unemployment
‣ Mileage reduced in response to fall in passenger demand
‣ OFT report and Competition Commission investigation in to local bus services in the UK
‣ Local Transport Act provisions enacted
‣ Passenger Focus became statutory watchdog

## UK RAIL

The operation of passenger rail services in the UK is mainly competitively tendered and also includes a limited number of open access companies.

### The market
Privatised in the mid-1990s the UK rail market is a competitive environment between transport operators for the award of passenger rail franchises (contracts with the Department for Transport – and other franchising authorities – for the provision of services) and between rail services and other modes of transport.

Revenue comes directly from fare paying passengers or from franchising authorities. Train operators share revenue risk with franchising authorities – this is referred to as revenue support or revenue share – but bear cost risk. Franchises are net cost contracts of variable length – often seven years plus a possible three year extension if performance targets are met.

Rail markets vary but are often grouped into three sectors – London and South East commuter services, regional and long distance. Some passenger rail franchises pay a premium to the franchising authority while others receive a subsidy. In some franchises the premium increases (or subsidy decreases) over the duration of the franchise and in some franchises the level of premium or subsidy is constant.

Operators are responsible for the day to day management of train services and while many elements of the service provided to passengers are mandated as part of the contract, other features are left to the commercial judgment of operators.

### Our market share
▶ We are the UK's largest rail operator
▶ Our operations are diversified by sector and by customer and journey purpose
▶ We operate First Hull Trains, an open access passenger rail service, and First GBRf, a rail freight operator
▶ Through our joint venture with Danish State Railways we operate passenger rail services in Denmark and Sweden

**Approximate market share**



## 23%

**Approximate passengers we carry per year**

## 280 million

### Market features
▶ Growing passenger numbers
▶ Increasing customer satisfaction
▶ Investment in new rolling stock
▶ Innovation in customer service

### Changes in market during 2009/10
▶ Lower passenger revenue growth as a result of economic weakness and higher unemployment
▶ Start of Control Period 4, Network Rail's access charging regime
▶ DfT publication of the 'Future of Franchising' consultation paper
▶ Refranchising of Essex Thameside, Greater Anglia and InterCity East Coast franchises
▶ Publication of new High Speed line proposals

OUR MARKETS CONTINUED

# SCHOOL BUSES IN NORTH AMERICA

**The market**
Yellow school buses provide home to school transportation to millions of students across the US and Canada. There are over 15,000 school districts in North America responsible for providing approximately 534,000 school buses each day.

In total, the North American market is estimated to be worth $22 billion per annum. However, only around 30% of school districts have outsourced their operations – approximately 183,000 school buses – to the private sector. The private outsourced sector market is highly fragmented with only ten operators running more than 1,000 buses.

School districts provide transportation for students depending on varying criteria determined at State level and contracts are typically awarded for three to five years. School districts receive funding for their activities including school transportation primarily from State and local sources, including property taxes.

**Our market share**
▸ We are the largest private sector operator of school buses in North America – more than four times bigger than the next largest competitor
▸ We operate approximately 60,000 yellow school buses – with an average fleet age of 6.5 years
▸ We operate in 42 States in the US and eight Provinces in Canada
▸ We have more than 1,800 different contracts in 650 locations
▸ We consistently retain over 90% of our contracts that come up for renewal
▸ We provide charter hire services for school and non-school activities
▸ Our scale enables us to develop value added services for existing and potential customers to provide greater on demand information and operating efficiencies


Approximate share of total market


Approximate students we carry per day

## 6 million

**Market features**
▸ Contracted revenue
▸ Safety and security is a priority
▸ Trusted operator in the local community
▸ Innovation and investment in technology

**Changes in market during 2009/10**
▸ Unprecedented pressure on public spending budgets as a result of economic weakness
▸ Reduction in school and non-school charter services as a result of recession

# NORTH AMERICA INTERCITY COACH

**The market**
Greyhound is the only national provider of scheduled intercity coach transportation in the US and Canada. Intercity coach transportation competes with many other modes of mid to long distance travel and Greyhound serves a diverse, value-oriented customer base by offering scheduled passenger services with an unrivalled network and route coverage. The majority of revenue is generated from passenger services but Greyhound also provides package express services, charter services and, in many terminals, food services.

In 2008 Greyhound launched BoltBus, a low cost, premium coach operation in the North East of the US. The region is the most dense travel corridor in the country and is a highly competitive intercity coach market. BoltBus operates between key city pair destinations such as New York and Boston and attracts a different customer demographic to Greyhound with yield managed fares, online reservation and a package of features including free wireless internet on all buses.

