13.     All documents reflecting the number of sales calls made by VersaTrans on school districts in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.

51123531.2



**FOSTER PEPPER** PLLC

| | |
|---|---|
| Direct Phone | (206) 447-5142 |
| Direct Facsimile | (206) 749-1949 |
| E-Mail | bulls@foster.com |

February 14, 2011

**VIA MESSENGER**
Tyler Technologies, Inc.
5949 Sherry Lane, Suite 1400
Dallas, TX 75225

Re: *Education Logistics, Inc., et al. v. Laidlaw Transit, Inc.*
U.S. District Court for the District of Montana, Missoula Division, Cause No.
CV-07-06-M-DWM

Dear Sir or Madam:

We represent Education Logistics, Inc. and Logistics Management, Inc. (collectively, "Edulog"), plaintiffs in the above-referenced lawsuit. Enclosed is a copy of a Subpoena in a Civil Action to Tyler Technologies, Inc. The subpoena directs you to produce and permit inspection and copying of the requested documents on February 28, 2011 at 10:00 a.m. at ATTN: Stephen C. Schoettmer, Thompson & Knight LLP, One Arts Plaza, 1722 Rough Street, Suite 1500, Dallas TX 75201.

The requested documents relate to Edulog's claim against Laidlaw Transit, Inc. that it has failed to use its best efforts to promote Edulog's routing software as required by Edulog's 1992 agreement with Laidlaw. To understand the impact of Laidlaw's breach of contract on Edulog's sales and Laidlaw's actions in promoting competing software, we are requesting historical financial and sales data from you for the period 1987 to present.

Edulog served a subpoena on Tyler Technologies in this matter in October 2008. In response, Tyler Technologies objected to much of the requested production. Shortly after Tyler Technologies asserted its objections, the Montana court dismissed Edulog's duty to promote claim. As a result, Edulog did not seek to enforce the 2008 subpoena. Now however, Edulog's claim has been reinstated and Edulog is serving this revised subpoena on Tyler Technologies.

Tyler Technologies previous objections generally asserted that the requested material "require[d] disclosure of trade secret or confidential information." A protective order has been entered in this lawsuit and is enclosed with this letter and subpoena. It protects the confidentiality of documents and other information produced in discovery by the parties to this lawsuit. If the documents you produce in response to the subpoena are confidential and you wish to avail yourselves of the protections afforded by the order, please advise us and we will work with you to obtain appropriate protection from the Court.

TEL: 206.447.4400 FAX: 206.447.9700 1111 THIRD AVENUE, SUITE 3400 SEATTLE, WASHINGTON 98101-3299 WWW.FOSTER.COM
51123525.1
SEATTLE WASHINGTON SPOKANE WASHINGTON

151

February 14, 2011
Page 2


       Please contact me with any questions.  Thank you, in advance, for your cooperation and assistance.

                        Very truly yours,

                        Samuel T. Bull

Enclosures
cc:   Chuck Nomellini
      Ronald Bender
      Stephen Schoettmer
      Debra Parker
      James Jordan
      Devon Sharp



**FILED**

AUG 1 8 2008

PATRICK E. DUFFY, CLERK

By_____
DEPUTY CLERK, MISSOULA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| EDUCATION LOGISTICS, INC., a Montana corporation, and LOGISTICS MANAGEMENT, INC., a Washington corporation, | Cause No. CV-07-06-M-DWM |
| Plaintiffs, | PROTECTIVE ORDER |
| -vs- | |
| LAIDLAW TRANSIT, INC., a Delaware corporation, | |
| Defendant. | |

This matter having come before the Court on the stipulation of the parties and it

Protective Order

appearing to the Court that confidential and proprietary information, including both technical and sales related information, relative to the software licensing agreement that is the subject of this lawsuit will be requested, produced and exchanged and good cause appearing;

IT IS HEREBY ORDERED, pursuant to Rule 26(c), F.R.Civ. P.:

1.     All discovery designated Confidential or Attorneys' Eyes Only Information under this Protective Order shall be used solely for the purpose of prosecuting or defending the Proceeding and for no other purpose.

2.     The party producing discovery material containing information that is not publicly available may designate as "Confidential" any information that it in good faith believes embodies confidential information ("Confidential Information"). The producing party may designate Confidential Information by stamping each page of a document containing such Confidential Information with the legend "Confidential." With respect to multi-page documents which contain Confidential Information, the designation may be made by stamping only the first page thereof "Confidential." Inadvertent failure to designate material as Confidential shall not be deemed a waiver of any claim of confidentiality as to such matter, and the same thereafter may be corrected by supplemental written notice.

3.     Confidential Information may be disclosed to or made available by the party receiving such information, only to the following "Qualified Persons" as defined herein. The term "Qualified Persons" means:

(a)     The Court and employees thereof if filed under seal, unless the Court orders otherwise;

Protective Order                                                     Page 2 of 11

(b)     Any party to the Proceeding (including in-house counsel, employees and agents of the parties);

(c)     Outside counsel of record to any party to the Proceeding;

(d)     Court reporters;

(e)     Outside experts, advisors or consultants retained by counsel of record in the Proceeding, but only to the extent reasonably deemed necessary by such counsel of record; provided that such experts, advisors or consultants are not employed by any non-party competitor of the producing party and that prior to disclosure of any Confidential Information, counsel for the party proposing such disclosure shall deliver a copy of this Protective Order to any such expert, advisor or consultant, shall explain the terms of the Protective Order, and such expert, advisor or consultant shall execute a copy of the Confidentiality Agreement in the form of Exhibit A. The expert, advisor, or consultant shall further acknowledge that he or she is subject to the jurisdiction of the Court and to any other court that may obtain jurisdiction. A copy of each such undertaking shall be forwarded to the other parties at the end of the Proceeding or at the time the identity of the expert, advisor or consultant is disclosed. If any expert, advisor or consultant is called to testify, a copy of such person's undertaking will be provided to the other party no later than that time;

(f)     Potential fact witnesses, to the extent reasonably necessary, in connection with their testimony or in preparation thereof, provided that such witness is given a copy of the Protective Order, is advised that he or she is subject to its terms and

Protective Order                                                    Page 3 of 11

conditions and acknowledges the terms thereof by the execution of the Confidentiality Agreement in the form of Exhibit A. The witness shall further acknowledge that he or she is subject to the jurisdiction of the Court and to any other court that may obtain jurisdiction. A copy of such Confidentiality Agreement shall be furnished to the other parties at the end of the Proceeding or the time the identity of the fact witness is disclosed. In the case of actual testimony, the witness shall acknowledge on the record that he or she has read the Stipulated Protective Order and will abide by its terms; and

(g)    Other persons only after notice to all parties and upon order of the Court, or upon prior written consent of the producing party.

