**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

EDUCATION LOGISTICS, INC., a
Montana corporation, and LOGISTICS
MANAGEMENT, INC., a Washington
corporation,

  Plaintiffs,

v.

LAIDLAW TRANSIT, INC., a Delaware
corporation

  Defendant,

v.

TYLER TECHNOLOGIES, INC.,

  Respondent.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

MISC. ACTION NO. 3-11-MC-036-L-BD
(Civil Action No. 07-06-M-DWM
Action pending in: District of Montana,
Missoula Division)

---

**Joint Status Report**

---

In accordance with the Court's Order signed March 9, 2011 ("March 9 Order"), Education Logistics, Inc. and Logistics Management, Inc. (collectively "Edulog") and Tyler Technologies, Inc. ("Tyler")[1] submit the following Joint Status Report:

(a)  **Names of attorneys participating in the discovery conference:**

The discovery conference was attended in person by Kim McCrea of Thompson & Knight LLP for Edulog and Andrew B. Russell of K&L Gates for Tyler. Samuel T. Bull of Foster Pepper PLLC appeared by telephone on behalf of Edulog.

---

[1] In 2008 Tyler acquired Versatrans Solutions Inc., one of Edulog's main competitors in the school bus routing software market. While Versatrans was previously an independent company, it is now operated as a division of Tyler. The routing software provided by Tyler has retained the Versatrans name.

**(b)**     **Date of Conference and amount of time the parties conferred:**

Counsel for Edulog and Tyler conferred at Mr. Russell's office on March 15, 2011, for two hours.  Each matter in dispute between the parties was discussed in detail.

**(c)**     **Matters resolved by agreement:**

<u>Agreed Confidentiality Protections</u>

Edulog and Tyler agreed to file with the Court a proposed Protective Order allowing Tyler to designate documents as "Confidential" or "Attorneys Eyes Only."  Edulog has the right to challenge Tyler's designation of a document as "Confidential" or "Attorneys Eyes Only," in whole or in part, by notifying Tyler of its challenge prior to the later of April 15, 2011, the expert disclosure deadline in the underlying Montana action, or two (2) weeks from the date of production.  Edulog and Tyler agreed to make reasonable efforts to resolve any disputed designations.  A copy of the Proposed Agreed Protective Order is being submitted to the Court concurrently with this filing.

<u>Resolved Requests for Production</u>

**Request for Production No. 1:  All contracts entered into between VersaTrans and Laidlaw including without limitation all drafts of same, and all copies with any hand-written notes thereon.**

Tyler agreed to produce all contracts between VersaTrans and Laidlaw, including drafts of same, and all copies with any handwritten notes thereon, since 1987.  No further consideration is needed by the Court as to this request.

**Request for Production No. 2:  All documents, including, but not limited to, correspondence, letters, memos, emails, faxes, and hand-delivered notes, exchanged**

between Laidlaw and any employee or former employee of VersaTrans related to the purchase, provision, installation, or promotion of bus routing software, including those circumstance in which routing software was discussed as part of a larger package.

Request for Production No. 3: All documents, including, but not limited to, correspondence, letters, memos, emails, faxes, and hand-delivered notes, exchanged between VersaTrans and any third-party related to the promotion by Laidlaw of VersaTrans services and products.

Request for Production No. 4: All sales and/or promotional material provided by VersaTrans to Laidlaw related, even in part, to bus routing software.

Tyler has agreed to produce documents described by Request Nos. 2, 3 and 4 from 1996 to the present. No further consideration is needed by the Court as to these requests.

Request for Production No. 5: All documents reflecting the number of requests for proposals that VersaTrans received from school districts or school bus contractors (such as Laidlaw) in each year from 2003 to present.

Request for Production No. 6: All documents reflecting the number of requests for proposals received from school districts or school bus contractors (such as Laidlaw) to which VersaTrans responded in each year from 2003 to present.

Request for Production No. 7: All VersaTrans responses to requests for proposals received from school districts or school us contractors (such as Laidlaw) from 2003 to present.

Request Nos. 5, 6, and 7 relate to requests for proposals from school districts or school bus contractors (such as Laidlaw) and responses to those proposals from 2003 to present. Tyler

agreed to produce documents described by the requests if the request for proposal was received directly from Laidlaw.   A dispute remains as to Tyler's obligation to produce responsive documents related to requests for proposals received from any entity other than Laidlaw.  The parties have set forth their detailed positions below.

Tyler agreed to produce documents on a rolling basis.  To date, no documents have been produced.

No further agreements were reached.

**(d)     Specific matters that need to be heard and determined:**

As to Request Nos. 5, 6, and 7, a dispute remains as to Tyler's obligation to produce documents related to requests for proposals received from entities other than Laidlaw.

As to Request Nos. 8-13, a dispute remains as to Tyler's obligation to produce any responsive documents.

The arguments of Edulog and Tyler as to why the foregoing matters could not be resolved are set forth below.

**(e)     Explanation of reasons why agreement could not be reached as to matters that need to be heard and determined:**

Edulog's position:

## I.     SUMMARY

Edulog fully briefed its argument as to why it is entitled to the subpoenaed documents in its Emergency Motion to Compel Document Production.[2]  While the parties have eliminated their disputes as to 4 of the 13 document requests, a dispute remains as to a portion or all of the remaining requests.  Tyler's sole remaining objection appears to be its contention that the

---

[2]     A copy of the subpoena is attached to the Declaration of Samuel T. Bull at Ex. A-8.

documents being sought by Edulog are not "relevant" to Edulog's claims or damages in the underlying lawsuit. Edulog summarizes below the areas that remain at issue and the relief requested from the Court. It then provides background information to provide the Court with some context in which to consider the requests followed by a more thorough analysis of the remaining issues. Although much of the latter information is contained in Edulog's motion, Edulog understands that the Court prefers that all issues and briefing be contained in this document.

Edulog's Emergency Motion To Compel was filed as a peripheral proceeding to a lawsuit pending in the U.S. District Court for the District of Montana captioned *Education Logistics, Inc. v. Laidlaw Transit, Inc.*, Cause No. CV02-183 (the "Montana Action").[3] One of Edulog's principal claims against Laidlaw in the Montana Action is that it failed to use its "best efforts to promote" the Edulog Software as required by a 1992 Agreement between Edulog and Laidlaw ("failure to promote claim").[4] Prior to 1992, Edulog and Laidlaw did not have any contractual agreement. From 1992 to 1997, Edulog and Laidlaw had an exclusive license. In 1997, the exclusive license terminated, but, as recently ruled by the 9th Circuit Court of Appeals, the parties' obligations to use their "best efforts" to promote each others' products and services continued beyond the termination of the exclusive license to the present day.[5] The documents sought in Edulog's subpoena to Tyler relate to this claim.

---

[3]   Declaration of Samuel T. Bull ("Bull Decl.") ¶ 2. [App. 1].

[4]   Bull Decl. Ex. 1, Complaint ¶¶ 17, 22, 24-30; 1992 Agreement § 2.3.3 (Ex. A to the Complaint.). [App. 9, 11-12, 20-21].

[5]   Edulog notes that the purpose of this "best efforts" promotion clause (1992 Agreement § 2.3.3) is to, at least in part, counterbalance a separate clause in the 1992 Agreement that restricts Edulog's ability to contact Laidlaw/First Student customers (1992 Agreement § 2.3.2). [App. 20-21].

The Court's March 9 Order requires Tyler to produce "all responsive documents in its possession, custody or control" and requires that Edulog and Tyler confer regarding any remaining disputed areas of nonproduction.  At this time, Tyler has not produced any documents.  Tyler also has not produced a privilege log.  Edulog has an urgent need for the requested documents because its expert's report, for which it seeks many of the requested documents, is due April 15, 2011.  Although the parties have agreed to a rolling production, Edulog requests that the Court order that production be complete by March 28, 2011.  Tyler has had time to anticipate complying with the subpoena and producing documents since at least February 14, 2011, when Edulog's counsel provided notice of its subpoena.

The Court's March 9 Order states that Tyler's duty to produce responsive documents is "subject to being reimbursed for the reasonable costs of production."   Indeed, Rule 45(c)(2)(B)(ii) allows the Court to protect a person complying with a subpoena from "significant expense resulting from compliance."[6]  Edulog contends that "reasonable costs of production" include costs of copying, scanning, and searching for documents and does not include attorneys' fees for objecting to the subpoena and reviewing documents for production.[7]

---

[6]   FED. R. CIV. P. 45(c)(2)(B)(ii).

