terms of the Protective Order, and such expert, advisor or consultant shall execute a copy of the Confidentiality Agreement in the form of Exhibit A. A copy of each such undertaking shall be forwarded to the other parties at the end of the Proceeding or at the time the identity of the expert, advisor or consultant is disclosed. If any expert, advisor or consultant is called to testify, a copy of such person's undertaking will be provided to the other party no later than that time;

(d)     In-house counsel for a party who is required to work directly on this Proceeding, with disclosure only to the extent necessary to perform such work and with the restriction that in house counsel may not share the documents or information with his or her client; and

(e)     Any person of whom testimony is taken, if the Attorneys' Eyes Only Information was produced by the party with which the witness is employed, except that such person may only be shown copies of Attorneys' Eyes Only Information during his or her testimony, and may not retain any Attorneys' Eyes Only Information after his or her testimony and further provided that such witness is given a copy of the Protective Order, is advised that he or she is subject to its terms and conditions and acknowledges the terms thereof by the execution of the Confidentiality Agreement in the form of Exhibit A. A copy of such Confidentiality Agreement shall be furnished to the other parties at the end of the Proceeding or the time the identity of the fact witness is disclosed. In the case of actual testimony, the witness shall acknowledge on the record that he or she has read the Stipulated Protective Order and will abide by its terms.

Protective Order                                                    Page 6 of 11

8. Nothing in this Protective Order shall preclude any party to this Proceeding or their attorneys from disclosing or using, in any manner or for any purpose, any information or documents from the party's own files which the party itself has designated as Confidential or Attorneys' Eyes Only.

9. All Qualified Persons who have received Confidential and/or Attorneys' Eyes Only Information pursuant hereto shall safeguard such information so as to prevent its disclosure to persons who are not Qualified Persons entitled to see such Confidential and/or Attorneys' Eyes Only Information.

10. Subject to the Civil Rules and Rules of Evidence, documents containing Confidential and/or Attorneys' Eyes Only Information may be offered into evidence in the Proceeding or as part of any hearing related thereto, only on the following conditions:

(a) Use as an Exhibit at Trial. Prior to using any Confidential or Attorneys' Eyes Only information as an exhibit at trial, the attorneys for both parties will meet and confer regarding those documents that will be marked for identification as exhibits by the parties. The parties will raise concerns with the sealing of particular exhibits during the pre-trial conference with the Court, in compliance with L. R. 7.4, and the Court will make the ultimate determination of whether a particular document should be submitted under seal at trial. The party who made the confidential designation shall bear the ultimate burden to show that the document is actually confidential regardless of who actually identified the document as an exhibit at trial.

(b) Use in Any Other Filing. In the event that any party intends to use a

Protective Order                                                    Page 7 of 11

document designated as Confidential or Attorney's Eyes Only in any Court filing

or pleading, including as an exhibit to a declaration in support of a dispositive

motion, then prior to filing the document, the party offering the document will file

the document under seal and file a motion for leave to rely on a sealed document

pursuant to L.R. 7.4. The filing of a motion under this section is not intended to

be and shall not be deemed to be an admission by the moving party that a

document is confidential; rather, the party who made the confidential designation

shall bear the ultimate burden to show that the document is actually confidential,

and the moving party is not barred from objecting to the designation.

11.     Any party to the Proceeding to whom Confidential and/or Attorneys' Eyes Only

Information is produced or disclosed may object to the Confidential and/or Attorneys' Eyes Only

designation. The objection shall be made in writing to counsel for the designating party (the

"Notice"). The Notice shall have attached a copy of such designated material or shall identify

each subject document by production number and shall (a) state that the receiving party objects to

the designation and (b) set forth the particular reasons for such objection. Counsel shall confer in

good faith in an effort to resolve any dispute concerning such designation. If the objection

cannot be resolved by agreement within ten (10) calendar days of the date of service of the

objection, the objecting party may move to remove the Confidential and/or Attorneys' Eyes Only

designation. All material whose designation is so objected to shall continue to be treated as

Confidential and/or Attorneys' Eyes Only Information until there is a ruling to the contrary.

12.     Further, any party may move for an order that Confidential or Attorneys' Eyes

Only Information offered in evidence be received under conditions to prevent its disclosure to

Protective Order                                    Page 8 of 11

persons or entities not entitled under this Protective Order to have access to it.

13.     All Confidential and/or Attorneys' Eyes Only Information and all copies thereof shall be destroyed, and certified to the producing party as having been destroyed, or returned to counsel for the producing party within sixty (60) days after the final conclusion of the Proceeding.

14.     After the termination of this Proceeding, this Protective Order shall continue to be binding upon the parties hereto, and upon all persons to whom Confidential and/or Attorneys' Eyes Only Information has been disclosed or communicated.

15.     The inadvertent production of any discovery material shall be without prejudice to any claim that such material is privileged and/or protected from discovery as work product, and the producing party shall not be held to have waived any such claim by inadvertent production, provided that the producing party promptly advises the other parties of its position and identifies the documents to which the assertion is claimed.  All inadvertently produced material as to which a claim of privilege is asserted and any copies thereof shall be returned promptly.

16.     If Confidential and/or Attorneys' Eyes Only Information is disclosed to any person other than in the manner authorized by this Protective Order, the person responsible for the disclosure shall immediately bring all pertinent facts relating to such disclosure to the attention of counsel for all parties, without prejudice to other rights and remedies of any party, and shall make every effort to prevent further disclosure by it or by the person who was the recipient of such information.

17.     Any notice required or permitted herein shall be made to the parties' counsels or

Protective Order                                                                          Page 9 of 11

record. Notice may be by telephone with facsimile confirmation or other such means so as to provide timely notice as appropriate.

18. Nothing herein shall prevent the parties from seeking an order from the Court further restricting the use or access to information.

19. Each of the parties hereto shall be entitled to seek modification of this Protective Order for good cause shown by application to the Court on reasonable notice to the other parties hereto.

Dated this _____ day of August, 2008

Honorable Donald W. Molloy
United States District Judge

# K&L|GATES

K&L Gates LLP
1717 Main Street
Suite 2800
Dallas, TX  75201-7342

T 214.939.5500    www.klgates.com

February 28, 2011

Andrew B. Russell
D 214-939-5879
F 214-939-5849
andrew.russell@klgates.com

*VIA FACSIMILE AND CMRRR*
Samuel T. Bull
FOSTER PEPPER PLLC
1111 Third Avenue, Suite 4300
Seattle, WA 98101

Re:    *Education Logistics, Inc., et al. v. Laidlaw Transit, Inc.*

Dear Mr. Bull:

I represent Tyler Technologies, Inc. ("Tyler Technologies").  Pursuant to Federal Rule of Civil Procedure 45, Tyler Technologies serves the following responses and objections to Education Logistics, Inc. et al.'s ("Plaintiffs") Subpoena to Produce Documents, Information, or Objects in a Civil Action (the "Subpoena") as follows:

## GLOBAL OBJECTIONS

1.  Tyler Technologies objects to the Subpoena as it calls for production at a location greater than 100 miles from where the subpoena was served.  Additionally, documents potentially responsive to the Subpoena are not within 100 miles of the location of service or the specified location of production.

2.  Tyler Technologies objects to the contents and requirements of Plaintiffs' Instructions and Definitions as contained in the Subpoena, to the extent they are overly broad and impose burdens upon Tyler Technologies that exceed the scope of the Federal Rules of Civil Procedure (the "Rules"), and to the extent that they ascribe meanings to words beyond or different from their ordinary and commonly understood meanings.  Tyler Technologies does not agree to be bound by any of the requirements of Plaintiffs' Definitions or Instructions that exceed, among other things, the ordinary and commonly understood meanings of words or terms, the Rules, the Federal Rules of Civil Evidence, and/or relevant case law, as applicable.

3.  Tyler Technologies objects to the Subpoena to the extent it asks for information or documents already in Plaintiffs' possession, custody or control, equally available to the Plaintiffs and/or in the public domain, or otherwise obtainable from some other source that is more convenient, less burdensome or less expensive, or for which the burden of expense of the discovery outweighs its likely benefit.



**EXHIBIT**
**9**

163

Samuel T. Bull
February 28, 2011
Page 2

4.  Tyler Technologies objects to the Subpoena because the discovery sought therein is irrelevant to the current dispute between Plaintiffs and Defendants and not reasonably calculated to lead to the discovery of admissible evidence.  The Subpoena is overbroad in light of the issues and questions of law before the court with regard to Plaintiffs' complaint.

5.  Tyler Technologies objects to the Subpoena to the extent the discovery sought therein seeks the production of information protected by the attorney client privilege, work product doctrine or other applicable privilege against discovery.

6.  Tyler Technologies objects to the Subpoena to the extent it causes an undue burden on Tyler Technologies to comply with the subpoena without reimbursement by Plaintiffs of Tyler Technologies' costs and expenses.

7.  The foregoing objections are specifically incorporated into each of Tyler Technologies' Responses below.

## RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION

1.      **All contracts entered into between VersaTrans and Laidlaw including without limitation all drafts of same, and all copies with any hand-written notes thereon.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges.  Tyler Technologies further objects to the request to the extent it seeks documents and information that are confidential, proprietary or trade secret information. Tyler Technologies objects to the request as overly broad and unduly burdensome.  Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Tyler further objects as Plaintiffs should seek this information from parties to the case.  Indeed, it is Tyler Technologies' understanding that Plaintiffs are currently seeking this information from Laidlaw, but Laidlaw has objected to the discovery. Tyler Technologies, as a non-party to this proceeding, should not be forced to produce documents or incur fees and costs associated with this discovery until Plaintiffs, Laidlaw and the Court have resolved these discovery issues between the parties to the litigation.

Tyler Technologies will not produce documents in response to this request.

164

Samuel T. Bull
February 28, 2011
Page 3

2.    **All documents, including but not limited to, correspondence, letters, memos, emails, faxes, and hand-delivered notes, exchanges between Laidlaw and any employee or former employee of VersaTrans related to the purchase, provision, installation, or promotion of bus routing software, including those circumstances in which routing software was discussed as part of the larger package.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are confidential, proprietary or trade secret information. Tyler Technologies objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Tyler further objects as Plaintiffs should seek this information from parties to the case. Indeed, it is Tyler Technologies' understanding that Plaintiffs are currently seeking this information from Laidlaw, but Laidlaw has objected to the discovery. Tyler Technologies, as a non-party to this proceeding, should not be forced to produce documents or incur fees and costs associated with this discovery until Plaintiffs, Laidlaw and the Court have resolved these discovery issues between the parties to the litigation.

Tyler Technologies will not produce documents in response to this request.