**Our market share**
▸ We are the only national provider of scheduled intercity coach transportation services in the US and Canada
▸ We carry approximately 20 million passengers per annum
▸ We have a fleet of approximately 2,200 vehicles with an average fleet age of 9.9 years


Approximate passengers we carry per year

## 20 million

**Market features**
▸ Passenger revenues
▸ Highly flexible operating model – ability to match services to changing passenger demand, particularly in the US
▸ Value for money
▸ Main reason for travel is to see family and friends

**Changes in market during 2009/10**
▸ Reduced passenger revenues as a result of weaker economy and increased unemployment
▸ Mileage reduced in response to falling passenger demand
▸ Agreement with Canadian Provinces to reduce mileage or receive financial support to run certain, low-utilised services in specific areas
▸ New BoltBus destinations launched

129

OPERATING AND FINANCIAL REVIEW

# NORTH AMERICA TRANSIT AND SERVICES

## TRANSIT CONTRACTING AND MANAGEMENT
**The market**

The transit contracting and management services market includes fixed route bus services, paratransit bus services, airport, university and private shuttle services. The North American transit market is estimated to be worth $21 billion per annum with approximately 30% in the private outsourced sector. It is a fragmented market with the three largest private sector companies operating less than 35% of the total outsourced market.

Private transportation companies manage, operate, maintain and organise transportation services under contract to customers including Transit Authorities, Departments of Transportation, Federal, State and local agencies, as well as private institutions. The Americans with Disabilities Act requires public authorities operating fixed route transit to provide complementary paratransit services for eligible citizens. Contracts are typically for three to five years.

**Our market share**
▶ We operate 226 locations in 46 US States, Puerto Rico and five Canadian Provinces and Territories
▶ We operate and manage 10,800 buses
▶ Our strategy is to grow in the light transit market
▶ We are one of the largest providers of airport shuttle services in the US

## VEHICLE MAINTENANCE AND SUPPORT SERVICES
**The market**

First Vehicle Services is one of a number of companies that provide fleet vehicle maintenance services under contract to private and public sector clients including the Federal Government, cities and Fire and Police Departments. We estimate the vehicle maintenance market to be worth $2.9 billion per annum in total with approximately 38% contracted out to private sector providers.

First Support Services provides operations and maintenance services, including facilities management and warehousing and supply to agencies of Federal, State and local governments as well as to businesses in the private sector.

**Our market share**
▶ We operate over 150 facilities in 33 US States and five international locations
▶ We maintain over 43,000 vehicles
▶ We provide fleet maintenance services for public and private sector customers
▶ We provide support services including logistics support and facilities management to public and private sector clients including the US Navy and Air Force

Approximate share of outsourced transit market



**12%**

Approximate share of outsourced vehicle maintenance market



**12%**

Approximate passengers we carry a year



**300 million**

Number of maintained vehicles



**Over 43,000**

**Market features**
▶ Contracted revenue
▶ High level of customer service and retention
▶ Typically low capital investment

**Changes in market during 2009/10**
▶ Pressure on public spending budgets as a result of economic weakness

FirstGroup  Annual Report and Accounts 2010   7

# Delivering our key priorities

Our strategy is to provide safe, reliable, innovative and sustainable transport services and to deliver long term value for shareholders through profitable growth in our core markets.

There can be no doubt that continued economic uncertainty made 2009/10 a challenging year. Our strategy to build a balanced, diverse portfolio, together with the actions we have taken, has provided resilience in a difficult economic environment.

Our clear strategy to manage the Group through these challenging times enabled us to take swift, decisive action to mitigate the effects of the recession on trading.

## MANAGING OUR COSTS

With our experience and strong track record in cost management and improving operating efficiencies we were able to take prompt action to reduce costs throughout the Group. These actions mitigated the impact of the weaker economy and higher hedged fuel costs, which increased by approximately £90m during the year.

At the start of the year we had already devised and implemented comprehensive plans to reduce costs throughout the UK and North America. Throughout the year we continued to bear down on costs, reducing overheads and increasing operating efficiencies. As a result of the relentless focus and drive throughout the business we have exceeded our original cost reduction target and achieved annual savings of £228m.

## MAXIMISING THE FLEXIBILITY IN OUR BUSINESSES

In those areas of our business that are dependent on passenger revenues we responded quickly to the challenges presented by the recession and the adverse impact on passenger volumes. As well as rigorous cost control we focused on network management and targeted mileage reduction which protected revenue per mile, while ensuring that we retained the capability to restore service levels when demand returns.

In UK Bus we reduced mileage, primarily through service frequency adjustments while remaining focused on operating performance and customer service. At Greyhound where, as we anticipated, passenger revenues were adversely impacted as a result of the weak economic environment and increased unemployment, we were able to maximise the highly flexible operating model. With approximately 60% of the cost base being variable we were able to manage service provision on a route by route basis to match any changing demand.

## STRENGTHENING OUR FINANCIAL POSITION – REDUCING NET DEBT

Net debt reduction is a key priority for the Group. Despite the challenging trading environment we were pleased to increase net cash generation during the year which was used to reduce net debt. We are confident of further opportunities to increase net cash generation within the Group to accelerate our deleveraging plans.

Our robust financial position was strengthened during the year as we made further progress in executing our strategy to extend the maturity profile of the Group's debt and reduce reliance on bank finance. The Group's recent bond issues in the capital markets attracted strong support from fixed income investors and demonstrated the continued confidence in the underlying strength and resilience of the Group.