4.    The terms counsel, expert, advisor and consultant include their staff who are assigned to and necessary to assist such counsel, expert, advisor or consultant in the preparation of this litigation.

5.    The party producing discovery material containing information that is more highly private than Confidential Information may designate such documents or information for attorneys' eyes only ("Attorneys' Eyes Only Information"). The purpose of the Attorneys' Eyes Only Information designation is to provide a mechanism whereby the parties may produce certain documents containing confidential financial, customer, and/or proprietary information to opposing counsel for use in this Proceeding without those documents and information being made available to the opposing parties themselves, or their agents, except by a further specific agreement of the parties or order of the Court.

6.    The producing party may designate Attorneys' Eyes Only Information by stamping

each page of a document containing such Attorneys' Eyes Only Information with the legend "Attorneys' Eyes Only." With respect to multi-page documents which contain Attorneys' Eyes Only Information, the designation may be made by stamping only the first page thereof "Attorneys' Eyes Only." Inadvertent failure to designate material as Attorneys' Eyes Only shall not be deemed a waiver of any claim of confidentiality as to such matter, and the same thereafter may be corrected by supplemental written notice.

7.    Attorneys' Eyes Only Information may be disclosed to or made available by the party receiving such information only to the following "Qualified Persons for Attorneys' Eyes Only Information" as defined herein. The term "Qualified Persons for Attorneys' Eyes Only Information" means:

(a)    The attorneys of record working on this Proceeding on behalf of any party and any paralegal assistants, stenographic and clerical employees working under the direct supervision of such counsel;

(b)    The Court and the employees thereof, including necessary stenographic and clerical personnel (e.g., court reporters) if filed under seal, unless the Court orders otherwise;

(c)    The parties' outside expert(s) or consultant(s) whom counsel, in good faith, require to provide assistance in the course of this Proceeding; provided that such experts, advisors or consultants are not employed by any competitor of the producing party and that prior to disclosure of any Attorneys' Eyes Only Information, counsel for the party proposing such disclosure shall deliver a copy of this Protective Order to any such expert, advisor or consultant, shall explain the

terms of the Protective Order, and such expert, advisor or consultant shall execute a copy of the Confidentiality Agreement in the form of Exhibit A. A copy of each such undertaking shall be forwarded to the other parties at the end of the Proceeding or at the time the identity of the expert, advisor or consultant is disclosed. If any expert, advisor or consultant is called to testify, a copy of such person's undertaking will be provided to the other party no later than that time;

(d)     In-house counsel for a party who is required to work directly on this Proceeding, with disclosure only to the extent necessary to perform such work and with the restriction that in house counsel may not share the documents or information with his or her client; and

(e)     Any person of whom testimony is taken, if the Attorneys' Eyes Only Information was produced by the party with which the witness is employed, except that such person may only be shown copies of Attorneys' Eyes Only Information during his or her testimony, and may not retain any Attorneys' Eyes Only Information after his or her testimony and further provided that such witness is given a copy of the Protective Order, is advised that he or she is subject to its terms and conditions and acknowledges the terms thereof by the execution of the Confidentiality Agreement in the form of Exhibit A. A copy of such Confidentiality Agreement shall be furnished to the other parties at the end of the Proceeding or the time the identity of the fact witness is disclosed. In the case of actual testimony, the witness shall acknowledge on the record that he or she has read the Stipulated Protective Order and will abide by its terms.

8.     Nothing in this Protective Order shall preclude any party to this Proceeding or their attorneys from disclosing or using, in any manner or for any purpose, any information or documents from the party's own files which the party itself has designated as Confidential or Attorneys' Eyes Only.

9.     All Qualified Persons who have received Confidential and/or Attorneys' Eyes Only Information pursuant hereto shall safeguard such information so as to prevent its disclosure to persons who are not Qualified Persons entitled to see such Confidential and/or Attorneys' Eyes Only Information.

10.     Subject to the Civil Rules and Rules of Evidence, documents containing Confidential and/or Attorneys' Eyes Only Information may be offered into evidence in the Proceeding or as part of any hearing related thereto, only on the following conditions:

(a)     Use as an Exhibit at Trial. Prior to using any Confidential or Attorneys' Eyes Only information as an exhibit at trial, the attorneys for both parties will meet and confer regarding those documents that will be marked for identification as exhibits by the parties. The parties will raise concerns with the sealing of particular exhibits during the pre-trial conference with the Court, in compliance with L. R. 7.4, and the Court will make the ultimate determination of whether a particular document should be submitted under seal at trial. The party who made the confidential designation shall bear the ultimate burden to show that the document is actually confidential regardless of who actually identified the document as an exhibit at trial.

(b)     Use in Any Other Filing. In the event that any party intends to use a

Protective Order                                                                    Page 7 of 11

document designated as Confidential or Attorney's Eyes Only in any Court filing

or pleading, including as an exhibit to a declaration in support of a dispositive

motion, then prior to filing the document, the party offering the document will file

the document under seal and file a motion for leave to rely on a sealed document

pursuant to L.R. 7.4. The filing of a motion under this section is not intended to

be and shall not be deemed to be an admission by the moving party that a

document is confidential; rather, the party who made the confidential designation

shall bear the ultimate burden to show that the document is actually confidential,

and the moving party is not barred from objecting to the designation.