[7]   *Phillips Petro. Corp. v. Pickens*, 105 F.R.D. 545, 550 (N.D. Tex. 1985) (stating that "there is no authority in the federal rules for reimbursing a third party witness for his attorneys' fees"); *See also Del Campo v. Am. Corrective Counseling Servs., Inc.*, 2010 WL 3744436, No. C 01-211514 (N.D. Cal. Sep. 20, 2010) (specifically excluding attorneys' fees from reasonable costs of production).  With respect to designating whether documents should be marked "Confidential" or "Attorney Eyes Only," Tyler employees are likely to be in the best position to make such designations after being briefed by their attorneys as to the type of information that falls within each category.  Based upon what has transpired to date and counsels' discussion, Edulog counsel fears that Tyler took the Court's sentence regarding having Edulog pay the reasonable cost of production to open the door for a cadre of K&L Gates associates to eyeball every document gathered.

**Remaining Dispute RE: Document Requests Nos. 5-7.**  Request Nos. 5, 6, and 7 seek documents and information related to requests for proposals that Tyler received from school districts or school bus contractors and its responses to those requests.  As explained to Tyler's counsel, the information is relevant to liability as well as Edulog's damage model.  Tyler agreed to produce documents received directly from Laidlaw.  But Tyler's counsel explicitly refused to produce proposal requests and related documents that came from school districts, even after Edulog's counsel explained that typically a request for proposal is sent directly from a school district to the software provider even when Laidlaw is involved in recommending the software provider for the school district.  Thus, Tyler's agreement is illusory and will not lead to any meaningful production.  Edulog obtained, and has included in its Appendix, a Supplemental Declaration of Hien Nguyen explaining that a request for proposal is almost always sent directly from the school district (rather than the private bus contractor) to the software provider.[8]  Edulog also obtained a Supplemental Declaration from Dr. Hess explaining that pricing data that he requested can be found in Tyler's response to requests for proposals.  In addition, it is important to see the details contained in the responses to requests for proposals to be sure that the scope of the license and services being offered is similar to that being offered by other software vendors.

As to Request Nos. 5 and 6, Edulog again offered to permit Tyler to produce a summary of the information rather than the source documents.  Edulog requests an order directing Tyler to produce documents reflecting (a) the number of requests for proposals received from school districts and school bus contractors on an annual basis, (b) the number of requests to which Tyler responded on an annual basis, and (c) the actual response submitted.  Edulog has no objection to

---

[8]     Supplemental Declaration of Hien Nguyen ¶¶ 3-4.  [App. 206].

Tyler producing a summary document showing the number of proposals received and the number to which Tyler responded. In the event that any of the information contained in Tyler's responses to requests for proposal contain confidential or proprietary trade secret information, Tyler can designate those documents as "Confidential" or "Attorney Eyes Only" pursuant to the terms of the proposed protective order.

**Remaining Dispute RE: Document Requests Nos. 8-13.** Request Nos. 8-13 seek marketing and sales information requested by Edulog's expert to create a damage model computing the effect of Laidlaw's failure to promote Edulog's software. The purpose of the model is to control for the impact of other variables (independent of Laidlaw's duty to promote) on a school district's routing software purchase decision to generate a damages calculation that shows Edulog's lost profits resulting from Laidlaw's failure to promote the Edulog Software. Such other variables include marketshare information, pricing information, size of sales forces, marketing budgets, etc.

Edulog's expert is seeking the information from 1987 to present so that the model can factor into the three distinct phases of Edulog's relationship with Laidlaw: (a) 1987-1992, no contract; (b) 1992-1997, exclusive contract and duty to promote; and (c) 1997 to present, no exclusive contract, but still have the duty to promote.[9]

Edulog offered to allow Tyler to produce a summary document with the requested data rather than the source documents. The information should be readily accessible, especially for a sophisticated publicly-traded company such as Tyler. As Edulog's expert, Dr. Hess, explains in his Supplemental Declaration, sales and promotion data for the Versatrans division can likely be

---

[9]   Declaration of Alan C. Hess ¶ 4 and Supplemental Declaration of Alan C. Hess ¶¶ 5, 6. [App. 203, 208-209].

found in Tyler's monthly and annual financial reports or other financial and accounting spreadsheets that it maintains.  The burden on Tyler to produce such information is therefore minimal.

Edulog requests an order directing Tyler to produce documents reflecting Tyler's (a) revenue received from the sale of routing software from initial sales to school districts, (b) revenue received from annual licensing and/or maintenance fees relating to routing software from each school district, (c) aggregate sales of routing software, (d) the number of sales people in the Versatrans division's sales force, (e) the Versatrans division's marketing and sales promotion budget, and (f) the number of sales calls made by the Versatrans division on school districts for each year since 1987.  Edulog has no objection to Tyler producing a summary or spreadsheet of the requested data.

## II.    BACKGROUND

**A.    Brief Background Of School Bus Routing Software And The Parties To The Present Dispute.**

### 1.    Historically, school bus routes were created by a Bus Route Manager without the aid of optimization tools.

Prior to the advent of school bus routing software, school districts relied on school bus routing managers to create school bus routes to transport students to school.[10]  Typically, this was done by overlaying a school district map on a cork board and using push pins to identify student addresses.[11]  Routing managers would then manually create string routes, assigning students to specific buses.[12]

---

[10]   Nguyen Decl. ¶ 3.  [App. 193].
[11]   *Id.*  [App. 193-194].
[12]   *Id.*  [App. 194].

The task of creating bus routes can be quite complex, because in addition to a thorough knowledge of the map and travel patterns in the district, the router must satisfy various school district policy constraints affecting bus routes.[13]  For example, most school districts require that the to- and from-school travel times for each pupil not exceed a certain amount of time.[14]  In this vein, a hypothetical Happy Valley School District might decide that the travel time for each pupil must be less than 60 minutes from the moment the pupil is picked up by a school bus to the moment that pupil arrives at school.[15]  The school bus routing manager must create routes to insure that each child in the school district arrives at school within the prescribed time.[16]

Generally, the cost of bussing students to school is directly related to the number of school buses that a school district uses to transport its students.[17]  The more buses a school district uses to transport its students, the more the school district will pay in transportation costs. For example, a private bus contractor often bases its contracts with school districts on a per-bus fee.[18]  The fee is typically around $40,000 per bus and it may vary according to the unique attributes and needs of each school district.[19]  This creates an incentive for school districts to minimize the number of school buses they rely upon to transport their students to school.[20]

---

[13]   *Id.* ¶ 4.  [App. 194].
[14]   *Id.*  [App. 194].
[15]   *Id.*  [App. 194].
[16]   *Id.*  [App. 194].
[17]   Swendsen Decl. ¶ 9.  [App. 200].
[18]   *Id.*  [App. 200].
[19]   *Id.*  [App. 200].
[20]   *Id.*  [App. 200].

2.   **In the late 1970s, Edulog developed school bus routing optimization software that helped school districts reduce their fleet sizes and save money.**

In the 1970s, working out of his basement, Hien Nguyen, the founder and Chief Executive Officer of Edulog, developed a mathematical algorithm and accompanying software that optimized transportation routing efficiency.[21]  Over the ensuing decades, this algorithm has been used by school districts, and a slight variation of it by police departments, and fire departments to optimize fleet sizes, travel routes, and response times.[22]

The Edulog Software optimizes a school district's bus routes to enable school districts to use fewer buses, and thus reduce costs, while satisfying the district's routing constraints.[23]  In the case of hypothetical Happy Valley School District, by using the Edulog Software to create more efficient school bus routes, the school district might reduce the number of buses needed to transport its students from 50 to 35 and still get the students to school in the same amount of time.[24]  This reduction generates tremendous cost savings to the school district (15 X $40,000 = $600,000), even when taking into account the cost of the software license.[25]  Although license fees vary, the cost of an Edulog Software license to a 50-school bus school district is approximately $25,000.[26]

---

[21]   Nguyen Decl. ¶ 5.  [App. 194].

[22]   *Id.*  The public safety software that is used by police departments and fire departments is owned by a separate company that is not a party to this lawsuit.  [App. 194].

[23]   *Id.*  [App. 194].

[24]   *Id.*  [App. 194-195].

[25]   *Id.*  [App. 195].

[26]   *Id.*  [App. 195].