3.    **All documents, including, but not limited to, correspondence, letters, memos, emails, faxes, and hand-delivered notes, exchanged between VersaTrans and any third-party related to the promotion by Laidlaw of VersaTrans services and products.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are confidential, proprietary or trade secret information. Tyler Technologies objects to the request as overly broad and unduly burdensome.

165

Samuel T. Bull
February 28, 2011
Page 4

Tyler further objects as Plaintiffs should seek this information from parties to the case. Indeed, it is Tyler Technologies' understanding that Plaintiffs are currently seeking this information from Laidlaw, but Laidlaw has objected to the discovery. Tyler Technologies, as a non-party to this proceeding, should not be forced to produce documents or incur fees and costs associated with this discovery until Plaintiffs, Laidlaw and the Court have resolved these discovery issues between the parties to the litigation.

Tyler Technologies will not produce documents in response to this request.

4.    **All sales and/or promotional material provided by VersaTrans to Laidlaw related, even in part, to bus routing software.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are confidential, proprietary or trade secret information. Tyler Technologies objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Tyler further objects as Plaintiffs should seek this information from parties to the case. Indeed, it is Tyler Technologies' understanding that Plaintiffs are currently seeking this information from Laidlaw, but Laidlaw has objected to the discovery. Tyler Technologies, as a non-party to this proceeding, should not be forced to produce documents or incur fees and costs associated with this discovery until Plaintiffs, Laidlaw and the Court have resolved these discovery issues between the parties to the litigation.

Tyler Technologies will not produce documents in response to this request.

5.    **All documents reflecting the number of request for proposals that VersaTrans received from school districts or school bus contractors (such as Laidlaw) to which VersaTrans responded in each year from 2003 to present.**

166

Samuel T. Bull
February 28, 2011
Page 5

**RESPONSE:**

> Tyler Technologies objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous.

> Tyler Technologies will not produce documents in response to this request.

6.   **All documents reflecting the number of request for proposals received from school districts or school bus contractors (such as Laidlaw) to which VersaTrans responded in each year from 2003 to present.**

**RESPONSE:**

> Tyler Technologies objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous.

> Tyler Technologies will not produce documents in response to this request.

7.   **All VersaTrans responses to requests for proposals received from school districts or school bus contractors (such as Laidlaw) from 2003 to present.**

**RESPONSE:**

> Tyler Technologies objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous.

Samuel T. Bull
February 28, 2011
Page 6

Tyler Technologies will not produce documents in response to this request.

8.   **All documents reflecting revenue received by VersaTrans relating to the sale of routing software from initial sales to school districts in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous. Tyler Technologies also objects to the request as harassing and vexatious.

Tyler Technologies will not produce documents in response to this request.

9.   **All documents reflecting revenue received by VersaTrans from annual licensing and/or maintenance fees relating to routing software from each school district in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous. Tyler Technologies also objects to the request as harassing and vexatious.

Samuel T. Bull
February 28, 2011
Page 7

Tyler Technologies will not produce documents in response to this request.

10.     **All documents reflecting VersaTrans's aggregate sales of routing software in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous. Tyler Technologies also objects to the request as harassing and vexatious.

Tyler Technologies will not produce documents in response to this request.

11.     **All documents reflecting the number of salespeople in VersaTrans's sales force in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous. Tyler Technologies also objects to the request as harassing and vexatious.

Tyler Technologies will not produce documents in response to this request.

169

Samuel T. Bull
February 28, 2011
Page 8

12.     **All documents reflecting VersaTrans's market and sales promotion budget in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous. Tyler Technologies also objects to the request as harassing and vexatious.

Tyler Technologies will not produce documents in response to this request.

13.     **All documents reflecting the number of sales calls made by VersaTrans on school districts in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.**

**RESPONSE:**

Tyler Technologies objects to the extent the request requires disclosure of information protected by the attorney client or work product privileges. Tyler Technologies further objects to the request to the extent it seeks documents and information that are Tyler Technologies' trade secret information or other confidential research, development, or commercial information. Tyler Technologies further objects to the request as overly broad and unduly burdensome. Tyler Technologies objects to the request as being irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Tyler Technologies objects to the request as vague and ambiguous. Tyler Technologies also objects to the request as harassing and vexatious.

Tyler Technologies will not produce documents in response to this request.

170

Samuel T. Bull
February 28, 2011
Page 9

Very truly yours,

Andrew B. Russell

# In The Matter Of:

*Education Logistics, Inc., et al. v.*
*Laidlaw Transit, Inc.*

---

*Sean O'Halloran*
*Vol. II*
*April 22, 2009*
*CV 07-06-M-DWM*

---

*Martin-Lake & Associates, Inc.*
*P.O. Box 7765*
*Missoula, MT 59807-7765*
*406-543-6447 / fax: 406-543.5014*
*mla@martin-lake.net*

Original File sh04.22.09.txt
Min-U-Script® with Word Index

**EXHIBIT**

**10**

172

Education Logistics, Inc., et al. v.          CV 07-06-M-DWM          Sean O'Halloran - Vol. II
Laidlaw Transit, Inc.                                                  April 22, 2009

---

**Page 80**

1  UNITED STATES DISTRICT COURT
   DISTRICT OF MONTANA, MISSOULA DIVISION
2
3  EDUCATION LOGISTICS, INC.,
   a Montana corporation, and
   LOGISTICS MANAGEMENT,
4  INC., a Washington
   corporation,                    CAUSE NO. CV-07-06-M-DWM
5
        Plaintiffs,
6
7  vs.
8  LAIDLAW TRANSIT, INC., a
   Delaware corporation,
9
        Defendant.
10
11
12    Taken at 111 North Higgins Avenue, Suite 600
         Missoula, Montana
13    Wednesday, April 22, 2009 - 9:02 a.m.
14
          D E P O S I T I O N
15
                OF
16
          SEAN O'HALLORAN
17
          VOLUME 2 OF 2
18
19
20
21
22
23
24    Reported by Julie M. Lake, RDR, CRR, CSR
          Registered Diplomate Reporter
25        Certified Realtime Reporter

---

**Page 81**

1       A P P E A R A N C E S
2  RONALD A. BENDER, Esq., of Worden Thane P.C., 600
   The Florence, P.O. Box 4747, Missoula, Montana
3  59806, and
4  SAMUEL T. BULL, Esq., of Foster, Pepper &
   Shefelman, PLLC, 34th Floor, 1111 3rd Avenue,
5  Seattle, Washington 98101,
       appearing on behalf of the Plaintiffs.
6
7  MARCIA DAVENPORT, Esq., of the Crowley Law Firm,
   100 North Park Avenue, Suite 300, P.O. Box 797,
8  Helena, MT 59624-0797,
       appearing on behalf of the Defendants.
9
10 ALSO PRESENT:  Bill Swendsen
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 82**

1           I N D E X
2  WITNESS:                                    PAGE:
3  SEAN O'HALLORAN
4  Examination by Mr. Bull.................    84
5
6  Stipulations..............................   83
7
8
9  EXHIBITS:                                  MARKED:
10 Deposition Exhibit No. 60.................   175
11
12
13
14
15
16 Certificate of Witness....................   197
17 Certificate of Court Reporter.............   198
18
19
20
21
22
23
24
25

---

**Page 83**

1        S T I P U L A T I O N S
2
3        It was stipulated by and between counsel
4  for the respective parties that the deposition be
5  taken by Julie M. Lake, RDR, CRR, CSR, Freelance
6  Court Reporter and Notary Public for the State of
7  Montana, residing in Missoula, Montana.
8
9        It was further stipulated and agreed by
10 and between counsel for the respective parties
11 that the deposition be taken in accordance with
12 the Federal Rules of Civil Procedure.
13
14       It was further stipulated and agreed by
15 and between counsel for the respective parties and
16 the witness that the reading and signing of the
17 deposition would be expressly reserved.
18
19
20
21
22
23
24
25

---

173

Education Logistics, Inc., et al. v.
Laidlaw Transit, Inc.

CV 07-06-M-DWM

Sean O'Halloran - Vol. II
April 22, 2009

---

**Page 84**
09:02:06-09:02:48

1     WEDNESDAY, APRIL 22, 2009
2  Thereupon,
3          SEAN O'HALLORAN,
4  having been sworn to tell the truth, testified as
5  follows:
6          EXAMINATION
7  BY MR. BULL:
8     Q.  Mr. O'Halloran, as you recall, I'm Sam
9  Bull. I'm an attorney for Education Logistics and
10  Logistics Management.
11         Our session today is a continuation of a
12  previous deposition we had with you last month.
13  And I know you know the drill, but just to make
14  sure that we're all on the same page, I'm just
15  going to reiterate some of the considerations when
16  we're doing the deposition. Okay?
17     A.  Okay.
18     Q.  Remember we want to make sure that we
19  don't talk over each other; so when I ask a
20  question, you should make sure you let me finish
21  and I'm going to do my best to let you finish your
22  answers.
23         If counsel for Laidlaw objects, you
24  should let her finish her objection and then after
25  she's finished her objection, you still need to

---

**Page 85**
09:03:01-09:04:36

1  answer the question to the best you can. If you
2  don't understand the question, please let me know
3  and I will try to make it more understandable.
4  Does that sound good?
5     A.  Yes.
6     Q.  Is there any reason why you aren't able
7  to testify fully and truthfully today?
8     A.  No, there isn't.
9     Q.  Are you familiar with Edulog's boundary
10  planning software?
11     A.  Yes, I am.
12     Q.  Are you also familiar with Edulog's
13  boundary optimization software?
14     A.  Yes, I am.
15     Q.  Is boundary planning software, is that an
16  independent product from Edulog's routing
17  software?
18     A.  Yes, it is. It's a separate module.
19     Q.  When a school district has Edulog's
20  boundary planning software, do they necessarily
21  also have to have Edulog's routing software?
22     A.  No, they do not.
23     Q.  In your previous deposition we talked
24  somewhat about different levels of access that
25  Laidlaw provides to its school district clients

---

**Page 86**
09:04:53-09:05:41

1  under the perpetual license, and one type of
2  access was remote access. Do you recall that?
3     A.  Yes.
4     Q.  And I believe you previously testified
5  that some school districts receive remote access
6  to Edulog software in a read-only capability; is
7  that correct?
8     A.  That is correct.
9     Q.  In those instances is the school district
10  connecting to the Edulog software remotely?
11     A.  Yes.
12     Q.  And is that software located on a Laidlaw
13  server?
14     A.  Yes, it is.
15     Q.  And if, for example, Laidlaw upgrades its
16  version of the software, if a new version of the
17  Edulog routing software comes out, is the school
18  district also getting access to that upgraded
19  version of the software?
20     A.  Yes, they are.
21     Q.  So any time--with respect to remote
22  access, any time that Laidlaw upgrades the version
23  of the Edulog routing software that's running, the
24  school district is receiving access to that
25  upgraded version?