## DELIVERING PROFITABLE GROWTH

As we expected, the continued economic weakness presented a number of challenges during the year. The Group delivered a resilient performance with overall trading in line with management expectations. In this tough trading environment we exceeded our cash target for the year and expect to return to earnings growth in 2010/11.

The Board is confident in the underlying strength of the businesses which, combined with the many actions we have taken to mitigate the adverse effects of recession, will ensure the Group continues to trade robustly through the economic cycle and deliver long term value for shareholders.

OPERATING AND FINANCIAL REVIEW

## KEY PERFORMANCE INDICATORS

The Group's management use a wide range of financial and non-financial key performance indicators to assess our performance during the year.



**Reduction in Lost Time Injuries**

# 18%

We are committed to a targeted reduction in workplace accidents across the Group and this year achieved an 18% reduction in Lost Time Injuries.

**Contract retention in North America**

# >90%

Contract retention in both First Student and First Transit remained strong during the year at over 90%.

**Exhibit 2-11**

132





Searc

Register | Login



**WATCH US EMPOWER**

Home    Solutions & Products    News & Events    About Us    Client Support    Investors    Careers    Contact Us

**ABOUT US**

Why Tyler
Our Leadership
Success Stories
Speaking From Experience
Corporate History
Technology Partners
Awards and Accolades
Office Locations

Home > About Us

## About Us

*Our passion is empowering our clients.*

From financial management and property taxes to courts and education, we create, deliver and support software solutions and services that make it easier for local governments and schools to manage their complex, day-to-day business functions. We have a unique vantage point due to our singular focus on serving the public sector with a broad product portfolio.

From the courtroom to the classroom, Tyler's products serve as the backbone for core business functions in the public sector. We are dedicated to helping our local government and school clients streamline the many aspects of their financial management, court case, property tax, public safety, citizen services, public records and education systems.

However, our commitment goes well beyond delivering solutions that work for our public sector clients. It's about consistently delivering value for employees and shareholders as well.

Our deep industry knowledge comes from our staff — many of whom held public sector positions prior to joining Tyler. They understand what clients want and need to operate more efficiently because they've been there. They transfer their subject matter expertise to new employees who in turn become experts themselves, eventually passing it along to others.

With this knowledge and experience — along with focused innovation and an earnest commitment to our clients — we are positioned better than anyone to anticipate and address the changing technology needs of the public sector.

Solutions &

Client Supp

News & Ev

About Us

Investors

Careers

Contact Us

Privacy Statement | T
©2011 Tyler Technologies, Inc. | All Rig

133

**EXHIBIT**
**4**

http://www.tylertech.com/about-us

3/6/2011



Home    Solutions & Products    News & Events    About Us    Client Support    Investors    Careers    Contact Us



**RELATED**

Versatrans Product Suite
Information Warehouse
Transportation
Route Creation & Planning
Telematic GPS
GPS Vehicle Location
Field Trip Scheduling
Fleet Management
Online Information Portal

**SERVICES**

Consulting
GIS
Implementation
Support
Training Options

Home > Solutions & Products > Products > Versatrans Product Suite

## Versatrans Product Suite — School Transportation Software that Empowers

*Plan and manage your ever-changing transportation needs.*

Smart planning yields smart results, and at Tyler, we are here to help you achieve both with our powerful Versatrans solutions. From streamlining your transportation needs to establishing your districts' boundaries and plans, Versatrans can help you create greater efficiencies throughout your operations.

School districts are looking for ways to improve efficiencies, cut costs, provide more service and comply with government regulations. Tyler's Versatrans solutions are proven to reduce costs and enhance efficiencies.

**Student Transportation Management Solutions**
While tighter budgets are forcing many districts to re-evaluate spending, at Tyler, we understand that there's simply no value that can be placed on the safety and well-being of your students. That's why our Versatrans product suite is designed to help you efficiently and cost-effectively manage your day-to-day transportation needs—with the flexibility to plan for your long-term needs.

Our Versatrans student transportation management solutions help you manage tasks, including efficient route building, field trip scheduling, fleet maintenance management, GPS data collection, retrieve and utilization as well as 'what-if' scenarios to assist in planning for the future. With Versatrans, you can safely transport students and staff to and from their educational programs on time and on budget.

**School Boundary and District Planning**
School populations are changing dramatically around the country. Now more than ever, superintendents and school administrators need a smart solution for school planning and redistricting. Versatrans simplifies this complex process, enabling you to streamline and share information with essential parties—from school boards and planning committees to community leaders. Featuring robust automation tools, Versatrans can easily analyze your most important data, such as student populations, building capacities and enrollment boundaries. With Versatrans, you have everything you need to plan for today—and prepare for tomorrow.

Success S

Meetings &

Request In

**Speaking from Experience**

Melissa Belec
Marketing Communications
Program Specialist

I have worked in the trenche
I understand the challenges
transportation clients face o
basis.