     11.     Any party to the Proceeding to whom Confidential and/or Attorneys' Eyes Only

Information is produced or disclosed may object to the Confidential and/or Attorneys' Eyes Only

designation. The objection shall be made in writing to counsel for the designating party (the

"Notice"). The Notice shall have attached a copy of such designated material or shall identify

each subject document by production number and shall (a) state that the receiving party objects to

the designation and (b) set forth the particular reasons for such objection. Counsel shall confer in

good faith in an effort to resolve any dispute concerning such designation. If the objection

cannot be resolved by agreement within ten (10) calendar days of the date of service of the

objection, the objecting party may move to remove the Confidential and/or Attorneys' Eyes Only

designation. All material whose designation is so objected to shall continue to be treated as

Confidential and/or Attorneys' Eyes Only Information until there is a ruling to the contrary.

     12.     Further, any party may move for an order that Confidential or Attorneys' Eyes

Only Information offered in evidence be received under conditions to prevent its disclosure to

Protective Order                                           Page 8 of 11

persons or entities not entitled under this Protective Order to have access to it.

13. All Confidential and/or Attorneys' Eyes Only Information and all copies thereof shall be destroyed, and certified to the producing party as having been destroyed, or returned to counsel for the producing party within sixty (60) days after the final conclusion of the Proceeding.

14. After the termination of this Proceeding, this Protective Order shall continue to be binding upon the parties hereto, and upon all persons to whom Confidential and/or Attorneys' Eyes Only Information has been disclosed or communicated.

15. The inadvertent production of any discovery material shall be without prejudice to any claim that such material is privileged and/or protected from discovery as work product, and the producing party shall not be held to have waived any such claim by inadvertent production, provided that the producing party promptly advises the other parties of its position and identifies the documents to which the assertion is claimed. All inadvertently produced material as to which a claim of privilege is asserted and any copies thereof shall be returned promptly.

16. If Confidential and/or Attorneys' Eyes Only Information is disclosed to any person other than in the manner authorized by this Protective Order, the person responsible for the disclosure shall immediately bring all pertinent facts relating to such disclosure to the attention of counsel for all parties, without prejudice to other rights and remedies of any party, and shall make every effort to prevent further disclosure by it or by the person who was the recipient of such information.

17. Any notice required or permitted herein shall be made to the parties' counsels or

Protective Order                                                              Page 9 of 11

record. Notice may be by telephone with facsimile confirmation or other such means so as to provide timely notice as appropriate.

18.     Nothing herein shall prevent the parties from seeking an order from the Court further restricting the use or access to information.

19.     Each of the parties hereto shall be entitled to seek modification of this Protective Order for good cause shown by application to the Court on reasonable notice to the other parties hereto.

Dated this ___ day of August, 2008.

15:25

Honorable Donald W. Molloy
United States District Judge

Protective Order                                        Page 10 of 11



# K&L|GATES

K&L Gates LLP
1717 Main Street
Suite 2800
Dallas, TX 75201-7342

T 214.939.5500     www.klgates.com

February 28, 2011

Andrew B. Russell
D 214-939-5879
F 214-939-5849
andrew.russell@klgates.com

***VIA FACSIMILE AND CMRRR***
Samuel T. Bull
FOSTER PEPPER PLLC
1111 Third Avenue, Suite 4300
Seattle, WA 98101

Re:     *Education Logistics, Inc., et al. v. Laidlaw Transit, Inc.*

Dear Mr. Bull:

I represent Tyler Technologies, Inc. ("Tyler Technologies"). Pursuant to Federal Rule of Civil Procedure 45, Tyler Technologies serves the following responses and objections to Education Logistics, Inc. et al.'s ("Plaintiffs") Subpoena to Produce Documents, Information, or Objects in a Civil Action (the "Subpoena") as follows:

## GLOBAL OBJECTIONS

1. Tyler Technologies objects to the Subpoena as it calls for production at a location greater than 100 miles from where the subpoena was served. Additionally, documents potentially responsive to the Subpoena are not within 100 miles of the location of service or the specified location of production.

2. Tyler Technologies objects to the contents and requirements of Plaintiffs' Instructions and Definitions as contained in the Subpoena, to the extent they are overly broad and impose burdens upon Tyler Technologies that exceed the scope of the Federal Rules of Civil Procedure (the "Rules"), and to the extent that they ascribe meanings to words beyond or different from their ordinary and commonly understood meanings. Tyler Technologies does not agree to be bound by any of the requirements of Plaintiffs' Definitions or Instructions that exceed, among other things, the ordinary and commonly understood meanings of words or terms, the Rules, the Federal Rules of Civil Evidence, and/or relevant case law, as applicable.

3. Tyler Technologies objects to the Subpoena to the extent it asks for information or documents already in Plaintiffs' possession, custody or control, equally available to the Plaintiffs and/or in the public domain, or otherwise obtainable from some other source that is more convenient, less burdensome or less expensive, or for which the burden of expense of the discovery outweighs its likely benefit.



EXHIBIT
9

163



Samuel T. Bull
February 28, 2011
Page 2

4. Tyler Technologies objects to the Subpoena because the discovery sought therein is irrelevant to the current dispute between Plaintiffs and Defendants and not reasonably calculated to lead to the discovery of admissible evidence. The Subpoena is overbroad in light of the issues and questions of law before the court with regard to Plaintiffs' complaint.

5. Tyler Technologies objects to the Subpoena to the extent the discovery sought therein seeks the production of information protected by the attorney client privilege, work product doctrine or other applicable privilege against discovery.

6. Tyler Technologies objects to the Subpoena to the extent it causes an undue burden on Tyler Technologies to comply with the subpoena without reimbursement by Plaintiffs of Tyler Technologies' costs and expenses.

7. The foregoing objections are specifically incorporated into each of Tyler Technologies' Responses below.

## RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION

1.    **All contracts entered into between VersaTrans and Laidlaw including without limitation all drafts of same, and all copies with any hand-written notes thereon.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are confidential, proprietary or trade secret information. Tyler Technologies objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Tyler further objects as Plaintiffs should seek this information from parties to the case. Indeed, it is Tyler Technologies' understanding that Plaintiffs are currently seeking this information from Laidlaw, but Laidlaw has objected to the discovery. Tyler Technologies, as a non-party to this proceeding, should not be forced to produce documents or incur fees and costs associated with this discovery until Plaintiffs, Laidlaw and the Court have resolved these discovery issues between the parties to the litigation.

Tyler Technologies will not produce documents in response to this request.