Because it significantly reduced the bussing costs of school districts, Edulog was very successful at selling licenses directly to school districts from the time of its founding in the late 1970s through the early 1990s.[27]

### 3.   Laidlaw/First Student is the largest school bussing contractor in the United States.

When the Montana Action commenced, Laidlaw was the largest private bus contractor in the United States.[28]  It had contracts with more than 1,000 school boards and districts in North America, and operated a fleet of approximately 41,000 buses.[29]  During this suit, Laidlaw was acquired by FirstGroup plc, the largest bus and rail transport operator in the United Kingdom for approximately $3.6 billion.[30]  FirstGroup plc is currently the largest transport operator in the United Kingdom and North America with revenue of over $9.7 billion per year.[31]  The company operates approximately 62,000 school buses and employs more than 130,000 staff on two continents to transport some 2.5 billion passengers per year.[32]

Private bus contractors like Laidlaw contract with school districts to provide various bussing services.[33]  In many cases, Laidlaw will contract with a school district to provide the full scope of the school district's bussing needs, providing school buses, bus drivers, and coordinating the transportation of all of a school district's students to and from school.[34]  In other

---

[27]   Nguyen Decl. ¶ 7.  [App. 195].
[28]   Bull Decl., Ex. 2, p. 5.  [App. 112].
[29]   *Id.*, p. 6.  [App. 113].
[30]   *Id.*, p. 5.  [App. 112].
[31]   Bull Decl., Ex. 3, p. 4.  [App. 125].
[32]   *Id.*  [App. 125].
[33]   Swendsen Decl. ¶ 8.  [App. 200].
[34]   *Id.*  [App. 200].

cases, Laidlaw will sign a more limited management contract in which it helps manage a school district's fleet.[35]

      While Laidlaw's contracts with school districts vary, the amount that Laidlaw receives under a contract usually directly relates to the number of school buses that a school district operates.[36]  In these circumstances, the more school buses that a school district uses, the more money Laidlaw is paid.[37]

      **4.**     **Tyler is a publicly-traded software company that sells Versatrans school bus routing software.**

      Tyler is a publicly-traded company that manufactures public sector software and is headquartered in Dallas.[38]  It has approximately 2,000 employees and annual revenue of nearly $300 million.[39]  In 2008 it acquired Versatrans Solutions Inc., one of Edulog's main competitors in the school bus routing software market.[40]  While Versatrans was previously an independent company, it is now operated as a division of Tyler.

**B.**     **In 1992, Edulog And Laidlaw Entered Into A Licensing Agreement That Required Laidlaw To Use Its "Best Efforts" To Promote The Edulog Software.**

      Following Edulog's success through the 1980s and into the early 1990s, Laidlaw approached Edulog and inquired about the possibility of purchasing Edulog.[41]  While Edulog declined Laidlaw's overtures, the parties ultimately negotiated a license agreement that allowed

---

[35] *Id.*  [App. 200].

[36] Swendsen Decl. ¶ 10.  [App. 200].

[37] *Id.*  [App. 200].

[38] Bull Decl. ¶ 6, Ex. 5.  [App. 2, 135].

[39] *Id.*  [App. 136].

[40] *Id.* ¶ 7, Ex. 6.  [App. 3, 138].

[41] Nguyen Decl. ¶ 8.  [App. 195].

Laidlaw to use the Edulog Software subject to certain conditions.[42]  One of these conditions, contained in Section 2.3.3 of the 1992 Agreement, was the agreement that Laidlaw would "use its best efforts to promote the use of the Software and related services" provided by Edulog to its school district customers and to prospective clients.[43]

Edulog believed that the 1992 Agreement would enable Edulog and Laidlaw to leverage their strong market positions to expand their client bases.[44]  For Edulog, the 1992 Agreement promised to provide it with exposure to Laidlaw's existing and prospective customers with the anticipated promotion by Laidlaw of its software.[45]  Laidlaw, on the other hand, would receive the benefit of having a license with the industry-best optimization software that it could use to attract new customers.[46]

From 1992 to 1997, Edulog and Laidlaw had an "exclusive" license agreement.  During the period of the exclusive license, Laidlaw was barred from entering into licensing agreements with other bus routing software developers (§ 16.1) and Edulog was not allowed to license the Edulog Software to any other school bus contractors (§ 2.2).[47]

Shortly after signing the 1992 Agreement, it became clear that Laidlaw salespeople and junior management were not thrilled with the fees that the 1992 Agreement required Laidlaw to pay when a school district purchased the Edulog Software.[48]  For example, pursuant to Sections 4.2 and 4.4 of the 1992 Agreement, Laidlaw has to pay a per-bus royalty to Edulog under certain

---

[42]  *Id.*  [App. 195].
[43]  Bull Decl. Ex. A to Ex. 1, § 2.3.3.  [App. 20-21].
[44]  Nguyen Decl. ¶ 9.  [App. 195].
[45]  *Id.*  [App. 195].
[46]  *Id.*  [App. 195-196].
[47]  Bull Decl., Ex. A to Ex. 1, § 2.2.  [App. 19].
[48]  Nguyen Decl. ¶ 11.  [App. 196].

circumstances.[49]  Because of this, while Laidlaw, as a whole, might have incentives to pitch the Edulog Software to increase the overall number of school districts with which it contracts, Laidlaw sales personnel frequently had a counter-incentive to avoid use of the Edulog Software, lest the royalty fees and other fees that might be due under the 1992 Agreement cut into their own bottom lines.[50]

In 1997, Laidlaw declined to renew the exclusive license and the license converted to a non-exclusive license, paving the way for Laidlaw to enter into licensing agreements with other software providers.[51]  Since 1997, Laidlaw has entered into licensing agreements with several school bus routing software developers, including Tyler and GeoSpatial Technologies.[52]

Despite the end of exclusivity, Section 2.3.3's "best efforts" provision requiring Laidlaw to promote the Edulog Software remains in effect.[53]  Edulog believes that Laidlaw has been systematically breaching this obligation by, among other things, actively promoting Edulog's competitors including Tyler, at Edulog's expense to avoid paying royalty and other fees to Edulog.

## C.    Laidlaw Has Significant Influence Over School District's Routing Software Purchasing Decision.

Laidlaw acknowledges that school districts frequently rely on Laidlaw to recommend specific routing software, such as Versatrans:

---

[49]   Bull Decl., Ex. A to Ex. 1.  [App. 24-25].

[50]   Swendsen Decl. ¶ 11.  [App. 200].

[51]   Bull Decl., Ex. A to Ex. 1, § 2.1 and 2.2.  [App. 19].

[52]   Swendsen Decl. ¶ 12.  [App. 201].

[53]   *See Education Logistics, Inc. v. Laidlaw Transit, Inc.*, 309 F.App. 742, 742 (9th Cir. 2010) ("Interpreting the agreement as a matter of law, we conclude the promotion duty survives the exclusive license period.").  Bull Decl., Ex. 7.  [App. 139-141].

Q.     And just so I'm making sure I understand.  Does the Laidlaw branch usually suggest to the school district we think you should use, for example, Versatrans on this project.

A.     Yes.

Q.     <u>Do you know if school districts usually take the advice of the Laidlaw branch with respect to what software to use?</u>

A.     <u>Generally, yes.</u>  And also sometimes the school district gives their preference and the contract manager or the local management will abide by their request.[54]

When matched with communications between Tyler and Laidlaw and school districts, Edulog expects to find a correlation between Tyler's responses to requests for proposals from Laidlaw school district customers and success in selling licenses to those customers.   Edulog expects these documents to show that Laidlaw was working hand-in-hand with Tyler to pitch Tyler at the expense of Edulog, that Laidlaw was otherwise actively promoting Tyler software, and that Laidlaw was denigrating the Edulog Software.[55]  In this vein, Edulog already has information that immediately after the end of the 1992 Agreement's exclusive period, Laidlaw purchased a substantial number of Tyler licenses and has encouraged several school districts to purchase Tyler instead of Edulog Software.[56]

**D.     Edulog's Expert Needs Financial And Market Data From Tyler To Prepare His Report.**

Edulog's damages expert, Alan C. Hess, intends to prepare a market analysis of the school bus routing software market to show what damages, if any, Laidlaw's failure to promote the Edulog Software has had on Edulog Software sales and market share.[57]

---

[54]   Bull Decl., Ex. 10.  (O'Halloran Dep. 93:1-12.)  (Emphasis added.)  [App. 176].

[55]   *Id.*  [App. 196].

[56]   Swendsen Decl. ¶ 13.  [App. 201].

[57]   Hess Decl. ¶ 3.  [App. 203].

In order to construct this market analysis, Dr. Hess needs financial and sales data from the top routing software developers in the market, as well as any other routing software providers that Laidlaw actively promoted at the expense of Edulog.[58]  To this end, Edulog has subpoenaed documents from Tyler (Versatrans), Transfinder, and Trapeze, the most significant bus routing software developers.[59]  Edulog has also subpoenaed documents from GeoSpatial Technologies, a software developer with whom Laidlaw briefly entered into an exclusive agreement in the mid-2000s.[60]

Dr. Hess is seeking data from three major time periods: (a) prior to the 1992 Agreement; (b) the period during which the exclusive license was in place (1992-1997); and (c) after the exclusive license period.  He needs data from these distinct time periods to determine what impact, if any, the 1992 Agreement had on Edulog Software sales.[61]

The financial and sales records requested are intended to facilitate Dr. Hess's attempt to perform his market analysis.[62]

**E.    Tyler/Versatrans Has Previously Disclosed Information Similar To That Being Requested Here.**

While Tyler has asserted that financial information sought by Request Nos. 8-13 is confidential and trade secret protected, it has disclosed similar information in the past to news sources.   For example in a February 5, 2007 article in The Business Review, Versatrans disclosed that:

---

[58]   Hess Decl. ¶¶ 4-5.  [App. 203-204].
[59]   Bull Decl. ¶ 14.  [App. 4].
[60]   *Id.*  [App. 4].
[61]   Hess Decl. ¶ 4.  [App. 203].
[62]   Hess Decl. ¶¶ 4-5.  [App. 203-204].