---

**Page 87**
09:06:12-09:07:02

1     A.  That is correct.
2     Q.  I believe that you also previously
3  testified with respect to a different type of what
4  Laidlaw referred to as look-up access in which a
5  school district receives a copy of the Edulog
6  routing software on the school district's computer
7  and then receives hand-delivered copies of data
8  from time to time; is that correct?
9     A.  That is correct.
10     Q.  And that's something that's often
11  referred to as the Sneaker Net?
12     A.  Correct.
13     Q.  When a school district is receiving
14  access through the Sneaker Net, when Laidlaw
15  receives upgrades of Edulog's routing software,
16  does the school district also receive upgrades of
17  that routing software?
18     A.  Yes. In order for their access to
19  continue they have to upgrade. The prior versions
20  are not compatible.
21     Q.  In those circumstances does someone from
22  Laidlaw take over a new version and load it on to
23  the school district's computer?
24     A.  Yes.
25     Q.  Based upon your knowledge, about how

---

**Page 88**

09:08:03-09:09:05

1 often does Edulog come out with a new version of
2 its routing software?
3 A. Usually once a year.
4 Q. I would like to talk about some specific
5 school districts. Do you have any knowledge with
6 respect to whether the school district in the
7 Algiers section of New Orleans has ever had access
8 to Edulog software provided by Laidlaw?
9 A. I don't believe they have.
10 Q. Do you recall ever discussing that with
11 the Algiers—the school district that is in
12 Algiers, New Orleans?
13 A. I've not discussed it directly with the
14 school district. Our rep, Jennifer Keith, was the
15 one who did all the direct communication with the
16 contract manager and the customer.
17 Q. And it's your understanding that it was
18 never set up?
19 A. It was discussed but it was never set up.
20 Q. How do you know it was never set up?
21 A. I guess I can't say it was never set
22 up—well, Jennifer Keith would have had to had my
23 assistance to do it and she never asked me for it.
24 Q. And so since Jennifer never asked you to
25 help her set up the look-up access, it's your

**Page 89**

09:09:20-09:10:25

1 understanding that no access had been set up?
2 A. That's my understanding.
3 Q. Do you know if the Allentown School
4 District in Pennsylvania ever had access to Edulog
5 routing software?
6 A. Yes, they did.
7 Q. What access did they have?
8 A. They had the remote access where they
9 connected to a server at the Laidlaw office.
10 Q. When did Allentown first get access?
11 A. It would have been 2005.
12 Q. Do you know who set the access up?
13 A. That would have been Jay Makela, and he
14 probably had some assistance from Don Cameron.
15 Q. Did Allentown get full access to the
16 software?
17 A. No, they didn't.
18 Q. What is your understanding of the access
19 that Allentown received?
20 A. That, using the Edulog security module,
21 they were set up with read-only access.
22 Q. Would this have been on Edulog.NT?
23 A. Yes. That's the only flavor of Edulog
24 that they have ever had.
25 Q. To the best of your knowledge, does

**Page 90**

09:10:39-09:11:58

1 Allentown still have access to Edulog software?
2 A. Yes, they do.
3 Q. Who is the user at the school district in
4 Allentown?
5 A. I cannot remember her name.
6 Q. Do you know if Barrington, Rhode Island
7 School District has ever had access to Edulog
8 routing software?
9 A. I'm not sure. The Rhode Island sites I
10 was very minimally involved with.
11 Q. Who would be the best person to talk to
12 about that?
13 A. Don Cameron.
14 Q. Do you have any knowledge as to whether
15 or not the Rhode Island sites had access to Edulog
16 routing software?
17 A. I don't—I don't know. Most of those
18 were converted to another product when I first
19 started working with Laidlaw.
20 Q. Was that Versatrans?
21 A. Yes.
22 Q. About how many of Laidlaw's—to the
23 extent that you know, about how many of Laidlaw's
24 school district customers use some form of routing
25 software or another?

**Page 91**

09:12:09-09:13:19

1 MS. DAVENPORT: Objection, calls for
2 speculation.
3 A. Last number, I want to say maybe,
4 ballpark, 150.
5 Q. (By Mr. Bull) And what's the basis for
6 that knowledge?
7 A. Just lists I've compiled for Scott Parker
8 throughout the two years that I worked for him,
9 and that's usually the number that I came up with.
10 Q. So when you compiled those lists for
11 Scott Parker, you usually came up with 150 school
12 districts used one routing software or another?
13 A. One or another.
14 Q. How many of those 150 are Edulog, use
15 Edulog?
16 A. I want to say 75 or 80.
17 Q. And are most of those school districts,
18 is the use through Laidlaw's perpetual license?
19 A. Most of them, yes.
20 Q. Would you say over half?
21 A. Yes, over half.
22 Q. After Edulog, what is the second
23 most-used software?
24 A. Versatrans.
25 Q. About how many of the Laidlaw customers

175

Education Logistics, Inc., et al. v.
Laidlaw Transit, Inc.

CV 07-06-M-DWM

Sean O'Halloran - Vol. II
April 22, 2009

---

**Page 92**

09:13:33-09:14:45

```
1   use Versatrans routing software?
2       MS. DAVENPORT: Objection. Calls for
3   speculation.
4       A.  Well, 150 minus 75.  75, I guess.
5       Q.  (By Mr. Bull)  And you said 75 to 80 for
6   Edulog, so—but you think it's about half and
7   half?
8       A.  About half and half.  There's a couple
9   one offs there, but mostly it's about half and
10  half.  Maybe a few more Edulog.
11      Q.  Does Laidlaw have a policy for
12  determining what routing software to use at a
13  school district?
14      A.  No.  It's usually the preference of the
15  actual location.
16      Q.  When you say preference of the actual
17  location, are you talking about the Laidlaw branch
18  location?
19      A.  It's usually a determination made by the
20  contract manager and the regional operations
21  manager and higher up, but we don't—we never
22  really steered them in one direction.  We just
23  gave them all their options and they made their
24  decision.  Usually they had their decision made
25  even before they contacted us.
```

**Page 93**

09:14:57-09:15:59

```
1       Q.  And just so I'm making sure I understand.
2   Does the Laidlaw branch usually suggest to the
3   school district we think you should use, for
4   example, Versatrans on this project?
5       A.  Yes.
6       Q.  Do you know if school districts usually
7   take the advice of the Laidlaw branch with respect
8   to what software to use?
9       A.  Generally, yes.  And also sometimes the
10  school district gives their preference and the
11  contract manager or the local management will
12  abide by their request.
13      MS. DAVENPORT: Sam, you are not trying
14  to go into the best efforts issue, are you?
15      MR. BULL: I'm not.  I'm just trying to
16  get a little background and I'm going to go back
17  to the school districts.
18      MS. DAVENPORT: All right.
19      Q.  (By Mr. Bull)  Do you know if
20  Battleground, Washington—the school district for
21  Battleground in Washington has ever had access to
22  Edulog routing software?
23      A.  Yes, they have.
24      Q.  What do you know about that access?
25      A.  Initially they were set up as what we
```

**Page 94**

09:16:18-09:17:32

```
1   would term Sneaker Net and it was managed as you
2   had originally asked a few minutes ago.  And then
3   their server was replaced with a server capable of
4   allowing remote access.  And it's my understanding
5   that the customer is set up with that remote
6   access and the Sneaker Net version was uninstalled
7   from their system at the school district.
8       Q.  When did Battleground first get Sneaker
9   Net?
10      A.  I want to say 2001.  They were one of our
11  first Edulog.NT implementations.
12      Q.  And do you know when they got remote
13  access?
14      A.  I want to say that's around 2005.
15      Q.  And when Battleground had Sneaker Net,
16  would they have been able to manipulate the data
17  they received by disk?
18      A.  They might have initially, but once
19  Edulog—the version of Edulog that allowed control
20  of the levels of access as far as read-only or
21  full access, once that—I cannot remember what
22  version that was, but once that version was set up
23  we made sure that that was enabled such that they
24  had read-only access.
25      So that would be even when the school
```

**Page 95**

09:17:42-09:18:57

```
1   district only had access to old data, you would
2   still—your testimony is that you would still set
3   it up so they could read-only?
4       A.  That's correct.  And every time their
5   data was refreshed, even if somebody had managed
6   to hack the system, it's all stored in the data
7   and got overwritten anyway.
8       Q.  What is the—your basis for the assertion
9   you just made that even with Sneaker Net Laidlaw
10  would configure the software in such a way to
11  allow read-only access?
12      A.  That was a directive that I made to the
13  support staff and the implementers.
14      Q.  Was that a directive you made in writing?
15      A.  No.
16      Q.  Are you aware that Sparta, Wisconsin
17  still has Sneaker Net access to Edulog routing
18  software?
19      A.  I believe they do.  I'm not sure.
20      Q.  And are you aware that, according to the
21  Sparta School District administrator who testified
22  in this matter, that she is able to manipulate the
23  old data using the Edulog routing software on her
24  computer?
25      A.  I'm not aware of that.
```

---

Martin-Lake & Associates, Inc.
406.543.6447 / mla@martin-lake.net

Min-U-Script®

(4) Page 92 - Page 95

Ronald A. Bender, Esq.
WORDEN THANE P.C.
111 North Higgins, Suite 600
P.O. Box 4747
Missoula, Montana 59806-4747
Telephone: (406) 721-3400
Fax: (406) 721-6985
rbender@wthlaw.net


Charles Nomellini, Esq.
Samuel T. Bull, Esq.
FOSTER PEPPER PLLC
34th Floor, 1111 3rd Ave.
Seattle, WA 98101
Telephone: (206) 447-4400
Fax: 406-721-6985
nomec@foster.com
bulls@foster.com

Attorneys for Plaintiffs Education Logistics, Inc.,
and Logistics Management, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | |
|---|---|
| EDUCATION LOGISTICS, INC., a Montana corporation, and LOGISTICS MANAGEMENT, INC., a Washington corporation, | Cause No. CV-07-06-M-DWM |
| Plaintiffs, | |
| -vs- | DECLARATION OF CRAIG GRIFFITHS IN SUPPORT OF PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER |
| LAIDLAW TRANSIT, INC., a Delaware corporation, | |
| Defendant. | |



EXHIBIT

11

CRAIG GRIFFITHS declares as follows:

1.    I am an implementation manager for Education Logistics, Inc. ("Edulog"). I am over the age of 18 and am otherwise able to give testimony in this matter.

2.    Prior to my employment with Edulog, I was previously employed by Laidlaw Transit, Inc. ("Laidlaw") as an implementation manager at Laidlaw Planning Solutions ("LPS") from 1990 to 2007.  One of my duties during this time period was to provide recommendations relating to routing software to existing and potential school district customers of Laidlaw.