**Contact Us**
versatrans.info@tylerte
1-800-433-5530

Privacy Statement  |  T
©2011 Tyler Technologies, Inc. | All Rig

134



# Bloomberg Law®

## Company Report

### TYLER TECHNOLOGIES INC

5949 Sherry Lane
Suite 1400
Dallas, TX 75225
United States
www.tylertechnologies.com
1-972-713-3700
*Generated 03/07/2011*

## Table of Contents

Company Overview ............................................... 1
Issuer Credit Ratings ........................................... 2
Historical Price, Volume, and Earnings Data ........ 3
Federal Litigation Analytics ................................. 4
Most Recent Litigation ......................................... 8
Company Management .......................................... 9
Financial Results ................................................ 16
Debt and Equity Offerings .................................. 22
Holdings ............................................................. 23
Company Hierarchy ............................................ 26
Corporate Actions .............................................. 27
Most Recent Filings ............................................ 28
Recent Company News ........................................ 30



www.bloomberglaw.com  © 2011  Bloomberg Finance L.P. All rights reserved.

135



EXHIBIT
5

# Company Overview

## DESCRIPTION

Tyler Technologies, Inc. provides end-to-end information management solutions and services for local governments. The Company's client base includes local government offices throughout the United States, Canada, Puerto Rico, and the United Kingdom.

## QUICK-PROFILE

| | |
|---|---|
| Country of Incorporation | United States |
| State of Incorporation | Delaware |
| Fiscal Year End | December |
| Website | www.tylertechnologies.com |
| Employees | 2,054 |
| Transfer Agent | BNY Mellon Shareowner Svc |
| Auditor | ERNST & YOUNG |
| Primary Exchange | New York |
| Industry Sector | Technology |
| Group | Software |
| Sub-Group | Enterprise Software/Serv |
| SIC Code | 3678 |
| SIC Name | ELECTRON PARTS |
| Equity Float | 24.25 Million |
| Institutional Ownership | 30.5 Million |
| Brokers | 4 (BUY) 2 (HOLD) 0 (SELL) |
| Last Closing Price | 23.03 USD 03/04/11 |
| Market Capitalization | 726.7 Million USD |
| 52-Week High | 23.07 USD 03/07/11 |
| 52-Week Low | 13.61 USD 07/20/10 |
| Shares Outstanding | 32 Million shares |
| Last Dividend | 0.00 |
| Cash Flow from Operations | 35.35 Million USD |
| Cash and Near Cash Items | 7.3 Million USD |

# Financial Results

*All financials are in millions of USD; annual data is shown for 2007 to 2010*

**OVERVIEW**

| | | | | |
|---|---|---|---|---|
| | 20,101,232.00 | 20,091,232.00 | 20,081,232.00 | 20,071,232.00 |
| | | | | |
| | | | | |
| | 41.84 | 44.78 | 28.09 | 26.78 |
| | | | | |
| | 25.05 | 27.01 | 14.86 | 17.50 |
| | | | | |
| | 0.74 | 0.82 | 0.66 | 0.45 |
| | | | | |
| | 0.71 | 0.78 | 0.64 | 0.42 |
| | | | | |
| | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | |
| | 140,519.97 | 143,848.36 | 136,650.00 | 135,082.81 |
| | | | | |
| | | | | |
| | 98.45 | 109.89 | 97.22 | 131.06 |
| | | | | |
| | 264.03 | 270.57 | 251.76 | 241.51 |
| | | | | |
| | 32.41 | 7.06 | 8.03 | 7.72 |
| | | | | |
| | 106.97 | 134.36 | 114.26 | 137.21 |
| | | | | |
| | 2.22 | 2.79 | 2.37 | 2.85 |
| | | | | |
| | 40.51 | 49.64 | 45.39 | 55.81 |
| | | | | |
| | | | | |
| | 35.35 | 42.94 | 47.80 | 34.11 |
| | | | | |
| | -34.24 | -21.35 | -46.13 | -7.41 |
| | | | | |
| | 30.42 | 30.59 | 27.66 | 30.43 |

www.bloomberglaw.com  © 2011  Bloomberg Finance L.P. All rights reserved.



This Was Printed From The Business Review

# VersaTrans acquired by Tyler Technologies in Dallas

**The Business Review**

Date: Monday, February 4, 2008, 5:05pm EST - Last Modified: Monday, February 4, 2008, 5:23pm EST

**Related:**

Technology, Commercial Real Estate

VersaTrans Solutions Inc., a Latham company that makes bus-routing software, has been acquired by Tyler Technologies Inc., a public company in Dallas.

Tyler (NYSE: TYL) also acquired a second software company, Olympia Computing Co., based in Tumwater, Wash. Tyler said the two companies were acquired for a combined $16 million.

The two companies had a combined revenue of $13 million in 2007. VersaTrans reported having $9.1 million in revenue in 2007.

Olympia makes software related to the reporting of student information. It is used by 16,000 educators across the country. VersaTrans makes bus-routing software for 1,300 public school districts.

Tyler said the two acquisitions were designed to broaden its customer base in the K-12 market. Tyler makes products related to financial management and student information.

VersaTrans CEO Doug Hamlin said being acquired by Tyler was an exciting development for the company and its clients because Tyler shares VersaTrans' vision and values.

VersaTrans Solutions Inc., a Latham company that makes bus-routing software, has been acquired by Tyler Technologies Inc., a public company in Dallas.