164

Samuel T. Bull
February 28, 2011
Page 3

2.    **All documents, including but not limited to, correspondence, letters, memos, emails, faxes, and hand-delivered notes, exchanges between Laidlaw and any employee or former employee of VersaTrans related to the purchase, provision, installation, or promotion of bus routing software, including those circumstances in which routing software was discussed as part of the larger package.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are confidential, proprietary or trade secret information. Tyler Technologies objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Tyler further objects as Plaintiffs should seek this information from parties to the case. Indeed, it is Tyler Technologies' understanding that Plaintiffs are currently seeking this information from Laidlaw, but Laidlaw has objected to the discovery. Tyler Technologies, as a non-party to this proceeding, should not be forced to produce documents or incur fees and costs associated with this discovery until Plaintiffs, Laidlaw and the Court have resolved these discovery issues between the parties to the litigation.

Tyler Technologies will not produce documents in response to this request.

3.    **All documents, including, but not limited to, correspondence, letters, memos, emails, faxes, and hand-delivered notes, exchanged between VersaTrans and any third-party related to the promotion by Laidlaw of VersaTrans services and products.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are confidential, proprietary or trade secret information. Tyler Technologies objects to the request as overly broad and unduly burdensome.

Samuel T. Bull
February 28, 2011
Page 4

Tyler further objects as Plaintiffs should seek this information from parties to the case. Indeed, it is Tyler Technologies' understanding that Plaintiffs are currently seeking this information from Laidlaw, but Laidlaw has objected to the discovery. Tyler Technologies, as a non-party to this proceeding, should not be forced to produce documents or incur fees and costs associated with this discovery until Plaintiffs, Laidlaw and the Court have resolved these discovery issues between the parties to the litigation.

Tyler Technologies will not produce documents in response to this request.

4.     **All sales and/or promotional material provided by VersaTrans to Laidlaw related, even in part, to bus routing software.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges.  Tyler Technologies further objects to the request to the extent it seeks documents and information that are confidential, proprietary or trade secret information. Tyler Technologies objects to the request as overly broad and unduly burdensome.  Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Tyler further objects as Plaintiffs should seek this information from parties to the case.  Indeed, it is Tyler Technologies' understanding that Plaintiffs are currently seeking this information from Laidlaw, but Laidlaw has objected to the discovery. Tyler Technologies, as a non-party to this proceeding, should not be forced to produce documents or incur fees and costs associated with this discovery until Plaintiffs, Laidlaw and the Court have resolved these discovery issues between the parties to the litigation.

Tyler Technologies will not produce documents in response to this request.

5.     **All documents reflecting the number of request for proposals that VersaTrans received from school districts or school bus contractors (such as Laidlaw) to which VersaTrans responded in each year from 2003 to present.**

Samuel T. Bull
February 28, 2011
Page 5

**RESPONSE:**

Tyler Technologies objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous.

Tyler Technologies will not produce documents in response to this request.

6.      **All documents reflecting the number of request for proposals received from school districts or school bus contractors (such as Laidlaw) to which VersaTrans responded in each year from 2003 to present.**

**RESPONSE:**

Tyler Technologies objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous.

Tyler Technologies will not produce documents in response to this request.

7.      **All VersaTrans responses to requests for proposals received from school districts or school bus contractors (such as Laidlaw) from 2003 to present.**

**RESPONSE:**

Tyler Technologies objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous.

Samuel T. Bull
February 28, 2011
Page 6

Tyler Technologies will not produce documents in response to this request.

8.    **All documents reflecting revenue received by VersaTrans relating to the sale of routing software from initial sales to school districts in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges.    Tyler Technologies further objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome.    Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous. Tyler Technologies also objects to the request as harassing and vexatious.

Tyler Technologies will not produce documents in response to this request.

9.    **All documents reflecting revenue received by VersaTrans from annual licensing and/or maintenance fees relating to routing software from each school district in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges.    Tyler Technologies further objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome.    Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous. Tyler Technologies also objects to the request as harassing and vexatious.

Samuel T. Bull
February 28, 2011
Page 7

Tyler Technologies will not produce documents in response to this request.

10. **All documents reflecting VersaTrans's aggregate sales of routing software in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous. Tyler Technologies also objects to the request as harassing and vexatious.

Tyler Technologies will not produce documents in response to this request.

11. **All documents reflecting the number of salespeople in VersaTrans's sales force in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous. Tyler Technologies also objects to the request as harassing and vexatious.

Tyler Technologies will not produce documents in response to this request.



Samuel T. Bull
February 28, 2011
Page 8

12.    **All documents reflecting VersaTrans's market and sales promotion budget in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.**

**RESPONSE:**

    Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous. Tyler Technologies also objects to the request as harassing and vexatious.

    Tyler Technologies will not produce documents in response to this request.

13.    **All documents reflecting the number of sales calls made by VersaTrans on school districts in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.**

**RESPONSE:**

    Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous. Tyler Technologies also objects to the request as harassing and vexatious.

    Tyler Technologies will not produce documents in response to this request.

Samuel T. Bull
February 28, 2011
Page 9

Very truly yours,

Andrew B. Russell



**In The Matter Of:**

*Education Logistics, Inc., et al. v.*
*Laidlaw Transit, Inc.*

---

*Sean O'Halloran*

*Vol. II*

*April 22, 2009*

*CV 07-06-M-DWM*

---

*Martin-Lake & Associates, Inc.*

*P.O. Box 7765*

*Missoula, MT 59807-7765*

*406-543-6447 / fax: 406-543.5014*

*mla@martin-lake.net*

Original File sh04.22.09.txt
Min-U-Script® with Word Index

EXHIBIT

10

tables'

172

Education Logistics, Inc., et al. v.
Laidlaw Transit, Inc.

CV 07-06-M-DWM

Sean O'Halloran - Vol. II
April 22, 2009

---

**Page 80**

1
2                UNITED STATES DISTRICT COURT
         DISTRICT OF MONTANA, MISSOULA DIVISION
3
EDUCATION LOGISTICS, INC.
a Montana corporation, and
4    LOGISTICS MANAGEMENT,
     INC., a Washington
5    corporation,                    CAUSE NO. CV-07-06-M-DWM

6            Plaintiffs,

7        vs.