VersaTrans ended 2006 with sales of $7.1 million and added 131 new clients for a total of 1,260 school districts.  In 2005, it reported $5.6 million in sales, up from $5 million the previous year.  The company now has had six consecutive record-breaking quarters.[63]

**F.     Following Remand From The 9th Circuit Court Of Appeals, The Parties Have Received Only A Narrow Time Window In Which To Complete Their Failure-To-Promote Discovery And Produce Their Expert Reports.**

Edulog requests that Tyler be ordered to complete its document production by March 25, 2011, due to the extremely limited time period in which it has to conduct discovery and complete its expert report in the Montana Action.  Discovery was re-opened on Edulog's failure-to-promote claim on January 14, 2011.[64]  The deadline for Edulog to file failure-to-promote related expert reports is April 15, 2011.[65]  Prior to that time, Edulog will need to collect the necessary market data and liability data sought in its subpoenas to Tyler and other routing software providers, after which its expert will need to process the various data received and draft his expert report.

To date, Edulog has been diligent in seeking discovery relating to its failure to promote claim.  In the Montana Action, prior to the 9th Circuit's ruling that Laidlaw's duty to promote continued under the 1992 Agreement, the Montana trial court had entered a protective order precluding Edulog from seeking failure-to-promote claim discovery.  In fact, any time that

---

[63]   Notably, the import of the article in which Versatrans disclosed sales figures was that Versatrans and another routing software developer, Transfinder, had "helped topple Education Logistics Inc. … from its No. 1 spot."  *Id.*  Bull Decl., Ex. 12.  [App. 4].

[64]   Discovery was re-opened following the 9th Circuit's reversal of the trial court's dismissal of Edulog's failure-to-promote claim.  Prior to the 9th Circuit's reversal, Laidlaw has refused to respond to discovery relating to Edulog's failure-to-promote claim and the trial court had entered a protective order precluding Edulog from propounding failure-to-promote claim discovery.  Because of the 9th Circuit's reversal, discovery was re-opened for this claim, and a new expert disclosure deadline was set.  Bull Decl., Ex. 13.

[65]   *Id.*  [App. 181-183].

Laidlaw's counsel believed that discovery might somehow relate to the failure to promote claim, they were quick to object.[66]

On January 14, 2011, after the case was remanded, the Court reopened discovery. Edulog served discovery on Laidlaw on January 18, 2011 and immediately started to prepare and serve subpoenas to other software vendors, such as Tyler.  Since January 14, the Montana Action has been very busy with the parties exchanging discovery (though Laidlaw still refuses to produce substantive responses to specific failure-to-promote claim discovery) and Laidlaw has re-filed summary judgment motions.  In addition, to seeking discovery from Laidlaw and other routing software vendors, Edulog is in the midst of coordinating efforts necessary to obtain documents and information from various school districts identified by Laidlaw in recent discovery disclosures.

## III.     ARGUMENT AND ANALYSIS

Federal Rule of Civil Procedure 26(b)(1) allows parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."[67]  Rule 45 provides the procedure for obtaining such discovery from nonparties.[68]  "Relevancy is broadly construed, and a request for discovery should be considered relevant if there is *any possibility* that the information sought may be relevant to the claim or defense of any party."[69]  As the party

---

[66]  *See* Exhibit 10, O'Halloran Dep. 93:13-14, "Sam, you are not trying to go into the best efforts issue, are you?"  Bull Decl. ¶ 16.  [App. 5, 176].

[67]  FED. R. CIV. P. 26(b)(1).

[68]  FED. R. CIV. P. 45.

[69]  *Enron Corp. Sav. Plan v. Hewitt Assoc., LLC*, 258 F.R.D. 149, 159 (S.D. Tex. 2009) (emphasis added); *see also* FED. R. CIV. P. 26(b)(1)("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."); *Ferko v. Nat. Ass'n for Stock Car Auto Racing, Inc.*, 218 F.R.D. 125, 132 (E.D. Tex. 2003) ("Courts construe discovery rules liberally to serve the purposes

opposing discovery, Tyler bears the burden of proving that good cause exists to deny the discovery sought, which it must do with a "particular and specific demonstration of fact."[70] Tyler must show specifically how each document request is overly broad, burdensome, or oppressive.[71]

### A.    Tyler's Relevance Objection Is Off Base.

Tyler's only remaining objection to producing the information requested in Edulog's subpoena appears to be its contention that the documents sought are not "relevant" to Edulog's duty-to-promote liability and damages claim.[72]  Tyler's objection is unfounded.

Edulog is seeking traditional expectation lost profits damages as a result of Laidlaw's failure to promote the Edulog Software.  As it explained in its Emergency Motion To Compel and in this brief, "Edulog seeks marketing and sales information of a competitor to prove how

---

of discovery:  providing parties with information essential to the proper litigation of all relevant facts, eliminating surprise, and promoting settlement.").

[70]    *Dongguk Univ. v. Yale Univ.*, 270 F.R.D. 70, 74 (D. Conn. 2010) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 (1981)); *Enron Corp. Sav. Plan*, 258 F.R.D. at 159 ("The party resisting discovery bears the burden to clarify and explain its objections and to *provide* support for those objections.").  Tyler cannot satisfy its burden of resisting discovery through conclusory statements.  *See Dongguk Univ., id.*

[71]    *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990).

[72]    Tyler cites *Cmedia, LLC v. Lifekey Healthcare, LLC*, 216 F.R.D. 387 (N.D. Tex. 2003).  Due to timing constraints in exchanging briefing by the parties, Edulog has not had a significant time to review Tyler's authorities.  A quick review of *Cmedia*, however, reveals that it is distinguishable on the points for which it is cited.  In that case, Cmedia was defending an overpricing claim by its former customer, Lifeway.  Cmedia sought discovery on prices that its replacement obtained for Lifeway to prove that it was not overcharging (or was not liable) rather than to prove damages.  Also, Cmedia requested pricing information charged by its replacement for Lifeway's related companies that had not levied such a claim at Cmedia.  Since there was no issue on whether Cmedia's liability to those companies, it didn't matter what their replacement was charging and that pricing information wasn't relevant.  Again, *Cmedia* dealt with liability, not damages.

much it would have made had Laidlaw not breached its duty to Edulog by promoting Edulog's competitor."[73]

Expectation damages are an accepted measure of damages in breach of contract cases. *Hostetter v. Donlan*, 221 Mont. 380, 383, 719 P.2d 1243 (1986) (lost profit damages are a measure of damages in breach of contract cases). The premise of Dr. Hess's analysis, namely "that Edulog's damages from Laidlaw's alleged breach of contract is the difference between what Edulog's profits would have been absent the breach less what they actually were with the breach" is not controversial and has been relied upon him in several other cases as stated in his Supplemental Declaration.[74]

Further, to the extent that there should be an ultimate determination as to the appropriateness of Dr. Hess's methodology and the admissibility of his opinion, such a determination should be made by the trial court in the Montana Action after Dr. Hess had had an opportunity to write his report, present his credentials, and provide deposition testimony. Until that time, Dr. Hess should be provided some leeway in determining the information that he believes is relevant for the purposes of constructing his expectation lost profits damages models.

**B.    Documents Relating To Requests For Proposals Are Relevant.**

Request Nos. 5, 6, and 7 relate to Tyler's relationship with Laidlaw and the impact of that relationship on proposals made by Tyler to school districts. As noted above, Laidlaw has significant influence over its school district customers' choice of school bus routing software. As also noted above, Laidlaw owed Edulog a duty to promote its software to its school district

---

[73]   Emergency Motion To Compel, p. 15. *See also*, p. 7, "Edulog believes that Laidlaw has been … actively promoting Edulog's competitors … for purposes of <u>avoiding payment of royalty and other fees</u>."; "[Dr. Hess] intends … to show what damages, if any, Laidlaw's failure to promote the Edulog Software has had on Edulog Software <u>sales</u> and market share."; and p. 10, "[Dr. Hess] need data from these distinct time periods to determine what impact, if any, the 1992 Agreement had on Edulog <u>sales</u>."

[74]   Hess Suppl. Decl. at ¶ 4.  [App. 208].

customers.  Edulog expects that documents responsive to Request Nos. 5, 6, and 7 will show that Laidlaw and Tyler worked together to promote Tyler at the expense of Edulog and that Tyler was extremely successful in reaching licensing agreements with those school districts to which Laidlaw promoted Tyler.  In other words, Edulog anticipates that the requested documents will show that Laidlaw breached its duty to promote Edulog's software.