3.    While employed by Laidlaw, I retained numerous electronic documents and emails relating to the relationship between the parties to this lawsuit, and Laidlaw's actions relating to promoting Edulog routing software and competitors' routing software. I provided copies of these documents to Laidlaw before I left.

4.    When I suggested that Laidlaw recommend using Edulog routing software in New Orleans rather than the software of VersaTrans, one of Edulog's competitors, Diane Orndorff, my supervisor at Laidlaw, ordered me to telephone VersaTrans's CEO and explain to him why I was recommending Edulog over VersaTrans.  I provided at least one email related to this incident to Laidlaw personnel.

I declare under penalty of perjury that the forgoing is true and correct.

EXECUTED in Missoula, Montana this 15th day of September, 2008.

Craig Griffiths

DECLARATION OF CRAIG GRIFFITHS IN SUPPORT OF PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER
Page 2 of 2

50397571.1

This Was Printed From The Business Review

# Routing software firms vie for industry top slot

**Premium content from The Business Review - by Richard A. D'Errico, The Business Review**

Date: Monday, February 5, 2007, 12:00am EST - Last Modified: Thursday, February 1, 2007, 10:08am EST

Related:

Technology

A battle for your child's bus route is brewing.

The nation's two leading companies developing software to help school districts map bus routes, VersaTrans Solution Inc. and Transfinder, are located 10.31 miles apart from each other. Each dominates in its own backyard—VersaTrans in Albany County, Transfinder in Schenectady County—but the real prizes are the 15,000 school districts nationwide.

Together, they've helped topple Education Logistics Inc. in Missoula, Mont., from its No. 1 spot, said Antonio Civitella, Transfinder's president and CEO, making VersaTrans No. 1 and, possibly making Transfinder No. 2.

"It's very ugly," Civitella said. "It's Microsoft and Novell. It's Apple against Microsoft."

"I would characterize it as a very competitive market," said Bill Paul, editor and publisher of School Transportation News, based in Redondo Beach, Calif.

Bus-routing software helps districts determine the best and most efficient routes to take. It can also be updated as variables change, like when a student moves. Some software can even visualize "what if" scenarios, keep track of bus maintenance schedules and track buses in real time. Districts can spend as little as a few thousand dollars to hundreds of thousands of dollars on bus-transportation software.

Paul said it's tough to say who's on top based on revenue because the main companies are privately held, but VersaTrans and Transfinder are recognized leaders in the sector.

"Edulog was there first, I can't dispute that," Paul said. "For many years they were among the first to do this in the mid-1980s."

VersaTrans and Transfinder had strong years, according to their CEOs.

Transfinder closed 2006 with $3 million in revenue, up 15 percent from 2005. It added 151 new clients, for a total of 750 districts in 46 states. The company is expanding its space in Schenectady to accommodate growth.

VersaTrans ended 2006 with sales of $7.1 million and added 131 new clients for a total of 1,260 school districts. In 2005, it reported $5.6 million in sales, up from $5 million the previous year. The company has had six consecutive record-breaking quarters.

Edulog, as Education Logistics is known, did not return calls seeking comment.

**The right spin**

Just as Microsoft recently released its latest operating system Vista to stay ahead of the curve—or keep up with competition, depending on your perspective—bus-routing companies keep adding to their products



EXHIBIT

12

179

by integrating Global Positioning Systems (GPS) and Geographic Information Systems (GIS), or adding another bit of data to be factored into routing decisions. For example, Civitella said in Washington state a school district has used Transfinder to map around known meth labs.

VersaTrans recently touted that its software now allows users to incorporate the known residences of sexual predators.

"Student safety is the No. 1 concern among our clients," said Doug Hamlin, VersaTrans president and CEO. "They need to take measures to safeguard students before they board the bus, during their bus ride and after exiting the bus."

Terri Fallon, VersaTrans marketing and client-relations director, said as more states enact regulations to prohibit bus stops located within a certain distance—usually 1,000 feet—from a known sexual predator's home, more schools are wanting that information factored into bus-routing decisions.

Civitella said Transfinder's product has had the same capability for a few years, but has not been as public about it.

"When we had it, it was never a major selling feature at the time," Civitella said. "Now it's become more of a selling feature. It's not who has it first anymore. It's who can spin it better first.

"You want to shoot from the hip? Let's face it. There are companies that have great things, but if they're not spinning it correctly, you never know about it. Perhaps we're not spinning it correctly."

VersaTrans and Transfinder go after the same business all the time, said Civitella, but talk of a merger is premature, he said.

"We're both taking business out of that big one [Edulog]. We both together—not working together but individually. No. 1 isn't No. 1 anymore. We didn't do it as a combined company. We did it as individuals," Civitella said. "We had record years. It's not just one company doing better than the other. When both companies are thriving, that's not the right time for merger talks."

But School Transportation News publisher Paul said things can change rapidly in this industry.

"It changes all the time," he said. "These companies grow by leaps and bounds."

---

rderrico@bizjournals.com | 518-640-6807

180



**FILED**

JAN 1 4 2011

PATRICK E. DUFFY, CLERK

By_____
DEPUTY CLERK, MISSOULA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| EDUCATION LOGISTICS, INC., a Montana corporation and LOGISTICS MANAGEMENT, INC., a Washington corporation, | ) ) ) ) ) | CV 07-06-M-DWM – JCL |
| Plaintiffs, | ) ) | |
| vs. | ) ) | ORDER |
| LAIDLAW TRANSIT, INC., a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) ) | |

Plaintiffs Education Logistics, Inc. and Logistics Management, Inc.'s

moved to amend the case schedule and continue the trial date.  A status conference

in this case was held on January 14, 2011.  It appears good cause exists to amend

the case schedule.  Accordingly,

IT IS HEREBY ORDERED that plaintiffs' motion (dkt # 139) is

GRANTED.  The following schedule will govern all further pretrial proceedings

EXHIBIT

13

181

Disclosure of Plaintiff's
Damages Experts and Simultaneous
Disclosure of Liability Experts:          April 15, 2011


Disclosure of Defendant's
Damages Experts:                          May 13, 2011


Discovery Deadline:                       July 8, 2011


Motions Deadline (fully briefed):         August 22, 2011


Attorney Conference to Prepare
Final Pretrial Order:                     week of September 31, 2011


Submit Final Pretrial Order,
Proposed Jury Instructions,
Proposed Voir Dire Questions,
and Trial Briefs electronically
to dwm_propord@mtd.uscourts.gov
(Trial Briefs are optional):             November 10, 2011


Notice to Court Reporter of
Intent to Use Real-Time:                 November 10, 2011


Notice to I.T. Supervisor of
Intent to Use CD-ROM or
Videoconferencing:                       November 10, 2011


Final Pretrial Conference:               November 18, 2011 at 1:30 p.m.
                                         Missoula, Montana


182

Jury Trial (7-member jury):          November 28, 2011 at 8:30 a.m.[1]
                                          Russell Smith Courthouse
                                          Missoula, Montana


**Continuance of the above deadlines will not be granted, absent compelling**

**reasons.** A continuance of any deadline set by this order does <u>not</u> extend any

other deadline. Neither the date set for trial nor the date set to file motions will be

altered or changed even if the Court authorizes any other date to be changed.

    IT IS FURTHER ORDERED, unless otherwise stipulated, plaintiffs shall

take no more than 20 depositions, and defendants shall take no more than 20

depositions. Depositions previously taken in the case count towards the 20

deposition limit. But each party is allowed to supplement any deposition

previously taken.

    IT IS FURTHER ORDERED all other provisions of the Court's October 17,

2007 scheduling order (dkt # 25) shall remain in full force and effect.

    Dated this _14th_ day of January 2011.

Jeremiah C. Lynch
United States Magistrate Judge

---

[1] Pursuant to 18 U.S.C. § 3161(h) and Fed.R.Crim.P. 50, criminal matters take priority over civil matters in the event of a conflict. Accordingly, all civil trial settings are subject to the Court's criminal calendar.

183

Debra D. Parker
PARKER LAW FIRM
3245 Cummins Way
P.O. Box 7873
Missoula, MT 59807
Telephone: (406) 543-2302
Facsimile: (406) 493-0584
parkerlaw@bresnan.net

James D. Jordan
Devon D. Sharp
MUNSCH HARDT KOPF & HARR, P.C.
3800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Telephone: (214) 855-7543
Facsimile: (214) 978-4359
jjordan@munsch.com
Telephone: (214) 855-7539
Facsimile: (214) 978-5369
dsharp@munsch.com

*Attorneys for Defendant Laidlaw Transit, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | | |
|---|---|---|
| EDUCATION LOGISTICS, INC., a Montana corporation, and LOGISTICS MANAGEMENT, INC., a Washington corporation, | ) ) ) ) ) | CV 07-06-M-DWM **LAIDLAW TRANSIT, INC.'S OBJECTIONS TO PLAINTIFFS' SIXTH SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION** |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| LAIDLAW TRANSIT, INC., a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) | |

TO:  EDUCATION LOGISTICS, INC. and LOGISTICS MANAGEMENT, INC., and their
attorneys Ronald A. Bender, Matthew J. Cuffe, Charles P. Nomellini and Samuel T. Bull.

**LAIDLAW TRANSIT INC'S OBJECTIONS TO PLAINTIFFS' SIXTH
SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION**                     Page 1
MHDocs 3061729_5 10565.4



EXHIBIT
14

184

## OBJECTIONS TO PLAINTIFFS' DEFINITIONS

1.   Laidlaw objects to Plaintiffs' definition of the term "Bid" to the extent it includes "negotiated contracts between Laidlaw and customers or potential customers," as negotiated contracts to do not fall within the commonsense, everyday definition of the term "Bid."

## DEFINITIONS

1.   "Contract" shall mean the Agreement between Laidlaw Transit, Inc. and Logistics Management, Inc., dated June 30, 1992, which is attached to Plaintiffs' Complaint as Exhibit A.

2.   "Edulog" shall mean Plaintiff Education Logistics, Inc., along with all of its affiliates, subsidiaries, current and former employees, officers, directors, board members, managers, representatives, agents and anyone else acting on its behalf or otherwise subject to its control.

3.   "GST" shall mean GeoSpatial Technologies, Inc., along with all of its affiliates, subsidiaries, current and former employees, officers, directors, board members, managers, representatives, agents and anyone else acting on its behalf or otherwise subject to its control.

4.   "Laidlaw" shall mean Defendant Laidlaw Transit, Inc., along with all of its successors in interest, affiliates, subsidiaries, current and former employees, officers, directors, board members, managers, representatives, agents, "Laidlaw Planning Solutions" and anyone else acting on Laidlaw Transit Inc.'s behalf or otherwise subject to its control.

## OBJECTIONS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Identify all customers to whom Laidlaw provided school bus transportation services from January 11, 2003 to the present, including the name and address of the customer, the time period during which Laidlaw provided the services, the nature of the services including whether Laidlaw or any other party provided the customer with computerized bus routing software and the number of buses provided to the customer during each year.