Tyler (NYSE: TYL) also acquired a second software company, Olympia Computing Co., based in Tumwater, Wash. Tyler said the two companies were acquired for a combined $16 million.

The two companies had a combined revenue of $13 million in 2007. VersaTrans reported having $9.1 million in revenue in 2007.

Olympia makes software related to the reporting of student information. It is used by 16,000 educators across the country. VersaTrans makes bus-routing software for 1,300 public school districts.

Tyler said the two acquisitions were designed to broaden its customer base in the K-12 market. Tyler makes products related to financial management and student information.

VersaTrans CEO Doug Hamlin said being acquired by Tyler was an exciting development for the company and its clients because Tyler shares VersaTrans' vision and values.

**EXHIBIT**

**6**

tabbies'

138



Page 1

390 Fed.Appx. 742, 2010 WL 3005986 (C.A.9 (Mont.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 390 Fed.Appx. 742, 2010 WL 3005986 (C.A.9 (Mont.)))**

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Ninth Circuit Rule 36-3. (Find CTA9 Rule 36-3)

United States Court of Appeals,
Ninth Circuit.
EDUCATION LOGISTICS, INC., a Montana corporation; Logistics Management, Inc., a Washington corporation, Plaintiffs-Appellants,
v.
LAIDLAW TRANSIT, INC., a Delaware corporation, Defendant-Appellee.

No. 09-35601.
Argued and Submitted June 7, 2010.
Filed Aug. 2, 2010.

**Background:** Licensor of software for student bus transportation services brought action against licensee, alleging breach of contract. The United States District Court for the District of Montana, Donald W. Molloy, J., granted summary judgment in favor of licensee. Licensor appealed.

**Holdings:** The Court of Appeals held that:
(1) duties to promote and facilitate each other's businesses, as set forth in parties' contract, survived the termination of the exclusive license, and
(2) fact issues barred summary judgment.

Affirmed in part, reversed in part, and remanded.

Hall, Circuit Judge, filed opinion, concurring in part and dissenting in part.

West Headnotes

**[1] Copyrights and Intellectual Property 99 ☞107**

99 Copyrights and Intellectual Property

99II Intellectual Property
99k107 k. Contracts. Most Cited Cases

Under Montana law, software licensor's and licensee's mutual duties to promote and facilitate each other's businesses, as set forth in parties' contract, survived the termination of the exclusive license; contract did not explicitly or implicitly provide that the promotion and facilitation duties applied only to the exclusive license period, and contract provided for perpetual non-exclusive licensing period. MCA 28-3-303, 28-3-307.

**[2] Federal Civil Procedure 170A ☞2493**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2493 k. Copyright, trademark, and unfair competition cases. Most Cited Cases

Genuine issues of material fact as to whether and when breaches of licensing agreement for student bus transportation services software occurred precluded summary judgment, in breach of contract action, under Montana law. MCA 30-2-725(2).

\*742 Ronald A. Bender, Matthew James Cuffe, Esquire, Worden Thane, P.C., Missoula, MT, Samuel Taylor Bull, Esquire, Charles Paul Nomellini, Attorney General, Foster Pepper, PLLC, Seattle, WA, for Plaintiffs-Appellants.

Marcia J. Davenport, Scott Fisk, Crowley, Haughey, Hanson, Toole & Dietrich, Helena, MT, Debra D. Parker, Missoula, MT, for Defendant-Appellee.

Appeal from the United States District Court for the District of Montana, Donald W. Molloy, District Judge, Presiding. D.C. No. 9:07-cv-00006-DWM.

Before: HALL, FERNANDEZ and McKEOWN, Circuit Judges.

MEMORANDUM [FN*]

EXHIBIT
7

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 Fed.Appx. 742, 2010 WL 3005986 (C.A.9 (Mont.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 390 Fed.Appx. 742, 2010 WL 3005986 (C.A.9 (Mont.)))

FN* This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

**1 Education Logistics and Logistics Management, Inc. ("Edulog") appeal from the grant of summary judgment to Laidlaw Transit, Inc. in this action arising from a claimed breach of a 1992 contract ("the *743 Agreement") to license software for routing student bus transportation services. Reviewing *de novo,* we affirm in part, reverse in part, and remand for further proceedings.

[1] The district court concluded that the parties' duty to promote and facilitate each other's business, contained in Section 2.3.3 of the Agreement, did not survive the termination of the exclusive license in 1997. The court based its conclusion primarily on a specific reference within Section 2.2, the exclusive license provision, subjecting it to Section 2.3, and the absence of such a reference in the non-exclusive license provision, Section 2.1. Interpreting the agreement as a matter of law, we conclude the promotion duty survives the exclusive license period. Nothing in Section 2.3.3 explicitly or implicitly provides that the promotion duty applies only to the exclusive license provision; correspondingly, the non-exclusive license provision, Section 2.1, does not provide that it is exempt from the promotion duty provision. *See* Mont.Code Ann. § 28-3-303. When read as a whole, the Agreement does not require a specific reference to another provision in order for that provision to affect obligations within the provision being interpreted. *See* Mont.Code Ann. § 28-3-202.