8    LAIDLAW TRANSIT, INC., a
     Delaware corporation,
9
             Defendant.
10

11
        Taken at 111 North Higgins Avenue, Suite 600
12                    Missoula, Montana
         Wednesday, April 22, 2009 - 9:02 a.m.
13

14
15       D E P O S I T I O N
16              OF
17        SEAN O'HALLORAN
18        VOLUME 2 OF 2
19
20
21
22
23
24      Reported by Julie M. Lake, RDR, CRR, CSR
             Registered Diplomate Reporter
25            Certified Realtime Reporter

---

**Page 81**

1         A P P E A R A N C E S
2    RONALD A. BENDER, Esq., of Worden Thane P.C., 600
     The Florence, P.O. Box 4747, Missoula, Montana
3    59806, and
4    SAMUEL T. BULL, Esq., of Foster, Pepper &
     Shefelman, PLLC, 34th Floor, 1111 3rd Avenue,
5    Seattle, Washington 98101,
             appearing on behalf of the Plaintiffs.
6
     MARCIA DAVENPORT, Esq., of the Crowley Law Firm,
7    100 North Park Avenue, Suite 300, P.O. Box 797,
     Helena, MT 59624-0797,
8            appearing on behalf of the Defendants.
9
ALSO PRESENT:  Bill Swendsen
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 82**

1              I N D E X

2    WITNESS:                                    PAGE:

3    SEAN O'HALLORAN

4    Examination by Mr. Bull........................  84

5

6    Stipulations.................................  83

7

8

9    EXHIBITS:                                   MARKED:

10   Deposition Exhibit No. 60.....................  175

11

12

13

14

15

16   Certificate of Witness....................... 197

17   Certificate of Court Reporter................. 198

18

19

20

21

22

23

24

25

---

**Page 83**

1        S T I P U L A T I O N S
2
3        It was stipulated by and between counsel
4    for the respective parties that the deposition be
5    taken by Julie M. Lake, RDR, CRR, CSR, Freelance
6    Court Reporter and Notary Public for the State of
7    Montana, residing in Missoula, Montana.
8
9        It was further stipulated and agreed by
10   and between counsel for the respective parties
11   that the deposition be taken in accordance with
12   the Federal Rules of Civil Procedure.
13
14       It was further stipulated and agreed by
15   and between counsel for the respective parties and
16   the witness that the reading and signing of the
17   deposition would be expressly reserved.
18
19
20
21
22
23
24
25

---

Education Logistics, Inc., et al. v.
Laidlaw Transit, Inc.

CV 07-06-M-DWM

Sean O'Halloran - Vol. II
April 22, 2009

**09:02:06-09:02:48**       Page 84

1         WEDNESDAY, APRIL 22, 2009
2 Thereupon,
3         SEAN O'HALLORAN,
4 having been sworn to tell the truth, testified as
5 follows:
6         EXAMINATION
7 BY MR. BULL:
8    Q. Mr. O'Halloran, as you recall, I'm Sam
9 Bull. I'm an attorney for Education Logistics and
10 Logistics Management.
11      Our session today is a continuation of a
12 previous deposition we had with you last month.
13 And I know you know the drill, but just to make
14 sure that we're all on the same page, I'm just
15 going to reiterate some of the considerations when
16 we're doing the deposition. Okay?
17    A. Okay.
18    Q. Remember we want to make sure that we
19 don't talk over each other; so when I ask a
20 question, you should make sure you let me finish
21 and I'm going to do my best to let you finish your
22 answers.
23      If counsel for Laidlaw objects, you
24 should let her finish her objection and then after
25 she's finished her objection, you still need to

**09:03:01-09:04:36**       Page 85

1 answer the question to the best you can. If you
2 don't understand the question, please let me know
3 and I will try to make it more understandable.
4 Does that sound good?
5    A. Yes.
6    Q. Is there any reason why you aren't able
7 to testify fully and truthfully today?
8    A. No, there isn't.
9    Q. Are you familiar with Edulog's boundary
10 planning software?
11    A. Yes, I am.
12    Q. Are you also familiar with Edulog's
13 boundary optimization software?
14    A. Yes, I am.
15    Q. Is boundary planning software, is that an
16 independent product from Edulog's routing
17 software?
18    A. Yes, it is. It's a separate module.
19    Q. When a school district has Edulog's
20 boundary planning software, do they necessarily
21 also have to have Edulog's routing software?
22    A. No, they do not.
23    Q. In your previous deposition we talked
24 somewhat about different levels of access that
25 Laidlaw provides to its school district clients

**09:04:53-09:05:41**       Page 86

1 under the perpetual license, and one type of
2 access was remote access. Do you recall that?
3    A. Yes.
4    Q. And I believe you previously testified
5 that some school districts receive remote access
6 to Edulog software in a read-only capability; is
7 that correct?
8    A. That is correct.
9    Q. In those instances is the school district
10 connecting to the Edulog software remotely?
11    A. Yes.
12    Q. And is that software located on a Laidlaw
13 server?
14    A. Yes, it is.
15    Q. And if, for example, Laidlaw upgrades its
16 version of the software, if a new version of the
17 Edulog routing software comes out, is the school
18 district also getting access to that upgraded
19 version of the software?
20    A. Yes, they are.
21    Q. So any time--with respect to remote
22 access, any time that Laidlaw upgrades the version
23 of the Edulog routing software that's running, the
24 school district is receiving access to that
25 upgraded version?

**09:06:12-09:07:02**       Page 87

1    A. That is correct.
2    Q. I believe that you also previously
3 testified with respect to a different type of what
4 Laidlaw referred to as look-up access in which a
5 school district receives a copy of the Edulog
6 routing software on the school district's computer
7 and then receives hand-delivered copies of data
8 from time to time; is that correct?
9    A. That is correct.
10    Q. And that's something that's often
11 referred to as the Sneaker Net?
12    A. Correct.
13    Q. When a school district is receiving
14 access through the Sneaker Net, when Laidlaw
15 receives upgrades of Edulog's routing software,
16 does the school district also receive upgrades of
17 that routing software?
18    A. Yes. In order for their access to
19 continue they have to upgrade. The prior versions
20 are not compatible.
21    Q. In those circumstances does someone from
22 Laidlaw take over a new version and load it on to
23 the school district's computer?
24    A. Yes.
25    Q. Based upon your knowledge, about how

Education Logistics, Inc., et al. v.
Laidlaw Transit, Inc.