**C.**    **Documents Relating To Tyler's Marketing And Sales Of Bus Routing Software Are Necessary For Edulog's Damage Model.**

As discussed above, Edulog seeks Tyler's marketing and sales data to allow its expert to create a damage model.[75]  Tyler resists producing such information on the basis that it is a competitor of Edulog.  But that does not bar Edulog's discovery.  If that were the case, discovery would be unduly limited in a vast array of cases.  In *Ferko v. National Association for Stock Car Auto Racing, Inc.*, the United States District Court for the Eastern District of Texas compelled a racetrack to provide information on its revenues and profits from stock car races to its competitor.[76]  The plaintiff sought such information to prove how much it would have made on hosting an additional stock car race but for NASCAR awarding the race to the competitor.[77]  The court explained that "where, as here, the damages alleged are lost profits from a NASCAR race that never occurred, profits and revenues at other NASCAR races that did occur is pertinent information."[78]

---

[75]   See Request Nos. 5-13.  [App. 166-170].

[76]   *Ferko*, 218 F.R.D. at 137.

[77]   *Id.*

[78]   *Id.  See also Centeno Supermarkets v. H.E. Butt Grocery Co.*, No. SA-83-CA-72, 1987 WL 42402 (W.D. Tex. Sept. 2, 1987) (compelling disclosure of competitor pricing information that pre-dated alleged anticompetitive conduct to show changes in producing party's pricing strategy).

In this case, like in *Ferko*, Edulog seeks marketing and sales information of a competitor to prove how much it would have made had Laidlaw not breached its duty to Edulog by promoting Edulog's competitor.  The requested documents reach back to 1987 in some cases to allow Dr. Hess to demonstrate what the market looked like before, during and after the 1992 Agreement's exclusive period.  By comparing the relative performance of Edulog and its competitors over these periods, it is anticipated that Dr. Hess will be able to quantify the effect of Laidlaw's failure to promote.

Among Tyler's list of objections is the complaint that documents related to its business are its "trade secret information or other confidential research, development, or commercial information."[79]  But, as discussed above, Tyler has previously disclosed information related to its profits and revenues.  Further, the proposed Protective Order permits the designation of documents as "Confidential" or "Attorneys' Eyes Only Information."[80]  Tyler is free to designate documents as "Attorneys' Eyes Only Information," thereby limiting their disclosure to Edulog's counsel and experts.

## D.     Tyler Fails To Demonstrate That The Requested Documents Are Privileged.

The Fifth Circuit has "made clear that the attorney-client privilege may not be tossed as a blanket over an undifferentiated group of documents. . .[but] must be specifically asserted with respect to similar documents."[81]  Rather, Tyler must show that all of the following conditions have been met: (1) the asserted holder of the privilege is or sought to become a client; (2) the

---

[79]   Tyler asserted this version of its confidentiality objection to Request Nos. 5-13.  It used another variation in response to Request Nos. 1-4, which pertain to documents and communications with Laidlaw.  Tyler fails to explain how documents exchanged with Laidlaw might be confidential.

[80]   Protective Order, at ¶2, 5.  [App. 153-162].

[81]   *U.S. v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982).

person to whom the communication was made (a) is a member of a bar of a court, or his subordinate and (b) in connection with this communication was acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of serving primarily either (i) an opinion on law or (ii) legal service or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been claimed and not waived by the client.[82] Tyler summarily objected that all but three requests seek privileged documents.  On their face, many of the requests seek documents that were exchanged with third parties, suggesting that no privilege existed or that it has been waived through disclosure.

To the extent that Laidlaw is continuing to object to production on the grounds of any applicable privilege, it must create a produce a privilege log as required by the Civil Rules and by the Court's March 9 Order.

### E.     The Entry Of The Proposed Protective Order Protects Tyler.

Edulog has stated from the outset that it believes that the entry of a protective order is appropriate to help safeguard the information requested in its subpoena to Tyler.  The parties have now negotiated a proposed protective order that should allay Tyler's concerns regarding the confidentiality of any information that Tyler produces.[83]

### TYLER'S POSITION:

### I.     Introduction.

Edulog claims that Laidlaw breached its contractual obligation to use its "best efforts" to promote Edulog's bus routing software and services.  In its Complaint, Edulog alleges that it has

---

[82]   *Brady*, 238 F.R.D. at 438.

[83]   A copy of the proposed Protective Order is being separately submitted by the parties.

lost "licensing fees and royalties" as a result of Laidlaw's breach of its duty to promote. Edulog does not allege any other category of damages in this regard. As shown below, Edulog's document requests that remain in dispute between the parties have no relation to the claims or damages at issue in this case.

Importantly, Tyler is not a party to the litigation or the contract at issue therein. Indeed, Edulog admits in its Motion to Compel that, by virtue of Tyler's purchase of VersaTrans Solutions Inc. ("VersaTrans"), Edulog and Tyler are direct competitors. *See* Plaintiffs' Motion to Compel at p. 5-6. Edulog further admitted during the discovery conference that it was not seeking damages for conduct occurring prior to 2003. Nonetheless, Edulog has served Tyler with a broad, all-encompassing Subpoena that asks Tyler to produce, among other documents, confidential and proprietary documents relating to VersaTrans'—and thus Tyler's—business practices and revenues, dating back to 1987. This broad Subpoena asks not only for specific information on VersaTrans' sales, revenues, and budgets (requests nos. 8, 9, 10, and 12), but also for documents and information that would reveal VersaTrans' clients, client targets, and strategies in obtaining clients. Indeed, the Subpoena specifically seeks documents relating to requests for proposals ("RFPs") received by VersaTrans, as well as RFPs submitted by VersaTrans (requests nos. 5, 6, and 7). Moreover, the Subpoena seeks documents relating to VersaTrans' staffing levels and needs (request no. 11), and information relating to the number of sales calls made by VersaTrans (request no. 13).

Tyler has agreed that it will produce documents that are responsive to the Subpoena and that might somehow relate to Edulog's *only* claim in the Montana Action—Laidlaw's alleged breach of an underlying agreement between Edulog and Laidlaw (the "1992 Agreement").

Indeed, Tyler has generally agreed that it will produce documents that are responsive to the requests that are numbered 1 through 4 in the Subpoena.  Tyler cannot, however, agree to produce its highly confidential and sensitive business information documents that are entirely unrelated to Laidlaw's alleged breach of the 1992 Agreement or any alleged damages resulting therefrom.  For this reason, and as more fully set forth below, Tyler objects to the production of the documents being sought in the requests that are numbered 5 through 13, except to the extent that the requests seek documents that are specific to Tyler's business dealings with Laidlaw directly.

It should be noted that Tyler has made substantial concessions in response to the Court's order and has agreed, despite valid objections to the very broad scope of the subpoena, to produce all documents requested that relate to Laidlaw in response to 7 of the 13 requests. Edulog, on the other hand, did not withdraw even one request or agree to narrow the subject matter of any of the requested documents.  It is Tyler's view that it conceded numerous valid objections with the intent to resolve all possible disputes, but hat Edulog did not meaningfully compromise any of its substantive positions.

**II.  Tyler Should Not Be Forced to Produce The Documents Requested in the Subpoena Requests That are Numbered Five Through Thirteen.**

*A.  Legal Standards.*

Federal Rule of Civil Procedure 45 provides that a Court may modify a subpoena if the subpoena requires "disclosing a trade secret or other confidential research, development, or commercial information."  *See* FED. R. CIV. P. 45(c)(3)(B)(i).  Moreover, Federal Rule of Civil Procedure 26, the rule governing the scope and limitations of discovery, provides as follows:

> Unless otherwise limited by court order, the scope of discovery is as follows: ***Parties may obtain discovery regarding any nonprivileged matter***

> *that is __relevant__ to any party's __claim__ or __defense__*--including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(C).

*See* FED. R. CIV. P. 26(b)(1) (emphasis added).  In applying these rules and in determining whether a non-party is obligated to produce confidential documents, Courts have stated that the non-party from whom confidential information is sought has the burden of first establishing that the information sought is indeed confidential and that disclosure might be harmful.  *See Cmedia, LLC v. LifeKey Healthcare, LLC*, 216 F.R.D. 387, 390-91 (N.D. Tex. 2003).

Once the non-party meets this burden, the burden then shifts to the party seeking discovery to show that the information is relevant and that there is a ***"substantial need"*** for the requested information.  *See Bramell v. Aspen Exploration, Inc.*, No. 4:05-CV-384, 2008 WL 4425368, at *2 (E.D. Tex. Sept. 24, 2008); *see also In re Stewart Title Co.*, No. H-09-247, 2009 WL 1708079, at *2 (S.D. Tex. June 17, 2009); *see also Centurion Industries, Inc. v. Warren Steurer & Associates*, 665 F.2d 323, 325 (10th Cir. 1981) (if a party establishes that the information sought is a trade secret and that its disclosure might be harmful, the "burden shifts to the party seeking discovery to establish that the disclosure of trade secrets is relevant and necessary to the action … ***If proof of relevancy or need is not established, discovery should be denied.***") (emphasis added) (internal citations omitted); *see also Cmedia*, 216 F.R.D. at 391.