### ANSWER:

Objections: Overly broad; not reasonably calculated to lead to the discovery of admissible evidence. As worded, this Interrogatory would require Laidlaw to identify customers that have never used school bus routing software at all, or that have purchased, installed and operated school bus routing software on their own with no assistance from Laidlaw. Such information would be wholly irrelevant to the disputed issues and facts in this case.

Subject to and without waiving its objections, Laidlaw will identify all customers to which Laidlaw provided school bus transportation services from January 11, 2003 to the present,

**LAIDLAW TRANSIT INC'S OBJECTIONS TO PLAINTIFFS' SIXTH**
**SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION**                   Page 2
MHDocs 3061729_5 10565.4

provided that those customers utilize(d) some type of school bus routing software, and provided that Laidlaw actually purchased such software on the customer's behalf or influenced the customer's purchasing decision in some way. As requested, Laidlaw will also provide the name and address of the relevant customers, the time period during which Laidlaw provided the services, the nature of the services, and the number of buses provided to the customers during each year, to the extent such information is within Laidlaw's possession, custody or control.

## INTERROGATORY NO. 2:

Identify all customers or potential customers to which Laidlaw has submitted a bid for school bus contracting services and/or management services from January 11, 2003 to the present including bids submitted to then-existing Laidlaw customers. For each such customer or potential customer, list the name and address of the school district to which the bid was provided, the name of Laidlaw's contact at the school district, the date of the bid, whether the bid was accepted and if the bid provided for or required the use of school bus routing software.

## ANSWER:

Objections: Overly broad; not reasonably calculated to lead to the discovery of admissible evidence. As worded, this Interrogatory would require Laidlaw to identify bids that did not include school bus routing software. Such information would be wholly irrelevant to the disputed issues and facts in this case.

Subject to and without waiving its objections, Laidlaw will identify all bids issued from January 11, 2003 to the present that included school bus routing software. As requested, Laidlaw will also provide the name and address of the school district to which the bid was provided, the name of Laidlaw's contact at the school district, the date of the bid, and whether the bid was accepted, to the extent such information is within Laidlaw's possession, custody or control.

## INTERROGATORY NO. 3:

Identify all Laidlaw customers to which Laidlaw or Laidlaw Planning Solutions has provided non-Edulog school bus routing software or to which Laidlaw or Laidlaw Planning Solutions has assisted in purchasing a non-Edulog product since January 11, 2003. For each such customer, provide the date of initial installation and the dates of any subsequent upgrades to the software.

## ANSWER:

Objections: Overly broad; not reasonably calculated to lead to the discovery of admissible evidence. As worded, this Interrogatory would require Laidlaw to identify customers that Laidlaw has assisted in purchasing products other than school bus routing software. Such information would be wholly irrelevant to the disputed issues and facts in this case. "[T]he dates of any subsequent upgrades to [non-Edulog school bus routing] software" are also irrelevant to the disputed issues and facts in this case.

Subject to and without waiving its objections, Laidlaw will identify all Laidlaw customers to which Laidlaw or Laidlaw Planning Solutions has provided non-Edulog school bus

LAIDLAW TRANSIT INC'S OBJECTIONS TO PLAINTIFFS' SIXTH
SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION                                              Page 3
MHDocs 3061729_5 10565.4

186

routing software since January 11, 2003, as well as the date of initial installation of such software, to the extent such information is within Laidlaw's possession, custody or control.

**INTERROGATORY NO. 4:**

Identify all current or former Laidlaw employees who participated in the negotiation, formation, and/or drafting of any agreements between Laidlaw and GST in effect at any time from January 11, 2003 to the present.  Provide the name and title of such persons and a description of their participation.

**ANSWER:**

Objections: Overly broad; not reasonably calculated to lead to the discovery of admissible evidence.  As worded, this Interrogatory potentially calls within its scope agreements that have nothing to do with school bus transportation services.  Moreover, the existence of any agreement between Laidlaw and GST is irrelevant to the disputed issues and facts in this case.

Subject to and without waiving its objection, Laidlaw will identify all current or former Laidlaw employees who materially participated in the negotiation, formation, and/or drafting of any agreements between Laidlaw and GST in effect at any time from January 11, 2003 to the present, provided that such agreements relate to school bus transportation services.  As requested, Laidlaw will also provide the name and title of each such current or former employee and a description of their participation, to the extent such information is within Laidlaw's possession, custody or control.

**INTERROGATORY NO. 5:**

Identify all agreements between Laidlaw and any provider of routing, GPS, and/or any other boundary planning software in effect at any time from January 11, 2003 to the present. Provide the date of the agreement, the identity of the provider and the services to be provided by each party to the agreement.

**ANSWER:**

Objection: Since the Contract specifically allows Laidlaw to enter agreements with other providers of school bus routing software after the expiration of the exclusive license period, Laidlaw objects to this Interrogatory as overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence.

Laidlaw will not respond to this Request as it is currently worded.

**INTERROGATORY NO. 6:**

Describe all efforts made by Laidlaw since January 11, 2003 to promote the use of the Software to existing and/or prospective Laidlaw customers.

**LAIDLAW TRANSIT INC'S OBJECTIONS TO PLAINTIFFS' SIXTH
SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION**                                              Page 4
MHDocs 3061729_5 10565.4

187

**ANSWER:**

Objections: Overly broad; not reasonably calculated to the lead to the discovery of admissible evidence; unduly burdensome and harassing; assumes issues and facts in dispute.

Laidlaw will not respond to this Interrogatory as it is currently worded.

**INTERROGATORY NO. 7:**

List the name, title and contact information for all persons employed by Laidlaw in a sales capacity at any time since January 11, 2003 as a regional manager or any position subordinate to regional manager. For all such persons no longer employed by Laidlaw, provide their dates of employment with Laidlaw.

**ANSWER:**

Objections: Overly broad; ambiguous; not reasonably calculated to lead to the discovery of admissible evidence. As worded, this Interrogatory would require Laidlaw to identify employees who had no involvement in school bus transportation services. Such information would be wholly irrelevant to the disputed issues and facts in this case. Laidlaw further objects to the term "regional manager" as vague.

Subject to and without waiving its objections, Laidlaw responds as follows: There are no "Regional Managers" employed in a sales capacity at Laidlaw. Laidlaw's counsel is happy to discuss a clarification of this Request with Plaintiffs' counsel if necessary.

## OBJECTIONS TO REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

All documents relating to agreements and proposed agreements between Laidlaw and GST.

**RESPONSE:**

Objection: Since the Contract specifically allows Laidlaw to enter agreements with other providers of school bus routing software after the expiration of the exclusive license period, Laidlaw objects to this Request as overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Also, as worded, this Request potentially calls within its scope agreements and proposed agreements that have nothing to do with school bus transportation services. This Request might also require Laidlaw to violate confidentiality provisions of the agreements being requested. Additionally, this Request might require Laidlaw to disclose confidential commercial information. *See* FED. R. CIV. P. 45(c)(3)(B)(i). Finally, some of the documents requested may be subject to attorney-client privilege or may be privileged as a result of being prepared in anticipation of litigation.

Laidlaw will not respond to this Request as it is currently worded.

LAIDLAW TRANSIT INC'S OBJECTIONS TO PLAINTIFFS' SIXTH
SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION
MHDocs 3061729_5 10565.4

Page 5

188

**REQUEST FOR PRODUCTION NO. 2:**

All documents evidencing communications between Laidlaw and/or GST and any third party which refer or relate to the provision of school bus transportation services, routing software, and/or GPS software by Laidlaw and GST, including but not limited to correspondence, requests for proposal, bids, feasibility studies, agreements, or contracts.

**RESPONSE:**

Objections: Overly broad; not reasonably calculated to lead to the discovery of admissible evidence; not reasonably limited in time or subject matter; ambiguous. As worded, this Request would arguably require Laidlaw to produce every single communication between Laidlaw and each of Laidlaw's current and former customers for an unlimited period of time. Additionally, this Request might require Laidlaw to disclose confidential commercial information. *See* FED. R. CIV. P. 45(c)(3)(B)(i).

Laidlaw is unable to respond to this Request as it is currently worded. However, Laidlaw's counsel is happy to discuss a clarification of this Request with Plaintiffs' counsel.

**REQUEST FOR PRODUCTION NO. 3:**

All agreements entered into between Laidlaw and any provider of school bus routing software in effect at any time from January 11, 2003 to the present.

**RESPONSE:**

Objection: Since the Contract specifically allows Laidlaw to enter agreements with other providers of school bus routing software after the expiration of the exclusive license period, Laidlaw objects to this Request as overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Additionally, this Request might require Laidlaw to violate confidentiality provisions of the agreements being requested. Finally, this Request might require Laidlaw to disclose confidential commercial information. *See* FED. R. CIV. P. 45(c)(3)(B)(i).

Laidlaw will not respond to this Request as it is currently worded.

**REQUEST FOR PRODUCTION NO. 4:**

All documents evidencing communications between Laidlaw and any provider of school bus routing software from January 11, 2003 to the present relating to the negotiation, formation, implementation, and on-going maintenance of any agreement or potential agreement between Laidlaw and the software provider.

**RESPONSE:**

Objection: Since the Contract specifically allows Laidlaw to enter agreements with other providers of school bus routing software after the expiration of the exclusive license period, Laidlaw objects to this Request as overly broad, irrelevant, and not reasonably calculated to lead

LAIDLAW TRANSIT INC'S OBJECTIONS TO PLAINTIFFS' SIXTH
SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION                    Page 6
MHDocs 3061729_5 10565.4

189

to the discovery of admissible evidence.  Additionally, this Request might require Laidlaw to disclose confidential commercial information.  *See* FED. R. CIV. P. 45(c)(3)(B)(i).

Laidlaw will not respond to this Request as it is currently worded.

## REQUEST FOR PRODUCTION NO. 5:

All documents that refer or relate to efforts Laidlaw has made since January 11, 2003 to promote the use of the Software pursuant to Section 2.3.3 of the Contract.

## RESPONSE:

Objections: Overly broad; not reasonably calculated to the lead to the discovery of admissible evidence; unduly burdensome and harassing; assumes issues and facts in dispute.

Laidlaw will not respond to this Request as it is currently worded.

## REQUEST FOR PRODUCTION NO. 6:

All documents provided to Laidlaw employees for the purpose of marketing or promoting the Software, including but not limited to scripts or sales materials, that were used in any manner by Laidlaw at any time from January 11, 2003 to the present.

## RESPONSE:

Objections: Overly broad; not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its objections, Laidlaw will produce all documents within its possession, custody or control that are responsive to this Request.