Further, while Section 2.3 includes the duty to promote under Section 2.3.3, it also contains other duties, for example the "no contact" duty under Section 2.3.2 and the "avoid conflicts" and "prevent breaches by agents" duties under Section 2.3.3. Common sense and a plain reading of the Agreement dictate that these core duties-which are not provided for elsewhere in the Agreement-would continue during the perpetual non-exclusive license period. Consequently, interpreting Section 2.2 to require the termination of the Section 2.3.3 promotion duty would force an unnatural reading of the remainder of Section 2.3. *See* Mont.Code Ann. § 28-3-307. We conclude that summary judgment in favor of Laidlaw is not warranted on the basis articulated by the district

court, namely that the promotion duty claims accrued following the exclusive license period.

Section 23.0 provides that the Agreement "shall be governed by any applicable provisions" of the Montana Uniform Commercial Code ("MUCC") "[e]xcept to the extent that the provisions of this Contract are clearly inconsistent" with that application. We agree with the district court that the MUCC's four-year statute of limitations applies. *See* Mont.Code Ann. § 30-2-725.

The parties' intention that the MUCC governs whenever applicable is clear from the language of the contract alone. *See* Mont.Code Ann. § 28-3-303. Additionally, the MUCC's limitations provision governing contracts for sale serves as a more specific provision than Montana's eight-year limitations provision for contracts generally. *See* Mont.Code Ann. § 1-2-102; 27-2-202; 30-2-7205; *see also, e.g., In re MSR Exploration Ltd.,* 147 B.R. 560, 568 (Bkrtcy.D.Mont.1992). The Section 23.0 language designating the MUCC as governing law is explicit, and does not involve an absurdity. *See* Mont.Code Ann. § 28-3-401; *Ophus v. Fritz,* 301 Mont. 447, 11 P.3d 1192, 1196 (2000). Edulog's claim that a substantive provision offering relief under the MUCC must be identified before the MUCC's statute of limitations provision may be applied is unsupported. Application of the MUCC limitations provision is not "clearly inconsistent" with the provisions of the Agreement, and thus the MUCC four-year statute of limitations applies.

**2 [2] Edulog filed this suit on January 11, 2007. Following summary judgment on the promotion duty, the district court concluded that all of Edulog's remaining claims accrued before January 11, 2003, *744 and granted summary judgment to Laidlaw on statute of limitations grounds. We agree that the record is replete with evidence that a number of alleged breaches of the Agreement occurred well before January 2003. Although discovery is not required to trigger the MUCC limitations period, it bears noting that there is also ample evidence Edulog was aware of these potential breaches long before January 2003. *See* Mont.Code Ann. § 30-2-725(2). However, the district court does not appear to have considered whether new breaches for which Edulog may recover may have occurred within the limitations period. The Agreement is properly character-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 Fed.Appx. 742, 2010 WL 3005986 (C.A.9 (Mont.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 390 Fed.Appx. 742, 2010 WL 3005986 (C.A.9 (Mont.)))

ized as a contract with continuing obligations capable of distinct and separate breaches. *See Minidoka Irrigation Dist. v. Dep't of Interior,* 154 F.3d 924, 926 (9th Cir.1998). For example, Laidlaw's duty to pay royalties arises whenever a "New Bus" enters service. Laidlaw, which has continued to perform under the Agreement, has not demonstrated a total repudiation of the Agreement. Edulog, on the other hand, has submitted evidence raising a genuine issue of material fact whether Laidlaw has engaged in new breaches of the contract since January 11, 2003. Summary judgment was not appropriate for breaches Edulog alleges occurred since that date. *See Sands v. Nestegard,* 198 Mont. 421, 646 P.2d 1189, 1193 (1982). We affirm the grant of summary judgment as to all claims accruing prior to January 11, 2003, including promotion duty claims, and reverse and remand for further proceedings as to claims accruing on or following that date.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED. Each party shall pay its own costs on appeal.**

HALL, J., concurring in part and dissenting in part.

I agree with the majority that the Montana UCC's four-year statute of limitations applies and that the district court improperly granted summary judgment as to breach of contract claims accruing on or after January 11, 2003. I do not agree, however, that Laidlaw's duty to promote and facilitate Edulog's business under Section 2.3.3 of the Agreement survived the expiration of the exclusive license.

Section 2.2 of the Agreement explicitly conditions Laidlaw's exclusive license on the terms of Section 2.3 of the Agreement, which includes the duty to promote Edulog's software. Section 2.1 of the Agreement places no limitations on Laidlaw's perpetual non-exclusive license. If Section 2.3 of the Agreement were to apply to both the non-exclusive license and the exclusive license, there would be no need to include the express limitation in Section 2.2. It seems unlikely that the parties would draft two adjacent provisions, include an express limitation in just one provision, yet intend that that limitation would apply to both provisions. It also seems unlikely that the parties would see the need to expressly cross-reference a duty to promote in the context of a five-year exclusive license but would omit such a reference in the context of creating the same

duty in perpetuity.