CV 07-06-M-DWM

Sean O'Halloran - Vol. II
April 22, 2009

---

09:08:03-09:09:05 | Page 88

1   often does Edulog come out with a new version of
2   its routing software?
3     A.  Usually once a year.
4     Q.  I would like to talk about some specific
5   school districts.  Do you have any knowledge with
6   respect to whether the school district in the
7   Algiers section of New Orleans has ever had access
8   to Edulog software provided by Laidlaw?
9     A.  I don't believe they have.
10    Q.  Do you recall ever discussing that with
11  the Algiers--the school district that is in
12  Algiers, New Orleans?
13    A.  I've not discussed it directly with the
14  school district.  Our rep, Jennifer Keith, was the
15  one who did all the direct communication with the
16  contract manager and the customer.
17    Q.  And it's your understanding that it was
18  never set up?
19    A.  It was discussed but it was never set up.
20    Q.  How do you know it was never set up?
21    A.  I guess I can't say it was never set
22  up--well, Jennifer Keith would have had to had my
23  assistance to set it up and she never asked me for it.
24    Q.  And so since Jennifer never asked you to
25  help her set up the look-up access, it's your

---

09:09:20-09:10:25 | Page 89

1   understanding that no access had been set up?
2     A.  That's my understanding.
3     Q.  Do you know if the Allentown School
4   District in Pennsylvania ever had access to Edulog
5   routing software?
6     A.  Yes, they did.
7     Q.  What access did they have?
8     A.  They had the remote access where they
9   connected to a server at the Laidlaw office.
10    Q.  When did Allentown first get access?
11    A.  It would have been 2005.
12    Q.  Do you know who set the access up?
13    A.  That would have been Jay Makela, and he
14  probably had some assistance from Don Cameron.
15    Q.  Did Allentown get full access to the
16  software?
17    A.  No, they didn't.
18    Q.  What is your understanding of the access
19  that Allentown received?
20    A.  That, using the Edulog security module,
21  they were set up with read-only access.
22    Q.  Would this have been on Edulog.NT?
23    A.  Yes.  That's the only flavor of Edulog
24  that they have ever had.
25    Q.  To the best of your knowledge, does

---

09:10:39-09:11:58 | Page 90

1   Allentown still have access to Edulog software?
2     A.  Yes, they do.
3     Q.  Who is the user at the school district in
4   Allentown?
5     A.  I cannot remember her name.
6     Q.  Do you know if Barrington, Rhode Island
7   School District has ever had access to Edulog
8   routing software?
9     A.  I'm not sure.  The Rhode Island sites I
10  was very minimally involved with.
11    Q.  Who would be the best person to talk to
12  about that?
13    A.  Don Cameron.
14    Q.  Do you have any knowledge as to whether
15  or not the Rhode Island sites had access to Edulog
16  routing software?
17    A.  I don't--I don't know.  Most of those
18  were converted to another product when I first
19  started working with Laidlaw.
20    Q.  Was that Versatrans?
21    A.  Yes.
22    Q.  About how many of Laidlaw's--to the
23  extent that you know, about how many of Laidlaw's
24  school district customers use some form of routing
25  software or another?

---

09:12:09-09:13:19 | Page 91

1         MS. DAVENPORT:  Objection, calls for
2   speculation.
3     A.  Last number, I want to say maybe,
4   ballpark, 150.
5     Q.  (By Mr. Bull)  And what's the basis for
6   that knowledge?
7     A.  Just lists I've compiled for Scott Parker
8   throughout the two years that I worked for him,
9   and that's usually the number that I came up with.
10    Q.  So when you compiled those lists for
11  Scott Parker, you usually came up with 150 school
12  districts used one routing software or another?
13    A.  One or another.
14    Q.  How many of those 150 are Edulog, use
15  Edulog?
16    A.  I want to say 75 or 80.
17    Q.  And are most of those school districts,
18  is the use through Laidlaw's perpetual license?
19    A.  Most of them, yes.
20    Q.  Would you say over half?
21    A.  Yes, over half.
22    Q.  After Edulog, what is the second
23  most-used software?
24    A.  Versatrans.
25    Q.  About how many of the Laidlaw customers

---

Martin-Lake & Associates, Inc.
406.543.6447 / mla@martin-lake.net

(3) Page 88 - Page 91

Education Logistics, Inc., et al. v.
Laidlaw Transit, Inc.

CV 07-06-M-DWM

Sean O'Halloran - Vol. II
April 22, 2009

---

**Page 92**

09:13:33-09:14:45

1  use Versatrans routing software?
2       MS. DAVENPORT: Objection. Calls for
3  speculation.
4       A.  Well, 150 minus 75. 75, I guess.
5       Q.  (By Mr. Bull) And you said 75 to 80 for
6  Edulog, so--but you think it's about half and
7  half?
8       A.  About half and half. There's a couple
9  one offs there, but mostly it's about half and
10  half. Maybe a few more Edulog.
11      Q.  Does Laidlaw have a policy for
12  determining what routing software to use at a
13  school district?
14      A.  No. It's usually the preference of the
15  actual location.
16      Q.  When you say preference of the actual
17  location, are you talking about the Laidlaw branch
18  location?
19      A.  It's usually a determination made by the
20  contract manager and the regional operations
21  manager and higher up, but we don't--we never
22  really steered them in one direction. We just
23  gave them all their options and they made their
24  decision. Usually they had their decision made
25  even before they contacted us.