If the party seeking the confidential information establishes the relevance of the information and the party's "substantial need" for the information, then the court balances the asserted need against the claim of injury resulting from the disclosure.  *See Cmedia*, 216 F.R.D.

at 391.  In conducting this balancing test, courts may consider that the documents being sought are those of a non-party who would be entrusting the confidentiality of its documents to parties who do not represent its interests.  *See Cmedia*, 216 F.R.D. at 389; *see also In re Stewart Title*, 2009 WL 1708079, at * 2 ("Moreover, the Court is concerned that Stewart Title is a non-party who would be entrusting the confidentiality of its documents to parties who do not represent its interests.  ***Such concern, although perhaps not dispositive on its own, lend weight to the arguments for quashing discovery.***") (emphasis added).

### B.    The Documents and Information are Confidential and Proprietary.

There should be no dispute that the requests that are numbered 5 through 13 of the Subpoena—which generally seek everything from VersaTrans' sales and revenues, to RFPs submitted by VersaTrans, to the size of VersaTrans' sales force—seek confidential and proprietary business information that, if disclosed, would be unduly harmful to Tyler and VersaTrans.  Edulog has, in fact, impliedly conceded the confidential nature of the requested documents in its Motion to Compel.  *See* Plaintiffs' Motion to Compel at p. 15 (noting that Rule 26(c) allows a court to enter an order requiring that confidential information be revealed in a specific way, and further noting that Edulog has agreed that the Protective Order that is in place in the Montana Action would apply to confidential documents produced by Tyler.).  Moreover, and because Edulog and Tyler are competitors, disclosure of this information is considered to be presumptively more harmful than if a disclosure was made to a non-competitor.  *See Cmedia*, 216 F.R.D. at 391.

Nonetheless, and in the event that Edulog contests the confidentiality of the requested documents, both the declaration of Tyler's President of the VersaTrans Division—James Guzewich—and applicable case law confirm that the documents being sought in the requests

numbered 5 through 13 do indeed contain confidential information.  In determining whether requests seek documents or information that could be considered confidential, courts have considered, among other things, whether the information sought would provide a business advantage to competitors, whether the non-party has a practice of maintaining the confidentiality of the requested information, and whether disclosure of the information to a competitor would damage the non-party's ability to compete.  *See Cmedia*, 216 F.R.D. at 391.  The declaration of Mr. Guzewich confirms that, with respect to the documents sought in the requests at issue, all of these conditions are met.  Indeed, and not only would the requested information provide a business advantage to VersaTrans competitors if the competitors were able to obtain this information, but Tyler goes to great lengths to protect the confidentiality of this information.  *See* Guzewich Declaration at ¶ 6-10 [App. 213-215].  Finally, if this information was disclosed to a competitor of Tyler and/or VersaTrans, such disclosure would damage Tyler's and VersaTrans' ability to compete.  *See* Guzewich Declaration at ¶ 7-10 [App. 214-215].

The relevant case law likewise confirms that the requested documents contain confidential and proprietary information.  *See Cmedia*, 216 F.R.D. at 388, 391 (finding that a subpoena asking for, among other documents, proposals sent by a non-party media placement company, as well as documents showing prices charged for marketing spots, sought confidential information.); *see also Micro Motion, Inc. v. Kane Steel Co.,* 894 F.2d 1318, 1321, 1325 (Fed. Cir. 1990) (finding that a subpoena asking for documents evidencing the non-party's invoices, sales volumes, customers, and customer complaints sought confidential information.); *see also Allen v. Howmedica Leibinger*, 190 F.R.D. 518, 526 (W.D. Tenn. 1999) ("In the present case, [plaintiff] seeks marketing information, sales data, sales projections, and product details.  All of

these are the type of information which give one an advantage over competition and have traditionally been protected." (citing *American Std., Inc. v. Pfizer, Inc.*, 828 F.2d 734 (Fed. Cir. 1987))).

Because the documents sought in the requests that are numbered 5 through 13 contain Tyler's confidential, proprietary, and sensitive business information, Tyler should not be obligated to disclose these documents unless Edulog can show that the documents are relevant to its claims in the Montana Action and that Edulog has a "substantial need" for the documents.

    **C.**    ***Edulog Has Not, and Cannot, Establish a "Substantial Need" for these Documents and Information, or that the Documents are Even Relevant.***

        **1.**    **Edulog Makes No Claim for "Lost Market Share" in Its Complaint.**

Edulog argues that it needs the requested confidential and proprietary documents to prove its damages that allegedly resulted from Laidlaw breaching the 1992 Agreement by failing to promote Edulog's software. *See* Plaintiffs' Motion to Compel at p. 9. Edulog claims that Laidlaw's failure to promote the software has resulted in Edulog's loss of "market share," and that in order to construct this market analysis, Edulog's expert needs financial and sales data from other software developers in the market—including, but not limited to, VersaTrans. *See id*.

Edulog, however, makes ***no claim*** in its Complaint for loss of "market share" damages. *See* Exhibit A-1 to Plaintiffs' Motion to Compel. Indeed, in its entire Complaint, Edulog fails to even mention the words "lost market share," or anything similar. *See id*. Rather, Edulog claims that its damages for Laidlaw's alleged failure to promote are "lost profits," including loss of licensing fees and loss of royalties. *See id*. at p. 5, 6. The relevant language in the Complaint is as follows:

> Pursuant to  Section 2.3.3 of the Agreement, Laidlaw must use its best efforts to promote the use of the Software and related services provided by [Edulog] to

existing and prospective Laidlaw customers.  Laidlaw has breached Section 2.3.3 by promoting routing software provided by other vendors and discouraging the use of the Software.  Laidlaw has entered into an agreement with GST to compete directly with LMI and Edulog for the provision of routing software to school districts.  This breach of the Agreement has, among other things, resulted in the **loss of licensing fees and royalties** to [Edulog].  *See* Exhibit A-1 to Plaintiff's Motion to Compel at ¶ 24 (emphasis added).

Because Edulog has no claim for lost market share damages and any market analysis cannot show the amount of fees and royalties actually lost, the documents Edulog seeks relating to this all encompassing "market analysis" are not relevant to the underlying case.  *See* FED. R. CIV. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's ***claim or defense***.") (emphasis added).  Thus, Edulog certainly cannot establish a "substantial need" for the documents.

Indeed, it is unfathomable as to how VersaTrans' revenues or sales—much less VersaTrans' RFPs and information concerning VersaTrans' sales staff—could in any way shed light on the amount of license or royalty fees lost by Edulog as a result of Laidlaw's failure to promote Edulog's software.  At most, VersaTrans will have documents relating to its dealings with Laidlaw that may show the number of times Laidlaw promoted VersaTrans' software over Edulog's; as set forth above, Tyler has agreed to produce such documents and all other documents relating to VersaTrans' contracts and dealings with Laidlaw.  The other requested information, however (that found in Requests 5-13), is totally irrelevant to Laidlaw's damages.

> **2.  Case Law Supports the Conclusion that Tyler Should Not Be Forced to Disclose the Requested Confidential Documents.**

Federal courts in Texas have narrowly construed the "need" and "relevance" requirements when analyzing whether a non-party should disclose its confidential information to a competitor.  In *Cmedia, LLC v. LifeKey Healthcare, LLC*, Plaintiff was in the business of

placing media advertisements, and entered into a contract with Defendant.  216 F.R.D. 387, 388 (N.D. Tex. 2003).   In subsequent litigation, Defendant asserted a breach of contract counterclaim, asserting that Plaintiff had booked advertisements at excessive rates.  *See id*.

Plaintiff served a subpoena on a non-party direct competitor of Plaintiff who had replaced Plaintiff as Defendant's media agent.  *See id*.  Plaintiff requested, among other documents: (1) documents showing prices charged by networks for advertising placed by the non-party for Defendant or its related companies, including all proposals made by the non-party to the stations; and (2) agreements between the non-party and Defendant or its related companies, including all drafts.  *See id*.  The non-party objected that the requested documents were irrelevant and that they contained confidential information.  *See id*. at 389.  Plaintiff argued that the documents were relevant to its defense of Defendant's counterclaim, and that it needed the documents to obtain prices secured by the non-party on behalf of Defendant ***or its related companies***.  *See id*. at 389-90.

The Court held that the documents pertaining to the prices obtained by the non-party on behalf of Defendant's related companies were irrelevant because Defendant's counterclaim did not deal with either of the related companies.  *See id*. at 390.  The Court further held that the non-party's "proposals" to television stations were not relevant to the actual prices obtained, and that contracts between the parties were likewise irrelevant.  *See id*.  The Court thus limited production to documents showing the actual prices charged by television stations for advertising placed by the non-party for ***Defendant*** only.  *See id*.