## REQUEST FOR PRODUCTION NO. 7:

All documents provided to Laidlaw employees for the purpose of marketing or promoting Laidlaw's services to school districts including but not limited to scripts and sales materials, that were used by Laidlaw at any time from January 11, 2003 to the present.

## RESPONSE:

Objections: Overly broad; not reasonably calculated to lead to the discovery of admissible evidence.  As worded, this Request would require Laidlaw to produce marketing and/or promotional documents that have nothing to do with school bus routing software.  Such information would be wholly irrelevant to the disputed issues and facts in this case.

Subject to and without waiving its objections, Laidlaw will produce all documents within its possession, custody or control that were provided to Laidlaw employees for the purpose of marketing or promoting Laidlaw's services to school districts, provided that such documents were used by Laidlaw between January 11, 2003 to the present, and provided that such documents include references to school bus routing software.

LAIDLAW TRANSIT INC'S OBJECTIONS TO PLAINTIFFS' SIXTH
SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION                 Page 7
MHDocs 3061729_5 10565.4

190

**REQUEST FOR PRODUCTION NO. 8:**

All contracts in effect at any time between January 11, 2003 and the present between Laidlaw and any school district for the provision of school bus transportation services.

**RESPONSE:**

Objections: Overly broad; unduly burdensome; not reasonably calculated to lead to the discovery of admissible evidence.

Laidlaw will not respond to this Request as it is currently worded.

**REQUEST FOR PRODUCTION NO. 9:**

All documents constituting communications between Laidlaw and its school district customers or potential customers between January 11, 2003 and the present which relate in any way to Versatrans.

**RESPONSE:**

Objections: Overly broad; not reasonably calculated to lead to the discovery of admissible evidence. Communications between Laidlaw and its school district customers and potential customers relating to Versatrans could only conceivably be relevant to the extent they took place during the contract pitch stage (*i.e.*, when Laidlaw was pitching its services or products to the customer/potential customer), and to the extent they related to school bus routing software.

Subject to and without waiving the foregoing objections, Laidlaw will produce all bids within its possession, custody or control that were issued to its school district customers or potential customers from January 11, 2003 to the present which relate in any way to Versatrans.

**REQUEST FOR PRODUCTION NO. 10:**

All documents reviewed, referred to or relied upon in answering Plaintiffs' Sixth Set of Interrogatories and Requests for Production.

**RESPONSE:**

Objections: Overly broad; not reasonably calculated to lead to the discovery of admissible evidence; unduly burdensome and harassing.

Laidlaw will not respond to this Request as it is currently worded.

**LAIDLAW TRANSIT INC'S OBJECTIONS TO PLAINTIFFS' SIXTH SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION**
MHDocs 3061729_5 10565.4

Page 8

191

DATED this 23rd day of February, 2011.

_____

Debra D. Parker

and

James D. Jordan
Devon D. Sharp

*Attorneys for Defendant Laidlaw Transit, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of February, 2011, I delivered a true and correct copy of the foregoing document to the following counsel of record via facsimile and electronic mail:

Ronald A. Bender
Matthew J. Cuffe
WORDEN THANE P.C.
111 North Higgins, Suite 600
P.O. Box 4747
Missoula, MT 59806-4747
Facsimile: 406.721.6985
rbender@wthlaw.net
mcuffe@wthlaw.net

Charles Nomellini
Samuel T. Bull
FOSTER PEPPER PLLC
1111 Third Avenue, Suite 3400
Seattle, WA 98101
Facsimile: 406.721.6985
nomec@foster.com
bulls@foster.com

_____

Devon D. Sharp

LAIDLAW TRANSIT INC'S OBJECTIONS TO PLAINTIFFS' SIXTH
SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION           Page 9
MHDocs 3061729_5 10565.4

192

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EDUCATION LOGISTICS, INC., a Montana corporation, and LOGISTICS MANAGEMENT, INC., a Washington corporation, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | MISC. ACTION NO. _____ (Civil Action No. 07-06-M-DWM Action pending in: District of Montana, Missoula Division) |
| LAIDLAW TRANSIT, INC., a Delaware corporation | § § § | |
| Defendant, | § § | |
| v. | § § | |
| TYLER TECHNOLOGIES, INC., | § § | |
| Respondent. | § § | |

Declaration Of Hien Nguyen In Support Of Plaintiffs' Emergency Motion To Compel

HIEN NGUYEN declares:

1.    I am over the age of 18 and make this declaration based on my own personal

knowledge.

2.    I am the CEO of both Education Logistics, Inc. and Logistics Management, Inc.

(collectively, "Edulog"), Plaintiffs in *Education Logistics, Inc. v. Laidlaw Transit, Inc.*, Civil

Action No. 07-06-M-DWM, District of Montana, Missoula Division.

3.    Prior to the advent of school bus routing software, school districts relied on school

bus routing managers to create school bus routes to transport students to school.  Typically, this

NGUYEN DECLARATION IN SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION TO COMPEL - 1

511.31307.1

193

EXHIBIT

B

was done by overlaying a school district map on a cork board and using push pins to identify student addresses. Routing managers would then manually create string routes, assigning students to specific buses.

4.      The task of creating bus routes can be quite complex, because in addition to a thorough knowledge of the map and travel patterns in the district, the router must satisfy various school district policy constraints affecting bus routes.   For example, most school districts require that the to- and from-school travel times for each pupil not exceed a certain amount of time. In this vein, a hypothetical Happy Valley School District might decide that the travel time for each of its pupils must be less than sixty minutes from the moment the pupil is picked up by a school bus to the moment that pupil arrives at school. The school bus routing manager must create routes to insure that each child in the school district arrives at school within the prescribed time.

5.      In the 1970s, working out of my basement, I developed a mathematical algorithm and accompanying software that optimized transportation routing efficiency. Over the ensuing decades, this algorithm has been used by school districts, and a slight variation of it by police departments and fire departments to optimize fleet sizes, travel routes, and response times. The public safety software that is used by police departments and fire departments is owned by a separate company that is not a party to this lawsuit.

6.      The Edulog Software is geared to school districts and is tailored to allow school districts to reduce the costs of bussing by reducing the number of buses required to transport students to school. Or put another way, the Edulog Software optimizes a school district's bus routes to enable school districts to use fewer buses to transport the students to school while satisfying all routing constraints that may be required by the district. In the case of hypothetical

NGUYEN DECLARATION IN SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION TO COMPEL - 2

Happy Valley School District, by using the Edulog Software to create more efficient school bus routes, the school district might reduce the number of buses needed to transport its students from 50 to 35 and still get the students to school in the same amount of time. This reduction generates tremendous cost savings to the school district (15 X $40,000 = $600,000), even when taking into account the cost of the software license. Although license fees vary, the cost of an Edulog Software license to a 50-school bus school district is approximately $25,000.

7.      Because it significantly reduced the bussing costs of school districts, Edulog was very successful at selling licenses directly to school districts from the time of its founding in the late 1970s through the early 1990s.

8.      Following Edulog's success through the 1980s and into the early 1990s, Laidlaw approached Edulog and inquired about the possibility of purchasing Edulog. While Edulog declined Laidlaw's overtures, the parties ultimately negotiated a license agreement that allowed Laidlaw to use the Edulog Software subject to certain conditions. One of these conditions, contained in Section 2.3.3 of the 1992 Agreement, was the agreement that Laidlaw would "use its best efforts to promote the use of the Software and related services" provided by Edulog to its school district customers and to prospective clients. A copy of the 1992 Agreement is attached to the Complaint (which is attached to the Bull Declaration filed in support of Edulog's motion to compel).

9.      I believed that the 1992 Agreement would enable Edulog and Laidlaw to leverage their strong market positions to expand their client bases. For Edulog, the 1992 Agreement promised to provide it with exposure to Laidlaw's existing and prospective customers with the anticipated promotion by Laidlaw of its software. Laidlaw, on the other hand, would receive the

NGUYEN DECLARATION IN SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION TO COMPEL - 3

benefit of having a license with the industry-best optimization software that it could use to attract new customers.

10.    From 1992 to 1997, Edulog and Laidlaw had an "exclusive" license agreement. During the period of the exclusive license, Laidlaw was barred from entering into licensing agreements with other bus routing software developers (§ 16.1) and Edulog was not allowed to license the Edulog Software to any other school bus contractors (§ 2.2).

11.    Shortly after the signing of the 1992 Agreement, it became clear that Laidlaw salespeople and junior management were not thrilled with the fees that the 1992 Agreement required Laidlaw to pay when a school district purchased the Edulog Software.  For example, pursuant to Sections 4.2 and 4.4 of the 1992 Agreement, Laidlaw has to pay a per-bus royalty to Edulog under certain circumstances.

12.    In 1997, Laidlaw declined to renew the exclusive license and the license converted to a non-exclusive license, paving the way for Laidlaw to enter into licensing agreements with other software providers.

13.    I believe that the communications and contracts exchanged between Laidlaw and Versatrans will be directly relevant to whether Laidlaw has been promoting Versatrans at the expense of Edulog.  I expect these documents to show that Laidlaw was working hand-in-hand with Versatrans to pitch Versatrans at the expense of Edulog, that Laidlaw was otherwise actively promoting Versatrans software, and that Laidlaw was denigrating the Edulog Software.

/

/

/

NGUYEN DECLARATION IN SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION TO COMPEL - 4

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 8th day of March, 2011, in Missoula, Montana.

Hien Nguyen

NGUYEN DECLARATION IN SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION TO COMPEL - 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| EDUCATION LOGISTICS. INC.. a Montana corporation. and LOGISTICS MANAGEMENT. INC.. a Washington corporation, | § § § § § | |
| Plaintiffs. | § § | |
| v. | § § | MISC. ACTION NO. (Civil Action No. 07-06-M-DWM Action pending in: District of Montana. Missoula Division) |
| LAIDLAW TRANSIT. INC.. a Delaware Corporation | § § § | |
| Defendant. | § § | |
| v. | § § | |
| TYLER TECHNOLOGIES. INC.. | § § | |
| Respondent. | § | |

---

**Declaration Of Bill Swendsen In Support Of Plaintiffs' Emergency Motion To Compel**

---

BILL SWENDSEN declares:

1.    I am over the age of 18 and make this declaration based on my own personal knowledge.

2.    I am currently employed by Plaintiff Education Logistics, Inc. ("Edulog") as Senior Account Manager.

3.    Prior to working at Edulog, I was employed by Laidlaw for approximately 15 years in various positions.

4.    I was hired by Laidlaw in August of 1991 to be the Branch Manager at the Hudson, Wisconsin Laidlaw operation.  I was responsible for everything at that Branch.  These duties included but were not limited to: routing of the buses, developing and maintaining the

SWENDSEN DECLARATION IN SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION TO COMPEL - 1

EXHIBIT
C

198

budget for Hudson, employee relations, hiring bus drivers, working with the district in managing the contract, and other related duties.