**\*3** All of the provisions of Section 2.3 appear compatible only with an exclusive arrangement between Edulog and Laidlaw. Section 2.3.1 refers to "Retention of Rights by LMI During the Currency of *Exclusive* License" and refers only to Section 2.2 of the Agreement. Section 2.3.2 (the "no contact" duty referenced by the majority) provides Laidlaw the exclusive right to market to its own customers and limits Edulog's ability to contact Laidlaw's customers directly. This provision only makes sense if Laidlaw has an exclusive license to market Edulog's software. Once the exclusive license expires, Edulog is **\*745** free to provide its software to competing school bus providers, who in turn would be free to contact Laidlaw's customer base.

The mutual promotion and facilitation duties in Section 2.3.3 itself make little sense if, under the perpetual non-exclusive license, Edulog may freely license its software to Laidlaw's competitors. Section 2.3.3 obligates (1) Edulog and Laidlaw to work together to minimize potential conflicts and define respective markets; (2) Edulog to use its best efforts to promote Laidlaw bus services; (3) Laidlaw to use its best efforts to promote Edulog software; and (4) both parties to ensure that employees and contractors do not contravene the Agreement. Once Edulog begins serving Laidlaw's competitors–who presumably would attempt to infiltrate Laidlaw's market–Edulog loses any real ability to insulate Laidlaw from competition. If Edulog is unable to meaningfully fulfill the obligations set forth in 2.3.3 upon the expiration of the exclusive license, it seems unlikely that the parties would have intended for Laidlaw to actively promote Edulog software in perpetuity.

The most reasonable interpretation of the Agreement is that the duty to promote in Section 2.3.3 only applies for the duration of the exclusive license set forth in Section 2.2. I therefore dissent in part.

C.A.9 (Mont.),2010.
Education Logistics, Inc. v. Laidlaw Transit, Inc.
390 Fed.Appx. 742, 2010 WL 3005986 (C.A.9 (Mont.))

END OF DOCUMENT

141

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 Fed.Appx. 742, 2010 WL 3005986 (C.A.9 (Mont.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 390 Fed.Appx. 742, 2010 WL 3005986 (C.A.9 (Mont.)))**

142

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

*CTH 2/18/11*
*@ 2:45pm*

# UNITED STATES DISTRICT COURT
### for the
#### Northern District of Texas

| | |
|---|---|
| EDUCATION LOGISTICS, INC., ET AL. | ) |
| *Plaintiff* | ) |
| v. | ) |
| LAIDLAW TRANSIT, INC | ) |
| | ) |
| *Defendant* | ) |

Civil Action No.   07-06-M-DWM

(If the action is pending in another district, state where:
District of Montana, Missoula Division   )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Capitol Corporate Services, Inc. as Registered Agent for Tyler Technologies, Inc.
800 Brazos, Suite 400, Austin, Texas  78701

☑ *Production:* YOU ARE COMMANDED to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

See Exhibit A

| Place: ATTN: Stephen C. Schoettmer, Thompson & Knight LLP,  One Arts Plaza, 1722 Rough Street, Suite 1500, Dallas, Texas  75201 | Date and Time: 02/28/2011 10:00 am |
|---|---|

☐ *Inspection of Premises:* YOU ARE COMMANDED to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: 2/14/2011

CLERK OF COURT

OR   *Stephen C Schoettmer*

_____     _____
Signature of Clerk or Deputy Clerk          Attorney's signature

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Plaintiffs   , who issues or requests this subpoena, are:

Samuel T. Bull, FOSTER PEPPER PLLC
1111 Third Avenue, Suite 3400, Seattle, WA  98101
E-mail:  bulls@foster.com   Telephone:  (206) 447-5142

**AFFIDAVIT ATTACHED**

EXHIBIT
8

143

AO 88B  (Rev.  06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   07-06-M-DWM

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* AFFIDAVIT

☐ I returned the subpoena unexecuted because: _____ ATTACHED

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

144

# AFFIDAVIT OF SERVICE

Came to hand on the **18th** day of **February** , 2011, at **2:45** o'clock **pm**. Cause No. **07-06-M-DWM**

Executed at **800 Brazos Street, Suite 400** **Austin, Texas 78701** within the County of **Travis** at **4:15** o'clock **pm** on the **18th** day of **February** , 2011, by delivering to the within named:

**TYLER TECHNOLOGIES, INC.,**
by delivering to its Registered Agent, CAPITOL CORPORATE SERVICES, INC.,
by delivering to its designated agent, TONI OZEN, in person, a true copy of
this Supboena to Produce Documents, having first endorsed upon such copy of
such Supboena the date of delivery.

I am not a party to or interested in the outcome of the suit referenced above. I am authorized by written order to serve citation and other notices. I am not less than eighteen (18) years of age.