---

**Page 93**

09:14:57-09:15:59

1       Q.  And just so I'm making sure I understand.
2  Does the Laidlaw branch usually suggest to the
3  school district we think you should use, for
4  example, Versatrans on this project?
5       A.  Yes.
6       Q.  Do you know if school districts usually
7  take the advice of the Laidlaw branch with respect
8  to what software to use?
9       A.  Generally, yes. And also sometimes the
10  school district gives their preference and the
11  contract manager or the local management will
12  abide by their request.
13      MS. DAVENPORT: Sam, you are not trying
14  to go into the best efforts issue, are you?
15      MR. BULL: I'm not. I'm just trying to
16  get a little background and I'm going to go back
17  to the school districts.
18      MS. DAVENPORT: All right.
19      Q.  (By Mr. Bull) Do you know if
20  Battleground, Washington--the school district for
21  Battleground in Washington has ever had access to
22  Edulog routing software?
23      A.  Yes, they have.
24      Q.  What do you know about that access?
25      A.  Initially they were set up as what we

---

**Page 94**

09:16:18-09:17:32

1  would term Sneaker Net and it was managed as you
2  had originally asked a few minutes ago. And then
3  their server was replaced with a server capable of
4  allowing remote access. And it's my understanding
5  that the customer is set up with that remote
6  access and the Sneaker Net version was uninstalled
7  from their system at the school district.
8       Q.  When did Battleground first get Sneaker
9  Net?
10      A.  I want to say 2001. They were one of our
11  first Edulog.NT implementations.
12      Q.  And do you know when they got remote
13  access?
14      A.  I want to say that's around 2005.
15      Q.  And when Battleground had Sneaker Net,
16  would they have been able to manipulate the data
17  they received by disk?
18      A.  They might have initially, but once
19  Edulog--the version of Edulog that allowed control
20  of the levels of access as far as read-only or
21  full access, once that--I cannot remember what
22  version that was, but once that version was set up
23  we made sure that that was enabled such that they
24  had read-only access.
25      Q.  So that would be even when the school

---

**Page 95**

09:17:42-09:18:57

1  district only had access to old data, you would
2  still--your testimony is that you would still set
3  it up so they could read-only?
4       A.  That's correct. And every time their
5  data was refreshed, even if somebody had managed
6  to hack the system, it's all stored in the data
7  and got overwritten anyway.
8       Q.  What is the--your basis for the assertion
9  you just made that even with Sneaker Net Laidlaw
10  would configure the software in such a way to
11  allow read-only access?
12      A.  That was a directive that I made to the
13  support staff and the implementers.
14      Q.  Was that a directive you made in writing?
15      A.  No.
16      Q.  Are you aware that Sparta, Wisconsin
17  still has Sneaker Net access to Edulog routing
18  software?
19      A.  I believe they do. I'm not sure.
20      Q.  And are you aware that, according to the
21  Sparta School District administrator who testified
22  in this matter, that she is able to manipulate the
23  old data using the Edulog routing software on her
24  computer?
25      A.  I'm not aware of that.

---

176



Ronald A. Bender, Esq.
WORDEN THANE P.C.
111 North Higgins, Suite 600
P.O. Box 4747
Missoula, Montana 59806-4747
Telephone: (406) 721-3400
Fax: (406) 721-6985
rbender@wthlaw.net


Charles Nomellini, Esq.
Samuel T. Bull, Esq.
FOSTER PEPPER PLLC
34th Floor, 1111 3rd Ave.
Seattle, WA 98101
Telephone: (206) 447-4400
Fax: 406-721-6985
nomec@foster.com
bulls@foster.com

Attorneys for Plaintiffs Education Logistics, Inc.,
and Logistics Management, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | |
|---|---|
| EDUCATION LOGISTICS, INC., a Montana corporation, and LOGISTICS MANAGEMENT, INC., a Washington corporation, | Cause No. CV-07-06-M-DWM |
| Plaintiffs, | |
| -vs- | DECLARATION OF CRAIG GRIFFITHS IN SUPPORT OF PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER |
| LAIDLAW TRANSIT, INC., a Delaware corporation, | |
| Defendant. | |



EXHIBIT

11

CRAIG GRIFFITHS declares as follows:

1.    I am an implementation manager for Education Logistics, Inc. ("Edulog"). I am over the age of 18 and am otherwise able to give testimony in this matter.

2.    Prior to my employment with Edulog, I was previously employed by Laidlaw Transit, Inc. ("Laidlaw") as an implementation manager at Laidlaw Planning Solutions ("LPS") from 1990 to 2007. One of my duties during this time period was to provide recommendations relating to routing software to existing and potential school district customers of Laidlaw.

3.    While employed by Laidlaw, I retained numerous electronic documents and emails relating to the relationship between the parties to this lawsuit, and Laidlaw's actions relating to promoting Edulog routing software and competitors' routing software. I provided copies of these documents to Laidlaw before I left.

4.    When I suggested that Laidlaw recommend using Edulog routing software in New Orleans rather than the software of VersaTrans, one of Edulog's competitors, Diane Orndorff, my supervisor at Laidlaw, ordered me to telephone VersaTrans's CEO and explain to him why I was recommending Edulog over VersaTrans. I provided at least one email related to this incident to Laidlaw personnel.

I declare under penalty of perjury that the forgoing is true and correct.

EXECUTED in Missoula, Montana this 15th day of September, 2008.

Craig Griffiths

DECLARATION OF CRAIG GRIFFITHS IN SUPPORT OF PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER
Page 2 of 2

589287371



This Was Printed From The Business Review

# Routing software firms vie for industry top slot

**Premium content from The Business Review - by Richard A. D'Errico, The Business Review**

Date: Monday, February 5, 2007, 12:00am EST - Last Modified: Thursday, February 1, 2007, 10:08am EST

**Related:**

Technology

A battle for your child's bus route is brewing.

The nation's two leading companies developing software to help school districts map bus routes, VersaTrans Solution Inc. and Transfinder, are located 10.31 miles apart from each other. Each dominates in its own backyard—VersaTrans in Albany County, Transfinder in Schenectady County—but the real prizes are the 15,000 school districts nationwide.

Together, they've helped topple Education Logistics Inc. in Missoula, Mont., from its No. 1 spot, said Antonio Civitella, Transfinder's president and CEO, making VersaTrans No. 1 and, possibly making Transfinder No. 2.

"It's very ugly," Civitella said. "It's Microsoft and Novell. It's Apple against Microsoft."

"I would characterize it as a very competitive market," said Bill Paul, editor and publisher of School Transportation News, based in Redondo Beach, Calif.