As noted, the Court in *Cmedia* specifically stated that because Defendant's counterclaim did not mention any rates charged to its related companies, the information relating to those rates

was irrelevant.  Applying this reasoning to the case at hand, Edulog has made **_no claim_** in its Complaint that it has lost a "market share" as a result of Laidlaw's alleged breach of contract. As a result, the documents Edulog is seeking from Tyler to prove its alleged "lost market share" are irrelevant, and Edulog has not, and cannot, show a "substantial need" for these documents. *See also In re Stewart Title Co.*, No. H-09-247, 2009 WL 1708079, at *1-2 (S.D. Tex. June 17, 2009) (finding that, even though Plaintiff's alleged damages included "loss of enterprise value" and even though Plaintiff's expert relied on a non-party's Letter of Intent to purchase a portion of Plaintiff's business as evidence of this lost value, Defendant was not entitled to production of the non-party's internal evaluations of the value of Plaintiff's business; Defendant could not show a "substantial need" for the confidential information, as the only relevant issue was the value of Plaintiff's business, and what the non-party <u>thought</u> of that value "is one step removed.").

In addition to the foregoing authority, cases from other jurisdictions likewise confirm that Tyler should not be forced to produce the documents sought by Edulog.  In *Allen v. Howmedica Leibinger*, Plaintiff had developed and patented a medical device and had entered into an exclusive patent license agreement with Picker International, Inc. ("Picker").  190 F.R.D. 518, 519-20 (W.D. Tenn. 1999).  Plaintiff alleged in his lawsuit that Defendants had interfered with Plaintiff's license with Picker.  *See id* at 520.  After filing his lawsuit, Plaintiff sought documents from a non-party who held a patent for—and marketed, sold and licensed—a medical device (the "Device") that performed functions similar to the device patented by Plaintiff.  *See id*.  In its subpoena to the non-party, Plaintiff sought the following: (1) the non-party's financial information concerning its sales of the Device, including actual sales data, past and present sales projections, costs, profits and marketing plans; (2) information about the non-party's licenses of

the Device; and (3) details about the features and operation of the Device.  *See id*.  After the non-

party refused to produce the requested documents, Plaintiff filed a motion to compel, arguing

that the non-party's market position is a measure of the damages due to him as a result of

Defendants' conduct.  *See id* at 521.  Specifically, Plaintiff argued that absent Defendants'

tortious interference, Plaintiff would have become the market leader.  *See id*.

In response, the non-party argued that the requested documents were not relevant or

necessary to the underlying case, and that its confidential information would be compromised by

producing the requested documents.  *See id*.  In deciding the issue, the Court first looked at

whether the documents were relevant to Plaintiff's claim, and found they were not, stating that:

> ***In the present case, it is unclear that [Plaintiff's] 'lost market share'
> theory of damages is the 'subject matter involved in the pending action' in
> Delaware*** and that the information plaintiff seeks from [the non-party] is
> directly related to his theory of damages.  ***The only damages allegations in
> the complaint are that the price paid by Picker for the exclusive [] license
> was 'substantially depressed,' and 'adversely affected.'  All references to
> 'lost market share' are simply arguments in the motion.***

*See id*. at 522 (emphasis added) (internal citations omitted).  The Court further stated that:

> … [I]n order to determine in an ancillary proceeding if discovery is
> 'relevant to the subject matter' of the lawsuit and is 'calculated to lead to
> admissible evidence,' the plaintiff must, at a minimum, set forth a
> recognized damage theory.  Additionally, the plaintiff must enunciate some
> factual support for the theory with some degree of particularity.  ***Broad,
> general conclusory allegations of 'lost market share' or 'reduced price'
> will not suffice.  [Plaintiff's] damage theory of 'lost market share' is too
> tenuous at this time to permit discovery of the leading competitor's
> financial, sales, and marketing information.***

*See id*. at 524.  The Court thus held that Plaintiff had failed to demonstrate even the minimal

level of relevance required under Rule 26(b)(2).  *See id*. at 524-25.

The Court also found that the document requests were unduly burdensome on the non-

party.  *See id* at 525.  In so finding, the Court noted that the non-party had included in one of its

briefs to the Court publicly available financial information on other companies in the same field. *See id.*   The Court found that in the absence of some showing by Plaintiff that the publicly available information was inadequate, the burden on the non-party was unreasonable.  *See id.* The Court also recognized the confidential nature of the documents being sought, and stated that Plaintiff "has not demonstrated such a need for information from [the non-party] as opposed to the publicly available information regarding other similarly situated companies, to outweigh the potential harm to [the non-party] from disclosure."  *See id.* at 526.  Finally, the Court held that a protective order could not protect the non-party's interests in the case, noting that none of the parties would have an incentive to protect the non-party's information when issues concerning the confidentiality of the documents arose during trial.  *See id.*

The *Allen* case clearly presents a situation similar to the case at bar.  As noted above, Edulog makes ***no claim*** in its Complaint that it is entitled to "market share" damages, and Plaintiff's contention that it is entitled to "market share" damages was not raised until it filed the Motion to Compel at issue.  Thus, and as the Court in the *Allen* case did, this Court should likewise disregard Edulog's broad, general and conclusory allegation in its Motion to Compel that the documents Edulog seeks from Tyler are relevant to Edulog's claim for "market share" damages.  This is particularly true since Edulog has failed to articulate how or why it is entitled to "lost market share" damages as a result of Laidlaw's alleged breach.  Moreover, and similar to the parties in the *Allen* case, Edulog has access to some publicly available information concerning Tyler's market sales,[84] but has failed to make any showing as to why or how this

---

[84]   Edulog alludes to an argument in its Motion that because Tyler has made some of its "confidential" information public, the information sought in the Subpoena is not "confidential."  It is correct that the Albany Business Journal published a survey of annual revenues that included general revenue numbers of VersaTrans.  This information, however, is much more general than the information sought in the Subpoena.

publicly available information is not adequate to conduct Edulog's desired market analysis.  *See* Plaintiffs' Motion to Compel at p. 5-6; *see* Exhibit A to Plaintiffs' Motion to Compel at ¶ 6-7.

Finally, and as noted in the *Allen* case, Edulog's claim that Tyler's confidential and proprietary information will be protected by virtue of an existing Protective Order is similarly unpersuasive.  Indeed, neither Edulog nor Laidlaw will have an incentive to protect Tyler's confidential documents, and moreover, it is difficult to think of a scenario in which Edulog's expert could testify in open court about Tyler's market share without Tyler's confidential information becoming public.  In any event, and even if a Protective Order could protect Tyler, merely having a Protective Order in place does not absolve Edulog of its burden to show that the requested documents are relevant.  *See Micro Motion, Inc. v. Kane Steel Co.,* 894 F.2d 1318, 1325 (Fed. Cir. 1990) ("***The protective order is not a substitute for establishing relevance or need.***  Its purpose here is to prevent harm by limiting disclosure of ***relevant*** and ***necessary*** information.") (emphasis added).  As set forth above, Edulog has not, and cannot, carry its burden on this issue.

In another similar case, the Federal Circuit Court of Appeals in *Micro Motion, Inc. v. Kane Steel Co.* likewise held that the Plaintiff was not entitled to confidential and proprietary information from its non-party competitor to prove Plaintiff's alleged "lost profit" damages.  894 F.2d 1318, 1328 (Fed. Cir. 1990).  In that case, the Plaintiff sued Defendant for patent infringement, and served a subpoena on a non-party competitor in the same market.  *See id.* at 1320-21.  Plaintiff sought documents relating to, among other things, the non-party's invoices, sales volumes, loss of sales, customers, customer complaints, and the configuration of the non-party's device.  *See id.* at 1321.  Plaintiff argued that the requested information was relevant to

its "lost profit" damages, in that to recover "lost profits," Plaintiff may have to prove that the non-party's devices were infringements or were unacceptable noninfringing substitutes.  *See id*.

The Court held that the non-party would not be obligated to produce any of the requested documents.  *See id*. at 1328.  The Court stated that Plaintiff's theory of "lost profits" would be turned into a "quagmire of proofs" concerning a dozen or so other products (as in the case at bar, the Plaintiff had sought the same information from various other non-parties) that are related to the main suit only with respect to damages.  *See id*. at 1324.  The Court also stated that:

> ***A party to litigation has no absolute right to pursue any and every alternative theory of damages, no matter how complicated or tenuous*** … a district court has discretion to deny a plaintiff's *proposed method of proof* of damages which imposes too great a burden on court proceedings.