5.     I was promoted to a new position as Branch Manager in Bartonville, Illinois in February 1992. This was a two terminal operation serving approximately 15 school districts just outside of Peoria, Illinois.  While at this location, I was the manager of one of the first locations at which Laidlaw took advantage of the 1992 Edulog/Laidlaw Agreement by installing Edulog's routing software at both of the Laidlaw terminals. I was responsible for all activities in Bartonville, the same as Hudson, but with over 90 buses.  In approximately November of 1993, I was promoted to Area Manager for Central Illinois.  In that position I was responsible for about 12 Laidlaw branches in that area.  I was responsible for all aspects of the 12 branches.

6.     In December of 1994 I was promoted to General Manager of the Laidlaw Computerized Routing Division ("LCRD"), located in Missoula, Montana.  At the time LCRD rented space in the current Edulog building.  As General Manager I was responsible for managing the group of about 15 employees in this division.  I was also responsible for managing the 1992 Laidlaw/Edulog Agreement, working closely with the then President of Edulog, Clint Rooley and CEO, Dr. Nguyen.  I reported to the Laidlaw's Director of Strategic Planning, Diane Dennis-Finley, who was located in the corporate offices in Burlington, ON, Canada. Diane reported directly to the President of Laidlaw, John Grainger.

7.     The LCRD group was responsible for all computer routing for Laidlaw, both at current sites and for new school districts.  As part of my duties in managing the 1992 Laidlaw/Edulog Agreement, I was responsible for implementing the agreement and for the payment of fees and royalties that were due to Edulog.

SWENDSEN DECLARATION IN SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION TO COMPEL - 2

511131309.1

**199**

8.    Private bus contractors like Laidlaw contract with school districts to provide various bussing services.  In many cases, Laidlaw will contract with a school district to provide the full scope of the school district's bussing needs, providing school buses, bus drivers, and coordinating the transportation of all of a school district's students to and from school.  In other cases, Laidlaw will sign a more limited management contract in which it helps manage a school district's fleet.

9.    Generally, the cost of bussing students to school is directly related to the number of school buses that a school district uses to transport its students.  The more buses a school district uses to transport its students, the more the school district will pay in transportation costs.  For example, a private bus contractor often bases its contracts with school districts on a per-bus fee.  The fee is typically around $40,000 per bus, though it varies according to the unique attributes and needs of each school district.  Because of this, school districts have an incentive to create efficient routes to minimize the number of school buses they rely upon to transport their students to school.

10.    While Laidlaw's contracts with school districts vary, in many instances, the amount that Laidlaw receives under a contract is directly related to the number of school buses that a school district operates.   In these circumstances, the more school buses that a school district uses, the more money Laidlaw is paid.

11.    While I was at Laidlaw, Laidlaw sales personnel frequently had a counter-incentive to avoid use of the Edulog Software, lest the royalty fees and other fees that might be due under the 1992 Laidlaw/Edulog Agreement cut into their own bottom lines.

SWENDSEN DECLARATION IN SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION TO COMPEL - 3

51131309.1

12.     In 1997, Laidlaw declined to renew the exclusive license and the license converted to a non-exclusive license, paving the way for Laidlaw to enter into licensing agreements with other software providers.  Since 1997, Laidlaw has entered into licensing agreements with several other school bus routing software developers, including Versatrans, GeoSpatial Technologies, and others.

13.     Edulog expects that the communications and contracts exchanged between Laidlaw and Versatrans are directly relevant to whether Laidlaw has been promoting Versatrans at the expense of Edulog.  Edulog expects these documents to show that Laidlaw was working hand-in-hand with Versatrans to pitch Versatrans at the expense of Edulog, that Laidlaw was otherwise actively promoting Versatrans software, and that Laidlaw was denigrating the Edulog Software.  I am personally aware that after the end of the exclusive period of the 1992 Laidlaw/Edulog Agreement, Laidlaw purchased a substantial number of Versatrans licenses and encouraged several school districts to use Versatrans instead of the Edulog Software.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 8th day of March, 2011, in Missoula, Montana.

_____
Bill Swendsen

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

EDUCATION LOGISTICS, INC., a          §
Montana corporation, and LOGISTICS    §
MANAGEMENT, INC., a Washington        §
corporation,                          §
                                      §
        Plaintiffs,                   §
                                      §
v.                                    §          MISC. ACTION NO. _____ _
                                      §          (Civil Action No. 07-06-M-DWM
LAIDLAW TRANSIT, INC., a Delaware     §          Action pending in: District of Montana,
corporation                           §          Missoula Division)
                                      §
        Defendant,                    §
                                      §
v.                                    §
                                      §
TYLER TECHNOLOGIES, INC.,             §
                                      §
        Respondent.                   §

---

### Declaration Of Alan C. Hess In Support Of Plaintiffs' Emergency Motion To Compel

---

ALAN C. HESS, Ph. D. declares:

1.      I am over the age of 18 and make this declaration based on my own personal

knowledge.

2.      I am a Professor of Finance and Business Economics in the Michael G. Foster

School of Business at the University of Washington, and an Academic Affiliate of Finance

Scholars Group. I hold M.S. and Ph.D. degrees in economics from Carnegie Mellon University

and a B.S. in industrial management from Purdue University.  I have served in the Federal

Reserve System and the Securities and Exchange Commission. My academic and consulting

interests encompass both economics and finance.



HESS DECLARATION IN SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION TO COMPEL - 1

511313111

3.      I have been engaged by Plaintiffs Education Logistics, Inc. and Logistics Management, Inc. (collectively, "Edulog") in the a lawsuit pending in the U.S. District Court for the District of Montana captioned *Education Logistics, Inc. v. Laidlaw Transit, Inc.*, Cause No. CV02-183 (the "Montana Action"). In the Montana Action, Edulog has engaged me to estimate the damages it has suffered from Laidlaw's alleged failure to promote Edulog's school bus routing software ("Edulog Software").

4.      Based on the expectations theory of damages,[1] Edulog's damages from Laidlaw's breach of contract is the difference between what Edulog's profits would have been absent the breach less what they actually were with the breach. In order to calculate these damages, I intend to create a model that analyzes the school bus routing software market over time, and that looks at the effect that Laidlaw's promotion or lack thereof has had on the sales of the Edulog Software and competing software. In creating this model, I intend to review three distinct time periods for the school bus routing software market: (1) pre-1992 Edulog/Laidlaw Agreement; (2) the period in which the Edulog/Laidlaw license was "exclusive" (1992-1997); and (3) post-exclusivity (1997 to present).

5.      In order to assist in the construction of this market analysis, I asked Edulog to compile the specific data requested in Edulog's subpoena to Tyler and other bus routing software developers. I tried to gather this information independently, but could not identify any source for school bus routing software data generally, or for company-specific data. If I do not receive the

---

[1] John H. Barton, 1972, "The Economic Basis of Damages for Breach of Contract," *J. of Legal Studies* V. 1, No. 1, pp. 277-304. Victoria A. Lazear, 2001, "Estimating Lost Profits and Economic Losses," in Roman L. Weil, Michael J. Wagner, and Peter B. Frank, *Litigation Services Handbook: The Role of the Financial Expert*, (3rd ed.) New York, John Wiley & Sons.

HESS DECLARATION IN SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION TO COMPEL - 2

**203**

data requested, it will be extremely difficult for me to perform a market analysis to determine the effects that Laidlaw's promotion or non-promotion has had on Edulog's marketshare and profits.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 8th day of March, 2011, in Seattle, Washington.

_Alan C. Hess_

Alan C. Hess, Ph. D.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EDUCATION LOGISTICS, INC., a Montana corporation, and LOGISTICS MANAGEMENT, INC., a Washington corporation,<br><br>     Plaintiffs,<br><br>v.<br><br>LAIDLAW TRANSIT, INC., a Delaware corporation<br><br>     Defendant,<br><br>v.<br><br>TYLER TECHNOLOGIES, INC.,<br><br>     Respondent. | § § § § § § § § § § § § § § § § § § | MISC. ACTION NO. _____<br>(Civil Action No. 07-06-M-DWM<br>Action pending in: District of Montana,<br>Missoula Division) |

---

**Supplemental Declaration Of Hien Nguyen In Support Of Plaintiffs' Emergency Motion To Compel**

---

HIEN NGUYEN declares:

1.     I am over the age of 18 and make this declaration based on my own personal knowledge.

2.     I am the CEO of both Education Logistics, Inc. and Logistics Management, Inc. (collectively, "Edulog"), Plaintiffs in *Education Logistics, Inc. v. Laidlaw Transit, Inc.*, Civil Action No. 07-06-M-DWM, District of Montana, Missoula Division. I am submitting this declaration to supplement my previously submitted testimony.

**EXHIBIT**

*tabbies*

*E*

SUPPLEMENTAL NGUYEN DECLARATION IN SUPPORT OF
PLAINTIFFS' EMERGENCY MOTION TO COMPEL - 1

S11313307.1

3.      It is my understanding that Tyler Technologies, Inc. ("Tyler") has agreed to produce responses to Requests for Proposals for routing software from Laidlaw/First Student, but has stated that it will not produce responses to Requests for Proposals for routing software from school districts themselves.

4.      Practically speaking, Requests for Proposal almost always are issued by the school districts and not the private bus contractors who provide bussing for the school districts. Because of this, Tyler's proposed compromise would not be effective for the purpose of providing our expert witness with any significant number of Requests for Proposal responses from Tyler to school districts.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 15th day of March, 2011, in Missoula, Montana.

_____
Hien Nguyen

SUPPLEMENTAL NGUYEN DECLARATION IN SUPPORT OF
PLAINTIFFS' EMERGENCY MOTION TO COMPEL - 2

**206**

S11131307.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

EDUCATION LOGISTICS, INC., a
Montana corporation, and LOGISTICS
MANAGEMENT, INC., a Washington
corporation,

      Plaintiffs,

v.

LAIDLAW TRANSIT, INC., a Delaware
corporation

      Defendant,

v.

TYLER TECHNOLOGIES, INC.,

      Respondent.

MISC. ACTION NO. _____
(Civil Action No. 07-06-M-DWM
Action pending in: District of Montana,
Missoula Division)

---

**Supplemental Declaration Of Alan C. Hess In Support Of Plaintiffs' Emergency Motion To
Compel**

---

ALAN C. HESS, Ph. D. declares:

1.    I am over the age of 18 and make this declaration based on my own personal

knowledge.

2.    I am a Professor of Finance and Business Economics in the Michael G. Foster

School of Business at the University of Washington, and an Academic Affiliate of Finance

Scholars Group. I hold M.S. and Ph.D. degrees in economics from Carnegie Mellon University

and a B.S. in industrial management from Purdue University. I have served in the Federal

Reserve System and the Securities and Exchange Commission. My academic and consulting

interests encompass both econonmics and finance.