Service Fee $

| |
|---|
| EDUCATION LOGISTICS, INC., ET AL . |
| Plaintiff |
| V. |
| LAIDLAW TRANSIT, INC. |
| Defendant |

By: _____

**Tom Kroll   ID# SCH - 3012**
(Authorized Person)

**THOMAS PROCESS**
809 Rio Grande Street
Suite 103
Austin, Texas  78701
(512) 320-8330

## VERIFICATION

STATE OF TEXAS          §
COUNTY OF TRAVIS        §

    BEFORE ME, A NOTARY PUBLIC, on this day personally appeared **Tom Kroll** , known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared that the statements therein contained are true and correct.
    Given under my hand and seal of office this 19th of February , A.D., 2011.

NOTARY PUBLIC, STATE OF TEXAS

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07).

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## EXHIBIT A

VersaTrans Solutions ("VersaTrans"), a division of Tyler Technologies, Inc., shall produce all Documents in its possession, custody or control that are responsive to the requests below.

### DEFINITIONS

1.  "Contract" means any agreement, written or oral.

2.  "Document(s)" means, without limitation and in the broadest sense possible, writings of any kind, including the originals and all non-identical copies, whether different from the originals by reason of notation made on such copies or otherwise, including without limitation all internal and external email, letters, faxes, communications of any nature, reports, opinions, summaries, data compilations, charts, worksheets, spreadsheets, agreements, memoranda, and notes.

If information is on a computer disc, tape, or other memory or storage device, the term "document" means an electronic file in native file format. Please save these electronic files to disc and produce them along with any responsive hard-copy documents. If responsive data is maintained in a computer database that cannot be printed or produced in native format, in your response please describe (a) the types of data catalogued, (b) the software used to store, search, and display the data, and (c) the types of reports that can be produced from the data.

3.  "Edulog" means Education Logistics, Inc.

4.  "Initial Sale" means the first sale made by VersaTrans to a new customer.

5.  "Laidlaw" means Laidlaw Transit, Inc., a Delaware corporation, now known as First Student or FirstGroup America, along with all of its successors in interest, affiliates, subsidiaries, current and former employees, staff members, supervisors, officials, executives, officers, directors, board members, managers, representatives, agents, attorneys, consultants, experts, investigators, accountants, "Laidlaw Planning Solutions" and any other person(s) or entity(ies) directly or indirectly retained by Laidlaw Transit, Inc. or anyone else acting on its behalf or otherwise subject to its control.

-1-

51123531.2

6.    "<u>LMI</u>" means Logistics Management, Inc.

7.    "<u>LPS</u>" means Laidlaw Planning Solutions.

8.    "<u>Person</u>" or "Persons" means a natural person or persons, corporations, partnerships, or any other entity. Conversely, "entity" means entities as well as natural persons.

9.    "<u>Routing software providers</u>" means any provider of routing software, including but not limited to Ecotran, Edgar, EPS, GeoSpatial Technologies, MicroAnalytics, Transfinder, Trapeze, and VersaTrans Solutions.

10.   "<u>VersaTrans</u>" means VersaTrans Solutions, a division of Tyler Technologies, Inc., including its successors and predecessors in interest.

11.   <u>Applicable time frame</u>. Unless otherwise specified, responses to this subpoena should incorporate all available material from January 1, 1987 to present.

12.   <u>Singular/Plural</u>. The use of the singular or plural form of a word should not be construed to exclude any information from any answer or response. The plural should therefore include the singular, and the singular should therefore include the plural, when necessary to prevent such exclusion.

13.   "<u>And</u>" & "<u>Or</u>." The words "and" and "or" should not be interpreted to exclude any information from any answer or response. Both words should be interpreted to mean "and/or" when necessary to prevent such exclusion

## SUBPOENAED DOCUMENTS

1.    All contracts entered into between VersaTrans and Laidlaw including without limitation all drafts of same, and all copies with any hand-written notes thereon.

2.    All documents, including, but not limited to, correspondence, letters, memos, emails, faxes, and hand-delivered notes, exchanged between Laidlaw and any employee or former employee of VersaTrans related to the purchase, provision, installation, or promotion of bus routing software, including those circumstance in which routing software was discussed as part of a larger package.

511123531.2

3.     All documents, including, but not limited to, correspondence, letters, memos, emails, faxes, and hand-delivered notes, exchanged between VersaTrans and any third-party related to the promotion by Laidlaw of VersaTrans services and products.

4.     All sales and/or promotional material provided by VersaTrans to Laidlaw related, even in part, to bus routing software.

5.     All documents reflecting the number of requests for proposals that VersaTrans received from school districts or school bus contractors (such as Laidlaw) in each year from 2003 to present.

6.     All documents reflecting the number of requests for proposals received from school districts or school bus contractors (such as Laidlaw) to which VersaTrans responded in each year from 2003 to present.

7.     All VersaTrans responses to requests for proposals received from school districts, or school bus contractors (such as Laidlaw) from 2003 to present.

8.     All documents reflecting revenue received by VersaTrans relating to the sale of routing software from initial sales to school districts in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.

9.     All documents reflecting revenue received by VersaTrans from annual licensing and/or maintenance fees relating to routing software from each school district in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.

10.    All documents reflecting VersaTrans's aggregate sales of routing software in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.

11.    All documents reflecting the number of salespeople in VersaTrans's sales force in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.

12.    All documents reflecting VersaTrans's market and sales promotion budget in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.

-3-