Bus-routing software helps districts determine the best and most efficient routes to take. It can also be updated as variables change, like when a student moves. Some software can even visualize "what if" scenarios, keep track of bus maintenance schedules and track buses in real time. Districts can spend as little as a few thousand dollars to hundreds of thousands of dollars on bus-transportation software.

Paul said it's tough to say who's on top based on revenue because the main companies are privately held, but VersaTrans and Transfinder are recognized leaders in the sector.

"Edulog was there first, I can't dispute that," Paul said. "For many years they were among the first to do this in the mid-1980s."

VersaTrans and Transfinder had strong years, according to their CEOs.

Transfinder closed 2006 with $3 million in revenue, up 15 percent from 2005. It added 151 new clients, for a total of 750 districts in 46 states. The company is expanding its space in Schenectady to accommodate growth.

VersaTrans ended 2006 with sales of $7.1 million and added 131 new clients for a total of 1,260 school districts. In 2005, it reported $5.6 million in sales, up from $5 million the previous year. The company has had six consecutive record-breaking quarters.

Edulog, as Education Logistics is known, did not return calls seeking comment.

**The right spin**

Just as Microsoft recently released its latest operating system Vista to stay ahead of the curve—or keep up with competition, depending on your perspective—bus-routing companies keep adding to their products


EXHIBIT 12
tabbies

179

Page 2 of 2

Routing software firms vie for industry top slot | The Business Review
Case 1:11-cv-00048-RJA Document 34 Filed 03/08/11 Page 35 of 40 PageID 221

by integrating Global Positioning Systems (GPS) and Geographic Information Systems (GIS), or adding another bit of data to be factored into routing decisions. For example, Civitella said in Washington state a school district has used Transfinder to map around known meth labs.

VersaTrans recently touted that its software now allows users to incorporate the known residences of sexual predators.

"Student safety is the No. 1 concern among our clients," said Doug Hamlin, VersaTrans president and CEO. "They need to take measures to safeguard students before they board the bus, during their bus ride and after exiting the bus."

Terri Fallon, VersaTrans marketing and client-relations director, said as more states enact regulations to prohibit bus stops located within a certain distance—usually 1,000 feet—from a known sexual predator's home, more schools are wanting that information factored into bus-routing decisions.

Civitella said Transfinder's product has had the same capability for a few years, but has not been as public about it.

"When we had it, it was never a major selling feature at the time," Civitella said. "Now it's become more of a selling feature. It's not who has it first anymore. It's who can spin it better first.

"You want to shoot from the hip? Let's face it. There are companies that have great things, but if they're not spinning it correctly, you never know about it. Perhaps we're not spinning it correctly."

VersaTrans and Transfinder go after the same business all the time, said Civitella, but talk of a merger is premature, he said.

"We're both taking business out of that big one [Edulog]. We both together—not working together but individually. No. 1 isn't No. 1 anymore. We didn't do it as a combined company. We did it as individuals," Civitella said. "We had record years. It's not just one company doing better than the other. When both companies are thriving, that's not the right time for merger talks."

But School Transportation News publisher Paul said things can change rapidly in this industry.

"It changes all the time," he said. "These companies grow by leaps and bounds."

rderrico@bizjournals.com | 518-640-6807

180



**FILED**

JAN 1 4 2011

PATRICK E. DUFFY, CLERK

By _____
DEPUTY CLERK, MISSOULA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| EDUCATION LOGISTICS, INC., a Montana corporation and LOGISTICS MANAGEMENT, INC., a Washington corporation, | ) ) ) ) ) | CV 07-06-M-DWM — JCL |
| Plaintiffs, | ) ) | |
| vs. | ) ) | ORDER |
| LAIDLAW TRANSIT, INC., a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) ) | |

Plaintiffs Education Logistics, Inc. and Logistics Management, Inc.'s

moved to amend the case schedule and continue the trial date. A status conference

in this case was held on January 14, 2011. It appears good cause exists to amend

the case schedule. Accordingly,

IT IS HEREBY ORDERED that plaintiffs' motion (dkt # 139) is

GRANTED. The following schedule will govern all further pretrial proceedings

**EXHIBIT**

13

181

Disclosure of Plaintiff's
Damages Experts and Simultaneous
Disclosure of Liability Experts:           April 15, 2011


Disclosure of Defendant's
Damages Experts:                           May 13, 2011


Discovery Deadline:                        July 8, 2011


Motions Deadline (fully briefed):          August 22, 2011


Attorney Conference to Prepare
Final Pretrial Order:                      week of September 31, 2011


Submit Final Pretrial Order,
Proposed Jury Instructions,
Proposed Voir Dire Questions,
and Trial Briefs electronically
to dwm_propord@mtd.uscourts.gov
(Trial Briefs are optional):               November 10, 2011


Notice to Court Reporter of
Intent to Use Real-Time:                   November 10, 2011


Notice to I.T. Supervisor of
Intent to Use CD-ROM or
Videoconferencing:                         November 10, 2011


Final Pretrial Conference:                 November 18, 2011 at 1:30 p.m.
                                           Missoula, Montana

Jury Trial (7-member jury):  November 28, 2011 at 8:30 a.m.[1]
Russell Smith Courthouse
Missoula, Montana

**Continuance of the above deadlines will not be granted, absent compelling**

**reasons.** A continuance of any deadline set by this order does <u>not</u> extend any

other deadline. Neither the date set for trial nor the date set to file motions will be

altered or changed even if the Court authorizes any other date to be changed.

IT IS FURTHER ORDERED, unless otherwise stipulated, plaintiffs shall

take no more than 20 depositions, and defendants shall take no more than 20

depositions. Depositions previously taken in the case count towards the 20

deposition limit. But each party is allowed to supplement any deposition

previously taken.

IT IS FURTHER ORDERED all other provisions of the Court's October 17,

2007 scheduling order (dkt # 25) shall remain in full force and effect.

Dated this _14th_ day of January 2011.

Jeremiah C. Lynch
United States Magistrate Judge

---

[1]Pursuant to 18 U.S.C. § 3161(h) and Fed.R.Crim.P. 50, criminal matters take priority over civil matters in the event of a conflict. Accordingly, all civil trial settings are subject to the Court's criminal calendar.