*See id*. (emphasis added).  The Court further noted that if it were to accept Plaintiff's position that it was entitled to discovery because of its theory of damages, every patentee could, in virtually every infringement suit, immediately obtain discovery from all possible competitors by merely filing a complaint for damages against one.  *See id*. at 1324-25.  The Court additionally stated that Plaintiff's "assertion of a claim for damages or even lost profit damages in itself does not provide a mantle of relevancy with respect to all of the information it sought" and that "[t]he doors of the discovery process may not be so easily opened."  *See id*. at 1325.  Finding that Plaintiff had made no showing whatsoever that the non-party was indeed infringing, the Court thus held that the documents requested were not relevant to the underlying claim, and that discovery would be denied.  *See id*. at 1326-28.

Similar to the Plaintiff in *Micro Motion*, Edulog asserts that it is entitled to Tyler's confidential information merely because Edulog has asserted a "theory" of damages that may

necessitate the use of such information.  However, and as the Court in *Micro Motion* held, "[t]he doors of the discovery process may not be so easily opened."  *See id*. at 1325.

> **D.**      ***The Case Relied Upon by Edulog is Inapposite.***

In support of its argument that Tyler should be forced to produce its confidential and proprietary documents, Tyler primarily relies upon *Ferko v. National Ass'n for Stock Car Auto Racing, Inc.*, a case in which the court compelled a racetrack to provide its revenues from stock car races to the plaintiff in order to prove how much money the plaintiff would have made by hosting an additional stock car race.  *See* 218 F.R.D. 125 (E.D. Tex. 2003); *see also* Plaintiffs' Motion to Compel at p. 14-15.  This case is distinguishable from the instant case in two primary ways.  First, in *Ferko*, the Plaintiff sought the documents from another party to the case, not a non-party.  *Ferko*, 218 F.R.D. at 137.  As set forth above, non-party status is a consideration that a court should look to in determining whether to order production of confidential documents.

Second, and more importantly, the documents sought in *Ferko* actually related to the damages sought, while the documents sought in the case at bar do not.  The Plaintiff's alleged damages in *Ferko* were the profits that Plaintiff would have realized from hosting another car race.  *See id*.  Thus, the Court found that Defendant's profits from hosting individual car races were relevant to this claim.  *See id*.  In the case at hand, Edulog's alleged damages are also "lost profits"—specifically, those resulting from Laidlaw's alleged failure to use best efforts to market Edulog software by promoting other software.  *See* Exhibit A-1 to Plaintiffs' Motion to Compel at p. 12.  As set forth above—and as Edulog alleges in its Complaint—Edulog's "lost profits" are the number of license and royalty payments that should have been paid to Edulog but for Laidlaw promoting some other software.  *See* Exhibit A-1 to Plaintiffs' Motion to Compel at ¶

24.  Tyler has agreed to produce the documents and information relevant to prove this theory of "lost profits."  Thus, and in short, Tyler's failure to produce broad market share data in no way runs contrary to *Ferko*.  Indeed, the Court in *Ferko* did ***not*** hold that the Plaintiff was entitled to the revenues and sales of all non-party race track owners all over the world to prove some broad, conclusory, and un-pled "lost market share" theory of damages, when only "lost profits" had been pled.

For the reasons set forth above, Tyler respectfully requests that its objections to request numbers 5-13 be sustained and that Edulog's Motion to Compel Production of Documents sought by such requests be denied.

## III.   Tyler Will Produce a Privilege Log in Accordance with the Court's Order.

Edulog argues in its "position" section of this Report that Tyler has failed to produce a privilege log in accordance with this Court's March 9, 2011 Order.  In that Order, this Court stated that "[a] privilege log must be produced for any documents, communications, or other materials withheld from production on the grounds of attorney-client, work product, or other privilege or immunity."  *See* Court Order at ¶ 1.  Tyler has done nothing to in any way violate this Order.  Once Tyler has reviewed the documents to be produced, Tyler will withhold privileged documents and provide a privilege log for those withheld documents.  Edulog's complaint that Tyler has not yet produced a privilege log—even though no documents have been produced and the scope of production has not been decided by this Court—is, in fact, surprising because Edulog failed to mention a privilege log issue in the Conference on March 15, 2011.

IV.     **Tyler Should Not be Obligated to Produce Documents by March 25, 2011 or March 28, 2011.**

Edulog also argues that Tyler should have to produce documents by either March 25, 2011 or March 28, 2011—its position in this regard is inconsistent, as its asks for production by March 25 in one section of their position statement, and by March 28 in another.  Both of those dates, however, are unreasonable.  On the face of the requests alone, particularly those dealing with communications between Tyler and Laidlaw, demonstrate the enormous scope of discovery and the large volume of documents that will need to be reviewed.  Indeed, Edulog seeks, among other documents, all communications between Laidlaw and Tyler going back to 1996.

Moreover, Edulog has, as set forth in this Status Report, agreed to allow Tyler to label certain documents as "Confidential" or "Attorneys' Eyes Only."  Clearly, in order to do this, Tyler's counsel will need to review every document to be produced.  Given that the documents to be produced will very likely run into the thousands, it is unreasonable for Tyler to have to produce documents by March 25, 2011 or March 28, 2011.  Asking Tyler to produce these documents without sufficient time to review and "stamp" the documents would essentially result in the "Confidential" and "Attorneys' Eyes Only" protections being worthless, as Tyler would not have the ability to properly assert the need for such designations.

Edulog appears to argue that a March 25 or March 28 deadline is proper since Tyler has had the Subpoena since February 14, 2011.  However, and as Edulog is well aware, Tyler served proper objections to the Subpoena on February 28, 2011, and therein, stated that it would not produce **any** documents.  Because Tyler properly objected to the discovery, Tyler was not obligated to produce any documents until a Court ordered otherwise.  *See Micro Motion, Inc. v. Kane Steel Co.,* 894 F.2d 1318, 1321, 1325 (Fed. Cir. 1990) ("A nonparty may also merely

object to production of documents and things.  ***By merely objecting, such discovery is foreclosed except pursuant to an order of the court.***") (emphasis added) citing FED. R. CIV. P. 45.); *see also* FED. R. CIV. P. 45(c)(2)(B).  Edulog did not file its Motion to Compel until March 8, 2011, and this Court did not issue an Order relating to the Motion to Compel until March 9, 2011.  Even in that Order, however, the issues regarding Tyler's objections were not resolved.  Thus, it was not until March 15, 2011 (the date of the parties' conference) that the parties agreed to production.  Given the scope of discovery and that Tyler's documents will contain sensitive and confidential information, a ten (or thirteen) day deadline to produce documents is unreasonable.

Finally, Edulog did not mention either of these dates during the March 15, 2011 conference.  In that conference, Tyler's counsel stated that it would start a rolling production and asked counsel for Edulog to prioritize its requests to ensure it received documents most important to Edulog first.  In response, Edulog made no mention that it would seek to have Tyler complete its production by March 25.  Tyler did not know of Edulog's proposed deadlines until the parties exchanged briefs on the day of this filing.  Because Edulog did not mention this deadline at the conference and instead agreed to a rolling production, Tyler has been prevented from obtaining additional evidence as to the precise number of documents at issue.  Based on the foregoing, Tyler proposes that the Court order Tyler to use its best efforts to produce documents on a timely basis and to produce documents on a rolling, weekly basis according to Edulog's prioritization.  The Court should note that Tyler is already processing the documents that Tyler has agreed to produce, and thus, Tyler is doing everything within its control to expedite this process.

Tyler anticipates that Edulog will complain that a production in mid-April will not give Edulog and/or Edulog's expert sufficient time to review documents by the Montana Action's expert disclosure deadline.  However, Tyler—a non-party to the Montana Action—should not be unduly burdened by deadlines that are set in a case in which is has no voice.  Moreover, Edulog itself notes that discovery in the Montana Action re-opened on Edulog's failure to promote claim on January 14, 2011.  *See* Plaintiff's Motion to Compel at p. 11-12.  Edulog delayed, however, one month (until February 14, 2011) to seek its desired discovery from Tyler, which as set forth above, is quite extensive.  If Edulog needs additional time to review the documents produced by Tyler, then Edulog should disclose that desire in the Montana Action and seek to postpone the expert disclosure deadline instead of shifting the burden and resulting prejudice to Tyler.

Respectfully submitted,

_(signature)_

Stephen C. Schoettmer
State Bar No. 16551420

Kim McCrea
State Bar No. 24041434

THOMPSON & KNIGHT L.L.P.
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Phone: (214) 969-1700
Fax:    (214) 969-1751

**ATTORNEYS FOR PLAINTIFFS
EDUCATION LOGISTICS, INC.
AND LOGISTICS MANAGEMENT,
INC.**

_(signature)_

Andrew B. Russell
State Bar No. 24034661

Blake Edwards
State Bar No. 24050553

K&L GATES
1717 Main Street, Suite 2800
Dallas, Texas  75201
Phone: (214) 939-5500
Fax:    (214) 939-5849

**ATTORNEYS FOR RESPONDENT
TYLER TECHNOLOGIES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon counsel of record via hand delivery on March 17, 2011.

_____
Kim McCrea