SUPPLEMENTAL HESS DECLARATION IN SUPPORT OF
PLAINTIFFS' EMERGENCY MOTION TO COMPEL - 1



51133123R.1

207

3.      I have been engaged by Plaintiffs Education Logistics, Inc. and Logistics
Management, Inc. (collectively, "Edulog") in the a lawsuit pending in the U.S. District Court for
the District of Montana captioned *Education Logistics, Inc. v. Laidlaw Transit, Inc.*, Cause No.
CV02-183 (the "Montana Action"). In the Montana Action, Edulog has engaged me to estimate
the damages it has suffered from Laidlaw's alleged failure to promote Edulog's school bus
routing software ("Edulog Software").

4.      The procedures I intend to use in this matter are widely used and accepted. I base
my analysis on the expectations theory of damages,[1] which to an economist means that Edulog's
damages from Laidlaw's alleged breach of contract is the difference between what Edulog's
profits would have been absent the breach less what they actually were with the breach. The area
of economics and statistics that is called econometrics presents procedures to test whether an
established historical relationship has been changed by an intervening effect.[2] I have used these
procedures in prior engagements including inter alia: the Reinell matter in which I presented a
lost profits analysis in federal court; the effect of the Nisqually earthquake on Masin's sales and
profits; the Strobe Data v. Digital equipment matter in which I presented a lost profits analysis in
federal court; in the Oral Logic matter in which I testified in superior court; and in the
CipherTrust v. IronPort matter.

5.      The empirical procedures that I will use in this matter involve estimating the
relationships among Edulog's sales versus sales of Edulog's competitors, Edulog's sales efforts

---

[1] John H. Barton, 1972, "The Economic Basis of Damages for Breach of Contract," *J. of Legal Studies* V. 1, No. 1, pp. 277-304. Victoria A. Lazear, 2001, "Estimating Lost Profits and Economic Losses," in Roman L. Weil, Michael J. Wagner, and Peter B. Frank, *Litigation Services Handbook: The Role of the Financial Expert*, (3rd ed.) New York, John Wiley & Sons.
[2] William H. Greene, Econometric Analysis, (5th ed.) Upper Saddle River, NJ, Prentice-Hall, chapter 7.

SUPPLEMENTAL HESS DECLARATION IN SUPPORT OF
PLAINTIFFS' EMERGENCY MOTION TO COMPEL - 2

and the sales efforts of its competitors, and Edulog's prices relative to the prices of its competitors. I do this for three sequential periods of time: (1) pre-1992 Edulog/Laidlaw Agreement; (2) the period in which the Edulog/Laidlaw license was "exclusive" (1992-1997); and (3) post-exclusivity (1997 to present)

      6.      First, my analysis of the data for the years 1987 to 1992 will create a base period for Edulog's sales that can be used as a benchmark to project what Edulog's sales would have been absent its contract with Laidlaw. Second, I add data for the years from 1992 to 1997 and test whether the relationships between Edulog's sales and those of its competitors changed from the base period. If Laidlaw actively promoted Edulog's software, Edulog's sales should be higher than they would have been absent the promotion. If Edulog's sales in the promotion period were not higher, this can be interpreted as evidence that Laidlaw did not actively promote Edulog's products. The difference between Edulog's actual sales in the second period less what they would have been based on the relationships that prevailed in the base period is a direct input into my estmate of Edulog's damages. Third, I add data from 1998 to the present to see if the relationships between Edulog's sales and those of its competitors changed after Edulog's joint exclusivity contract with Laidlaw as terminated. If Laidlaw had been promoting Edulog's sales, after the promotion stopped Eduulog's sales should have decreased. If they did not, this is consistent with the view that Laidlaw did not promote Edulog's products.

      7.      As a check on my analysis, I will repeat it for each of Edulog's competitors. Doing so indicates which competitors gained market share and whether their market share gains were at the expense of Edulog.

8.      In order to assist in the construction of this market analysis, I asked Edulog to compile the specific data requested in Edulog's subpoena to Tyler and other bus routing software developers. I tried to gather this information independently, but could not identify any source for school bus routing software data generally, or for company-specific data. If I do not receive the data requested, it will be difficult for me to perform a market analysis to determine the effects that Laidlaw's promotion or non-promotion has had on Edulog's marketshare and profits.

9.      In particular, I request data on Edulog's competitors' quantities of sales each year, on the prices each of them charged for their products that competed with Edulog, and on the amounts of money they spent on promoting their products. Based on my past experiences in using these types of data, the sales and promotion data can be found from the companies' monthly and annual financial reports and the price data can be found from the companies' responses to school districts' RFPs.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 16th day of March, 2011, in Seattle, Washington.

_____
Alan C. Hess, Ph. D.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EDUCATION LOGISTICS, INC., ET AL., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | NO. 3-11-MC-036-L-BD |
| LAIDLAW TRANSIT, INC., | § § | |
| Defendant. | § § | |
| v. | § § | |
| TYLER TECHNOLOGIES, INC. | § § | |
| Respondent. | § § § | |

## DECLARATION OF JAMES GUZEWICH

1.      My name is James E Guzewich.  I am the President of Tyler Technologies, Inc ("Tyler") VersaTrans Division.  I am over the age of twenty-one, and I am competent and authorized to make this Declaration.  Except as otherwise indicated in this Declaration, I have personal knowledge of the facts set forth in this Declaration, and they are true and correct.

2.      Tyler acquired VersaTrans Solutions, Inc. ("VersaTrans") in 2008.  VersaTrans competes directly with Education Logistics, Inc. ("Edulog") in the bus routing software market.

3.      I am familiar with the manner in which Tyler and VersaTrans maintain their business, commercial and/or financial documents and information.  It is the policy and practice of Tyler and VersaTrans to maintain certain business, commercial and/or financial documents and information as confidential.



EXHIBIT
G

DECLARATION OF JAMES GUZEWICH - Page 1

4.     On our around February 18, 2011, Edulog served a Subpoena on Tyler (the "Subpoena"). I have read the Subpoena and the document requests that are contained therein. A copy of the Subpoena is attached as Exhibit A-8 to Plaintiff's Emergency Motion to Compel Document Production in the captioned matter.

5.     In the Subpoena, Edulog seeks, among others, the following documents:

a.     All documents reflecting the number of requests for proposals that VersaTrans received from school districts or school bus contractors (such as Laidlaw) in each year from 2003 to present.

b.     All documents reflecting the number of requests for proposals received from school districts or school bus contractors (such as Laidlaw) to which VersaTrans responded in each year from 2003 to present.

c.     All VersaTrans responses to requests for proposals received from school districts or school bus contractors (such as Laidlaw) from 2003 to present.

d.     All documents reflecting revenue received by VersaTrans relating to the sale of routing software from initial sales to school districts in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.

e.     All documents reflecting revenue received by VersaTrans from annual licensing and/or maintenance fees relating to routing software from each school district in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.

f.      All documents reflecting VersaTrans's **aggregate sales of routing software** in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.

g.      All documents reflecting the number of salespeople in VersaTrans's **sales force** in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.

h.      All documents reflecting VersaTrans's **market and sales promotion budget** in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.

i.      All documents reflecting the number of **sales calls** made by VersaTrans on school districts in each year since 1987, or since VersaTrans's inception, if VersaTrans was not then in business.

6.      Based on my knowledge and experience, Tyler and VersaTrans do not voluntarily disclose, in the business context or otherwise, any of the foregoing documents and information. Prior to and since VersaTrans' merger with Tyler, the Albany Business Journal published a survey of annual revenues that included general revenue numbers of VersaTrans.  Indeed, other than the aforementioned disclosure, Tyler and VersaTrans have maintained and continue to maintain all of the foregoing business, commercial and/or financial documents and information as confidential, and the above documents and information are not generally known outside of Tyler's and VersaTrans' businesses.  Tyler and VersaTrans have policies in place to prevent the dissemination of such documents and/or information, and to otherwise protect the confidentiality of these documents and information.

**DECLARATION OF JAMES GUZEWICH - Page 3**

7.      If Tyler and/or VersaTrans disclosed the foregoing documents and information to competitors of Tyler and/or VersaTrans, such competitors would have a business advantage over Tyler and VersaTrans.  Additionally, Tyler and VersaTrans would suffer severe harm if any of the foregoing documents or information were disclosed to a competitor of Tyler and/or VersaTrans, and any such disclosure to a competitor would damage Tyler's and VersaTrans' ability to compete.

8.      Disclosure of documents and information reflecting the number of requests for proposals received from school districts or school bus contractors to which VersaTrans responded, and documents reflecting VersaTrans' responses to requests for proposals that were received from school districts or school bus contractors, would provide competitors with a business advantage over Tyler and VersaTrans because such documents contain information about the manner in which Tyler and VersaTrans price their software and services, the manner in which services are performed and the competitive advantages Tyler and VersaTrans enumerate to prospective clients.  Disclosure of these documents and information would not only reveal Tyler's and VersaTrans' clients and client targets—which Tyler and VersaTrans maintain as confidential—but would also reveal Tyler's and VersaTrans' strategies in obtaining new clients. The information that Tyler and VersaTrans include in requests for proposal responses have been developed through extensive time, labor and money, and this information could be misappropriated in competition with Tyler and VersaTrans.  Thus, disclosure of this information would damage Tyler's and VersaTrans' ability to compete.

9.      Disclosure of documents and information reflecting VersaTrans' sales of routing software and reflecting revenues, other than the aforementioned disclosure, received by VersaTrans—whether from the sale of routing software or from annual license fees and/or

**DECLARATION OF JAMES GUZEWICH - Page 4**

maintenance fees relating to routing software—would provide competitors with a business advantage over Tyler and VersaTrans because such documents would provide confidential information regarding current, former and prospective customers and the financial strengths and weaknesses of Tyler and VersaTrans' business. The information contained in these documents have been developed through extensive time, labor and money, and this information could be misappropriated in competition with Tyler and VersaTrans. Thus, disclosure of this information would damage Tyler's ability to compete.

10.     Disclosure of documents and information reflecting the number of salespeople in VersaTrans' sales force, reflecting VersaTrans' market and sales promotion budget, and reflecting the number of sales calls made by VersaTrans would provide competitors with a business advantage over Tyler and VersaTrans because such documents would detail marketing and sales strategies, methodologies and the strengths, weaknesses and challenges not currently known to Tyler and VersaTrans competitors. The information contained in these documents have been developed through extensive time, labor and money, and this information could be misappropriated in competition with Tyler and VersaTrans. Thus, disclosure of this information would damage Tyler's ability to compete.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day March 2011.

_____
JAMES GUZEWICH

**DECLARATION OF JAMES GUZEWICH - Page 5**